CHARLES ROPER  8/25/2020

```
1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MISSOURI

3                  SOUTHEASTERN DIVISION

4

5

6    ROBIN MESEY and JENNIFER MESEY,  )

7            Plaintiffs,              )

8    vs.                             )

9    CITY OF VAN BUREN, MISSOURI, et  )Case No. 1:19-CV-71 SNLJ

10   al.,                            )

11           Defendants.             )

12

13

14

15            DEPOSITION OF CHARLES ROPER

16         TAKEN ON BEHALF OF THE PLAINTIFF

17                 AUGUST 25, 2020

18

19

20

21

22

23

24

25
```

EXHIBIT 1

CHARLES ROPER  8/25/2020

```
 1      A.   It was before then.
 2      Q.   Maybe -- that was maybe a date this report
 3  was prepared.
 4           MR. PHILLIPS:  Jim, if it helps --
 5           MR. SCHOTTEL:  Yeah.  I just don't have it
 6  off the top of my head.
 7           MR. PHILLIPS:  My understanding is that
 8  your complaint of incident was February 22nd, 2019.
 9  Does that sound right?
10      Q.   (BY MR. SCHOTTEL.)  Does that sound right to
11  you to the date of the incident, according to your --
12           MR. PHILLIPS:  Hold on.  Let's --
13           MR. SCHOTTEL:  I just want to make sure
14  we're all --
15           MR. PHILLIPS:  Why don't we go off the
16  record.
17           MR. SCHOTTEL:  Sure.
18                (OFF THE RECORD.)
19           MR. SCHOTTEL:  Back on the record.
20      Q.   (BY MR. SCHOTTEL.)  After reviewing the
21  records, does February 22nd, 2019 -- does that sound
22  about right for the date of the incident that's the
23  subject of this case?
24      A.   Yes, sir.
25      Q.   Okay.  Were you carrying a firearm that day?
```

CHARLES ROPER  8/25/2020

```
 1        A.    The date of the incident?  Yes, sir.
 2        Q.    Okay.  And where were you -- where on your
 3   person were you carrying it?
 4        A.    On my right hip.
 5        Q.    Okay.  And I'm assuming you wear a holster on
 6   your right hip.
 7        A.    Yes, sir.
 8        Q.    All right.  And is it -- can -- was it
 9   concealed on that day?
10        A.    No, sir.
11        Q.    Okay.  On that day, did you -- do you have to
12   have a permit to carry a concealed weapon?
13        A.    No.  State of Missouri doesn't require that.
14        Q.    And on February 22nd, 2019, what kind of
15   weapon were you carrying?
16        A.    It was a Springfield XD-S.
17        Q.    Okay.  And what is the capacity of that gun?
18        A.    Seven plus one.
19        Q.    And I know what that means, but could you
20   just give an explanation what that means, seven plus
21   one.
22        A.    Yes, sir.  It means it can hold seven in the
23   magazine and one in the chamber.
24        Q.    Okay.  And is -- is the chamber in that gun
25   in the handle?  In the grip.  I'm sorry.
```

CHARLES ROPER  8/25/2020

```
 1        A.   My father-in-law's.  Sorry.
 2        Q.   Okay.  And when did you first see your
 3   father-in-law's dog?
 4        A.   As I approached the intersection.
 5        Q.   And what is your father-in-law's dog's name?
 6        A.   Draco.
 7        Q.   Can you spell that for me.
 8        A.   I think he spells it D-R-A-C-O.
 9        Q.   Okay.  And how old is Draco now?
10        A.   Well, he's deceased now.
11        Q.   When did he pass away?
12        A.   Would have been May or June of this year.
13        Q.   Well, at the time he passed away, how old was
14   he?
15        A.   Don't quote me on it, but I believe my
16   father-in-law said he was like 16 years old.  He was
17   an old dog.  That's the best to my ability I know.
18        Q.   And what kind of breed was Draco, if you
19   know?
20        A.   He was a mixed breed, as best I know.
21        Q.   All right.  So on the date of the incident,
22   do you remember was it the -- when you first saw
23   Draco, was it in the morning time?  Afternoon?
24   Evening?
25        A.   I think this would have been around noon,
```

CHARLES ROPER  8/25/2020

 1   because we were getting hungry for lunch.  So it would
 2   have been somewhere around that time.
 3       **Q.   And you said -- were you driving at the time**
 4   **you saw Draco?**
 5       A.   Yes, sir.
 6       **Q.   What were you driving?**
 7       A.   My son's Ford Escape.
 8       **Q.   And why were you driving your son's car at**
 9   **the time?**
10       A.   Because mine was broke.
11       **Q.   And how old is your son?**
12       A.   He's 20.
13       **Q.   And was there anyone else in the vehicle with**
14   **you when you were driving and saw Draco that day?**
15       A.   My wife.
16       **Q.   Was she in the passenger's seat?**
17       A.   Yes, sir.
18       **Q.   And I'm sorry.  Could you describe again**
19   **where Draco was on -- he was on the ground?  Is that**
20   **what you said?**
21       A.   Yes, sir.  It was on Independence Street,
22   where Independence and Dale meet.
23       **Q.   So was he in the middle of the street, or off**
24   **to the side, or by the curb, or --**
25       A.   Well, there's no curb.  I mean --

CHARLES ROPER  8/25/2020

```
 1      Q.   Oh.
 2      A.   It would have -- yeah.  It would have been
 3   middle.  Yeah.  It had to have been middle-ish area.
 4      Q.   Okay.
 5      A.   The road's not very wide.
 6      Q.   And what did you do when you saw him on the
 7   ground?
 8      A.   I stopped the vehicle, and stepped out and
 9   yelled at the dogs to get off of him.
10      Q.   What were the dogs -- you said dogs as
11   plural.  Was there more than one?
12      A.   Yes, sir.
13      Q.   How many dogs were there near Draco when you
14   first saw them?
15      A.   Two.
16      Q.   And what were those dogs doing at the time
17   you saw Draco?
18      A.   The smaller dog was biting at like I do
19   believe his paws -- his front paws.  And then the
20   bigger one was behind him, and had him by the throat,
21   neck, whichever way.
22      Q.   Did -- did you know either of these two dogs
23   by name on that day?
24      A.   No, sir.
25      Q.   Can you describe what those two dogs looked
```

CHARLES ROPER  8/25/2020

1   like.

2       A.   White and brown.

3       Q.   Were both of them the same color, or --

4       A.   Honestly, I don't know.

5       Q.   Prior to the -- this day when you saw those

6   two dogs near Draco, had you seen those two dogs

7   before?

8       A.   Yes, sir.

9       Q.   And where had you seen those two dogs before?

10      A.   In my father-in-law's yard, attacking Draco.

11      Q.   And that's before this day?

12      A.   Yes, sir.

13      Q.   How many times would you say you saw that

14  happen before that day?

15      A.   That I personally witnessed was one.

16      Q.   Do you know of any other person that

17  witnessed that?

18      A.   My father-in-law.

19      Q.   And what is your father-in-law's name?

20      A.   Jeffrey Walberg.

21      Q.   At the time of this occurrence when you saw

22  Draco, was Draco on a leash?

23      A.   No.

24      Q.   With respect to your father -- or I'm

25  sorry -- what kind of residence did your father-in-law

CHARLES ROPER  8/25/2020

```
 1        Q.   When you -- did you park your vehicle at some
 2   point?  When you -- when you arrived and saw Draco,
 3   did you park your vehicle at some point?
 4        A.   I stopped in the middle of the road.
 5        Q.   Okay.  Did you put your vehicle in park so it
 6   wouldn't roll?
 7        A.   Yes, sir.
 8        Q.   All right.  What road was that when you
 9   parked your vehicle?
10        A.   Be Dale Street.
11        Q.   Okay.  What street did your father-in-law
12   live on?
13        A.   Dale Street.
14        Q.   Prior to the day of this incident, did you
15   know the owner of the two dogs that were near Draco
16   when you saw them?
17        A.   Yes.
18        Q.   And who were the owners?
19        A.   Jennifer and Robin Mesey.
20        Q.   And how did you know them?
21        A.   They were good friends with my wife.
22        Q.   Okay.  What did you do after you parked your
23   vehicle in the middle of Dale Street?
24        A.   I got out and yelled at the dogs to get away
25   from him.
```

CHARLES ROPER  8/25/2020

```
 1        Q.    So how did she exit your vehicle?
 2        A.    Through the door.
 3        Q.    Through the same door that you got out of?
 4        A.    I don't know.  I very seriously doubt it, but
 5   I don't know.
 6        Q.    Okay.  Well, I'm just -- I'm just trying to
 7   figure out how she was in the passenger's seat and
 8   then wound up behind you.  If you know.
 9        A.    Because I was standing in front of the
10   vehicle.
11        Q.    Oh, okay.  Were you standing directly in
12   front of the middle of the vehicle, or were you to
13   either side of the vehicle?
14        A.    I would have been on the driver's side of the
15   vehicle.
16        Q.    What happened after you yelled at the dogs?
17        A.    Neither dog let go of him.  I fired one
18   warning shot into the ground.
19        Q.    And are you referring to the gun that you had
20   on your hip?
21        A.    Yes, sir.
22        Q.    What type of surface was the ground that you
23   fired the shot into?
24        A.    Grass and dirt.
25        Q.    So the vehicle that you were driving was
```

CHARLES ROPER  8/25/2020

Page 27

1    parked, and you went -- did you go closer to the side

2    of the street, or did the street have grassy areas in

3    it?

4        A.    The -- the road they were on runs east and

5    west.  Back behind them was a grassy yard.  Or

6    correction.  The road -- Independence runs north and

7    south.  Dale runs east and west.

8        Q.    When you fired the shot into the ground,

9    where was your wife, Donna?

10       A.    Still would have been behind me.  Because I

11   didn't see her.

12       Q.    How close to the dogs were you when you fired

13   the warning shot?

14       A.    I would say three to five feet, give or take.

15       Q.    Were they directly in front of you?

16       A.    They might have been off to the left a little

17   bit.

18       Q.    Were the two dogs and your father-in-law's

19   dog -- were they on a grassy area, or in the street?

20       A.    They were on the blacktop.

21       Q.    And what happened after you fired the warning

22   shot?

23       A.    My gun jammed and I had to clear it.

24       Q.    Can you describe what you mean by your gun

25   jammed.

CHARLES ROPER  8/25/2020

```
 1        Q.    On which side of you did she walk around you?
 2        A.    On my right side.
 3        Q.    And where were you standing at this point
 4   with respect to your truck?
 5        A.    I would have been in front of it still,
 6   towards the driver's side.
 7        Q.    Okay.  After you firing a warning shot and
 8   yelling at the dogs, were the dogs -- the two dogs
 9   that were near your father-in-law's dog, were they
10   ignoring you?
11        A.    The smaller one ran off, went on up
12   Independence Street up the hill.
13        Q.    Do you know if you struck that dog with a
14   bullet or not?
15        A.    I honestly don't believe so, because I seen
16   the grass fly.
17        Q.    What happened after that other dog ran off?
18        A.    My wife walked around me, said that she was
19   going to break it up.  And that's when the bigger dog
20   let go of Draco, and was coming after her.  And then
21   that's when I fired the shot and stopped him from
22   attacking my wife.
23        Q.    Can you describe how the other dog was
24   attacking your wife.
25        A.    It didn't attack her.  It was coming after
```

CHARLES ROPER  8/25/2020

1    her to try and attack her, teeth showing, barking,

2    acting aggressive.  I mean, I don't know how to

3    explain it.

4        Q.   So you mentioned its teeth were showing.

5        A.   Yes, sir.

6        Q.   How close were you to the dog when you saw

7    the teeth showing?

8        A.   We were still within that three to five-feet

9    range.

10       Q.   And what else did you observe about that dog?

11       A.   What -- I don't know.  My family's always

12   called it hackles.  The hair on the back of their neck

13   and on their tail was raised.  His tail was stiff.  He

14   was in attack mode.

15       Q.   How do you know that the dog was in attack

16   mode?

17            MS. KAYSER:  Asked and answered.  He's

18   already described it.

19       Q.   (BY MR. SCHOTTEL.)  Subject to that, you can

20   answer the question.

21       A.   Okay.  Because his teeth were showing, and

22   his hackles were raised, and he was coming after my

23   wife.

24       Q.   And can you describe what you mean coming

25   after your wife.

CHARLES ROPER  8/25/2020

```
 1      A.    He was --
 2              MS. KAYSER:  Objection.
 3              MR. PHILLIPS:  He was -- oh, sorry.
 4              MS. KAYSER:  Asked and answered.  You can
 5      answer it one more time.
 6              THE WITNESS:  It was physically coming
 7      toward her.
 8      Q.    (BY MR. SCHOTTEL.)  Walking towards her?
 9      A.    I -- it didn't take but two steps.
10      Q.    Can you describe what that means, it didn't
11      take but two steps.
12      A.    I don't know if you can classify it as a
13      walk, a jog, a run.  It didn't -- we were -- we were
14      within three feet.  Reactionary gap is 21 feet.  We
15      were way inside that.  So it didn't take a bunch of
16      steps before I protected my wife.
17      Q.    And I think you testified you thought the dog
18      was going to attack your wife.
19      A.    I knew the dog was coming after my wife.
20      Q.    How did you know that?
21      A.    Because it was looking straight at her.
22      Q.    Okay.  Have you ever seen -- prior to this
23      date, have you ever seen a dog attack a human before?
24      A.    Yes.
25      Q.    Where?
```

EXHIBIT 1

CHARLES ROPER  8/25/2020

```
 1    knew to be the Meseys'.  Correct?
 2        A.   Yes.
 3        Q.   And your wife was friends with the Meseys.
 4    Is that correct?
 5        A.   Yes.
 6        Q.   And on that day, is it fair to say that she
 7    knew where they were living?
 8        A.   Yes.  We were standing in front of their
 9    house.
10        Q.   Did you go to their house and ask them for
11    help to get their dogs away from Draco?
12        A.   No.
13        Q.   Why not?
14        A.   We yelled at them.  Nobody answered.  There
15    was no vehicles there.  I wasn't even sure if they
16    were there.
17        Q.   Were they there?
18        A.   Yes.
19        Q.   Did you knock on the door or bang on the
20    door?
21        A.   No.  When I walked up there, they came
22    outside.
23        Q.   Well, prior to you confronting the dogs, did
24    you walk up to their door and bang on their door?
25        A.   No.
```

CHARLES ROPER  8/25/2020

1    procedures.  Could you just read your answer to that

2    question.

3        A.   There were no formal policy or procedures in

4    place at the time of the incident.

5        Q.   And I noticed you said there were no formal

6    policy or procedures.  Were there informal policy and

7    procedures?

8        A.   I'd only been there for three days.  I don't

9    know.

10       Q.   I was just curious why you stated there were

11   no formal, instead of -- why you clarified formal.

12   That's all I was asking.

13       A.   Oh, I have --

14       Q.   Not trying to trick you.

15       A.   No.  You're -- you're fine.

16       Q.   Okay.  And you said you were familiar with

17   Exhibit 5, the leash laws.  Is that correct?

18       A.   I've seen them since they've been printed

19   out.  Yeah.

20       Q.   When the bigger dog that you know you shot --

21   or admitted you shot -- when you shot the bigger dog,

22   the bigger dog did not have a leash on.  Is that

23   correct?

24       A.   No, sir.

25       Q.   When you shot the bigger dog without the

CHARLES ROPER  8/25/2020

 1   leash, were you enforcing the leash laws that were in

 2   place?

 3        A.   No, sir.

 4        Q.   Then what was your ultimate purpose in firing

 5   your weapon at the bigger dog?

 6             MS. KAYSER:  Objection.  Asked and

 7   answered.

 8             THE WITNESS:  To protect my wife.

 9        Q.   (BY MR. SCHOTTEL.)  Give me a couple minutes

10   to look through and we should be finished.  I missed

11   something.  Could you take a look at Plaintiff's

12   Exhibit 4.  Just take a look at it.  It's your

13   application for employment with City of Van Buren.

14   Right?  And could you look at the last page entitled

15   the oath of office.  And could you read that for me

16   into the record.

17        A.   Okay.  It says I, Charles Roper, do solemnly

18   swear that I possess the qualifications for the

19   position of police officer as prescribed by law; that

20   I will support the Constitution of the United States,

21   and of the State of Missouri, the provisions of all

22   laws of the state affecting cities of this class, and

23   the ordinances of the City of Van Buren, Missouri; and

24   faithfully demean myself in office, so help me God.

25        Q.   And what was the date that you had signed

CHARLES ROPER  8/25/2020

 1   that oath of office?

 2       A.   1/30/2019.

 3       Q.   And whose signature is below there?

 4       A.   Below mine, or --

 5       Q.   Yes.  Below yours.

 6       A.   That's the city clerk.  I think her name was

 7   Jeri Platt.

 8       Q.   Okay.  And that was just like a notary seal.

 9   Is that correct?

10       A.   Yes, sir.

11       Q.   All right.  Before you shot the bigger dog,

12   did your wife, Donna, make any comments to you like

13   shoot the dog?

14       A.   No.

15       Q.   No?  Okay.  Could you describe your wife's

16   reaction after you shot the dog as it was -- it was

17   near her?

18       A.   Like she walked over there to try and see if

19   she could check on Draco, and then she got in the

20   truck and went back down to my father-in-law's.

21       Q.   How close was your wife to the dog when

22   you -- to the bigger dog when you shot it?

23       A.   I pulled her back behind me.  So if I was

24   three to four foot, she was probably, you know, four

25   to five.

CHARLES ROPER  8/25/2020

Page 48

```
 1        Q.   So you pulled her -- you pulled your wife
 2   behind you before shooting the dog?
 3        A.   Yes.
 4        Q.   What did the dog do when you pulled your wife
 5   behind you?
 6        A.   Nothing different.
 7        Q.   Did it stand in front of you?
 8        A.   It was still coming her direction.  This was
 9   a very quick time this happened.
10        Q.   But if you pulled your wife behind you, then
11   you were in between the dog and --
12        A.   And her.
13        Q.   -- your wife.
14        A.   Yes.
15        Q.   Right.  So that's what I was asking.
16        A.   Okay.
17        Q.   What did the dog do when you pulled your wife
18   directly behind you?
19        A.   Well, I don't think it was directly behind
20   me, but behind me.  But it didn't do anything
21   different.  It was still approaching us.  You know.
22        Q.   So it was approaching you as well.
23        A.   Well, whenever I put her behind me, I guess
24   yeah, it would have been approaching me.
25        Q.   Was the dog barking at the time?
```

CHARLES ROPER  8/25/2020

Page 53

```
 1   deputy.
 2      Q.   (BY MR. SCHOTTEL.)  The form -- the form is
 3   not consistent with your testimony of firing two
 4   rounds.
 5      A.   No.
 6           MR. SCHOTTEL:  Okay.  All right.  I think
 7   that's all the questions I have.
 8           MR. PHILLIPS:  Mind if I power through
 9   about two minutes worth of questions before we get
10   kicked out of here?
11           THE WITNESS:  You're fine.
12               CROSS-EXAMINATION
13   QUESTIONS BY MR. PHILLIPS:
14      Q.   Okay.  So you were driving your son's Ford
15   Escape.  Right?
16      A.   Yes, sir.
17      Q.   Was that a police vehicle?
18      A.   No, sir.
19      Q.   Were you in uniform?
20      A.   No, sir.
21      Q.   The weapon that you used to defend your wife,
22   was that a gun that was given to you by the police
23   department?
24      A.   No, sir.
25      Q.   Was that your personal weapon?
```

CHARLES ROPER  8/25/2020

```
 1       A.   Yes, sir.
 2       Q.   When you were defending your wife, were you
 3  on your way back after visiting your father-in-law?
 4       A.   Yes, sir.
 5       Q.   Was that a social visit?
 6       A.   Yes, sir.
 7       Q.   Had you been visiting him in your capacity as
 8  a police officer?
 9       A.   No, sir.
10       Q.   When you left his residence, were you leaving
11  to go and do police work?
12       A.   No, sir.
13       Q.   As of the date of this incident, you had
14  become a reserve police officer within days of that
15  date.  Is that right?
16       A.   Yes, sir.
17       Q.   And at that same time, you were also a
18  reserve deputy with the Ripley County Sheriff's
19  Office.  Is that right?
20       A.   Yes, sir.
21       Q.   And you were also working with the Butler
22  County EMS.  Is that right?
23       A.   Yes, sir.
24       Q.   And you were also working with West Carter
25  County Ambulance.  Is that right?
```

CHARLES ROPER  8/25/2020

Page 55

 1      A.   Okay.  If I was already working at West
 2   Carter I wasn't working at Butler.  Sorry.
 3      **Q.   Okay.**
 4      A.   I can't remember exactly which one.  I was
 5   working for one of the ambulance services at the time.
 6   Yes.
 7      **Q.   Okay.  And in fact, you're even wearing an**
 8   **EMS shirt right now; aren't you?**
 9      A.   Yes, sir.
10      **Q.   So you were working in some capacity doing**
11   **EMS work, and you were a reserve deputy at the same**
12   **time as this incident.  Correct?**
13      A.   Yes, sir.
14      **Q.   Okay.  Did this incident have anything to do**
15   **with your being a reserve deputy?**
16      A.   No, sir.
17      **Q.   Did this incident have anything to do with**
18   **your being an EMS worker?**
19      A.   No, sir.
20      **Q.   Did this incident have anything to do with**
21   **you being a police officer?**
22      A.   No, sir.
23      **Q.   One last question.  And I'm sorry to pry on**
24   **this.  You said that Draco had passed away, it sounded**
25   **like within the last few months.  Is that right?**

CHARLES ROPER  8/25/2020

```
 1       A.    Yeah.  It hasn't been too long ago.

 2       Q.    Okay.

 3       A.    It was -- it was May or June of this year.

 4  Yeah.

 5       Q.    Okay.  How was his health after he was

 6  attacked by these two dogs?

 7       A.    I didn't see him every day until my

 8  father-in-law brought him over to my house when he

 9  moved in with us for a while.  When he brought him to

10  my house, he was in very bad health.

11       Q.    Okay.

12       A.    They said they believed he had had a stroke.

13       Q.    Okay.

14       A.    So he was -- horrible health.  He had -- he

15  was blind.  He was deaf.  Had a few teeth left.  I

16  mean, he was an old dog.

17       Q.    Okay.  Did you place Mr. or Mrs. Mesey under

18  arrest that day?

19       A.    No, sir.

20       Q.    Did you issue either of them a ticket?

21       A.    No, sir.

22            MR. PHILLIPS:  All right.  No other

23  questions.

24            MS. KAYSER:  I have none.  Do you have any

25  follow-ups?
```