```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MISSOURI
 3                  SOUTHEASTERN DIVISION
 4
 5
 6   ROBIN MESEY and JENNIFER MESEY,    )
 7           Plaintiff,                 )
 8   vs.                                )
 9   CITY OF VAN BUREN, MISSOURI, et    ) 1:19-CV-71 SNLJ
10   al,                                )
11           Defendant.                 )
12
13
14
15            DEPOSITION OF ALONZO BRADWELL
16          TAKEN ON BEHALF OF THE PLAINTIFF
17                  OCTOBER 30, 2020
18
19
20
21
22
23
24
25
```

```
 1   wanted to clarify that wasn't -- I wasn't asking about
 2   the city.
 3              MR. HARDEN:  And you're not.
 4       Q.    (BY MR. SCHOTTEL.)  Just your individual
 5   process.
 6       A.    Outside of police department?  Is that --
 7       Q.    No.  Just as you're in your function as
 8   sheriff, individually.
 9       A.    I'm the chief of police.
10       Q.    Or I'm sorry.  I said sheriff.  My apologies.
11   As the chief, what is your hiring process?
12       A.    So I have, generally speaking, at that time,
13   being as I was just taking over, I -- my process then
14   was to look over application, check their POST license
15   to make sure that they're up to date on all their
16   training required by the State, and call references,
17   and then do an interview.  Then I would present it to
18   our council and mayor as either a recommendation, or I
19   would recommend an officer to go to work for me or not
20   to go to work for me.
21       Q.    Okay.  And Officer Charles Roper, was he on
22   the force at the time you became chief of police?
23       A.    No.
24       Q.    Okay.
25       A.    He had been prior to -- to me.
```

Case: 1:19-cv-00071-SNLJ   Doc. #:  32-5   Filed: 12/03/20   Page: 3 of 12 PageID #: 192

```
 1      Q.   Okay.  So Charles Roper was hired when you
 2   were chief of police?
 3      A.   Yes, sir.
 4      Q.   Okay.
 5      A.   As a training reserve.
 6      Q.   Okay.  Training reserve officer?  Is that
 7   what it was?
 8      A.   Yes, sir.
 9      Q.   Can you describe what that is.
10      A.   With initial training, we -- may I rephrase?
11      Q.   Sure.
12      A.   I would hire an officer who has met the
13   qualifications through the interview process for
14   on-the-job training.  If they make it through that, at
15   that point, they would be listed as a reserve officer
16   ready to be called in.  At that time, Mr. Roper was
17   still in training.
18      Q.   And when you say at the time -- at the time
19   of the incident subject to the case when he shot the
20   Meseys' dogs, he was a training reserve officer?
21           MR. HARDEN:  Just object to form.
22           THE WITNESS:  He -- he held that position.
23   Yes.  He was not training when that incident happened.
24      Q.   (BY MR. SCHOTTEL.)  Okay.  I guess that was a
25   bad question.  But that was the position that he held
```

```
 1   at the time of the incident in this case?
 2       A.   Yes, sir.
 3       Q.   All right.  Do you remember when Mr. Roper
 4   began holding that position?
 5       A.   I believe his oath of office was the end of
 6   January, beginning of February, in that time frame.  I
 7   can't remember the exact date.
 8       Q.   Yeah.  I'm not --
 9       A.   Okay.
10       Q.   -- trying to tie you down to an exact date.
11   Just --
12       A.   Yeah.
13       Q.   -- month -- yeah.  That was -- and the
14   process that you mentioned before about reviewing
15   applications and then presenting it to a council when
16   you go to hire an officer, did any of that happen or
17   occur before Charles Roper became a training reserve
18   officer?
19       A.   They were notified, and they had no
20   objections.
21       Q.   Okay.  How long is the training reserve
22   period?
23       A.   Then, it would have been at the
24   recommendation of full-time officers that he trained
25   with.  At that point, when they stated to me that they
```

```
 1   felt that he was ready to go back and be a reserve --
 2   or to be a reserve, then I would do a ride-along
 3   training with them --
 4       Q.   Uh-huh.
 5       A.   -- and quiz them on the streets, quiz them on
 6   how-to on certain incidents.  And then they would be
 7   put on the reserve list if I felt that they were ready
 8   to do that.
 9       Q.   Okay.  So you didn't have a specific time
10   frame.  What you're testifying to is that it's -- it's
11   on an individual, person-by-person basis.
12       A.   At the time, I was brand new to the
13   department as their chief, and there's a lot of
14   process that I was still working on to make official.
15       Q.   Okay.  And you said at that time.  So did you
16   change that aspect?
17       A.   I had completed what I was working on.  Yes.
18       Q.   Okay.  So by your testimony, is it fair to
19   say once you became chief of police, you kind of
20   reviewed everything, and had your own ideas on what
21   you wanted to assess, or how you wanted things to run
22   in the department?
23       A.   I think it's important for me to review
24   current policies and current procedures, budgets,
25   everything, before making a complete decision on any
```

1  to me that he was acting while on duty; and it was not
2  Officer Roper that was involved in this, in my
3  opinion.
4      Q.   (BY MR. SCHOTTEL.)  But Charles Roper?
5      A.   Yes.
6      Q.   And I'm sorry.  Even -- I didn't clarify.  By
7  your earlier testimony, he was not an officer anyway
8  with the department yet.  He was a training --
9      A.   He was a training reserve officer.
10     Q.   Training reserve officer.  When Mr. Roper
11 became a training reserve officer, was he given any
12 equipment to use by you or the department?
13     A.   I -- I do not believe so.  When -- when I
14 hear equipment, when it comes to a new hire, I would
15 say badge, commission card, vest, gun, things like
16 that.  I don't recall ever -- I know he didn't have a
17 badge, a commission card, or a department firearm.  In
18 regards to any other equipment, I -- I don't recall
19 that.  I don't know.
20     Q.   Okay.  What does -- what does an officer do
21 as a training reserve officer?
22     A.   They train with a full-time officer.
23     Q.   Okay.  Out on the streets?
24     A.   Yes.
25     Q.   Are -- when they're training out on the

1   streets with a full-time officer, are they supposed to
2   be carrying a weapon at that time?
3        A.   Yes.  They're -- through the State of
4   Missouri, they're a law enforcement officer still.
5        Q.   Right.
6        A.   With us, they're training.  So thus, they can
7   still carry a firearm, as long as they have been
8   previously qualified, or still up to date with the
9   firearm requirements for the State for POST licensing.
10       Q.   And to the best of your recollection, at that
11  time when he was a training reserve officer, was
12  Charles Roper qualified to carry a weapon?
13       A.   He was.  He was qualified by the Ripley
14  County Sheriff's Office, where he also held a position
15  at that time.
16       Q.   Okay.  Now, as a training reserve officer,
17  did you or the department provide Charles Roper with a
18  gun to carry when he was out in the streets with a
19  full-time officer?
20       A.   No.
21       Q.   Were -- was a training reserve officer
22  required to purchase their own gun?  Or were they
23  given an option?
24       A.   As a training reserve, they're given -- I
25  mean, we don't have a firearm to give them.

```
 1   remember.  But as a trainee, usually I would have the
 2   trainees dress in a plain polo with khaki pants,
 3   without any logos or anything like that on them.
 4        Q.   Okay.
 5        A.   But I don't remember exactly that situation.
 6        Q.   All right.  Fair enough.  At the time you
 7   became chief, did -- did you require any new hires to
 8   go through any kind of firearm training or any
 9   exercises?
10        A.   Our department does firearms training once a
11   year in the summer.
12        Q.   Okay.
13        A.   So on new hires, as long as they were
14   compliant with POST requirements for firearm hours,
15   then they would wait for our firearms qualification.
16        Q.   Okay.
17        A.   For Mr. Roper, he had completed his firearms
18   training out of Ripley County.
19        Q.   All right.  So if an officer -- or -- he
20   wasn't an officer.  But a person like Charles Roper
21   who had previous law enforcement experience, you would
22   take that into consideration because he would have I
23   guess done certain things that you may have required
24   him to, but he had already done the previous --
25        A.   I verified that he did complete those hours.
```

```
 1   Yes.
 2       Q.   Okay.  But I wasn't trying to trick you or
 3   just nail -- narrow it down to Roper.  I was just
 4   saying you, that's what you do generally when you look
 5   at the new hires, or someone new you're bringing in.
 6       A.   Yes.  I -- I verify to make sure they're
 7   compliant with their POST licensing in the state, at
 8   which point I go through their equipment, make sure
 9   that I approve those.  And if they are still in
10   compliance outside of our agency's firearms
11   qualification, then they will be made to wait for that
12   qualification.
13       Q.   Okay.  You referenced a duty belt.  And I'm
14   not asking specifically to Charles Roper.  But I've
15   seen duty belts.  I'm not a police officer.  So if you
16   could enlighten me, what kinds of equipment can a duty
17   belt carry?
18       A.   Generally speaking, firearms, handcuffs, less
19   lethal devices, cell phone holders.
20       Q.   Yeah.
21       A.   You know, every duty belt's slightly
22   different, depending on the person.
23       Q.   Now, way back in the day -- I'm dating myself
24   here.  But they used to call it a night stick.  But
25   there's different names for it now.  Do you know what
```

```
 1   how did he notify you about the incident?
 2        A.   By calling me on my cell phone.
 3        Q.   Okay.  Did he call you on the same day it
 4   occurred?
 5        A.   While he was on scene.  He had just arrived.
 6        Q.   Okay.  And did Charles Roper come to see you
 7   immediately after this incident?
 8             MR. HARDEN:  Object to form.
 9        Q.   (BY MR. SCHOTTEL.)  Scratch the immediately.
10             MR. HARDEN:  Good.
11             THE WITNESS:  Mr. Roper did come to see me.
12   Yes.
13        Q.   (BY MR. SCHOTTEL.)  And are you aware of what
14   happened with his weapon after the incident, after he
15   shot the dogs?
16        A.   Everything from the point that I spoke with
17   the sheriff of Carter County, which was the phone call
18   after I spoke with Officer Dyer, I -- I relinquished
19   the -- we relinquished the scene over to the sheriff's
20   department.  So I -- their procedures, I couldn't tell
21   you.
22        Q.   Okay.  Was the pistol -- or the gun that
23   Charles Roper shot the Meseys' dog with, was that the
24   same gun he was carrying on the streets as a training
25   reserve officer?
```

```
 1     A.   No.
 2     Q.   Can you describe the differences of the guns.
 3     A.   The information I read in the incident report
 4  of the sheriff's department is that he used a
 5  Springfield 45-caliber.  I approved a 1911 for him to
 6  carry on duty.  He had a separate gun that I had
 7  nothing -- I have no idea about, that he did not use
 8  while under my care.
 9     Q.   The one you approved, can you state that one
10  again.
11     A.   It was a 1911.  I -- I don't remember the
12  brand.
13     Q.   Oh, okay.  And a 1911 is just a handgun?
14     A.   Yes.  I believe it had a blue handle on the
15  1911, if I remember correctly.
16     Q.   All right.  With your training reserve
17  officers, do you give them any instructions of whether
18  or not to carry their gun when they're not working?
19     A.   At the time, there was a policy for reserve
20  officers -- and all officers, part-time, full-time --
21  to -- that they could wear a concealed firearm or a
22  firearm, as long as they had a badge and a commission
23  card.  With Mr. Roper, he was still in training, and
24  did not have a badge and a commission card.  And
25  because he was in training, we hadn't even made it
```

```
 1      A.   We have received some calls of attacks.
 2   Yeah.
 3      Q.   And what is the policy and/or procedure that
 4   the department takes when it receives those calls?
 5           MR. HARDEN:  Just object to the extent that
 6   the scope's vague.
 7           THE WITNESS:  Generally, if a -- a dog gets
 8   out of a fence or off a leash, and they're running
 9   around in the neighborhood, the on-duty officer would
10   attempt to make contact with the owner, and most
11   likely write a citation if it's -- sometimes they'll
12   get warnings.  It depends on the situation.  It's --
13   that's the end of that, I guess.
14      Q.   (BY MR. SCHOTTEL.)  Okay.  What if the owner
15   is not near, or if it's a dog that's unidentified?
16      A.   We're not a -- we're not animal control, so
17   we only enforce city ordinance by issuing criminal
18   summons, things like that.
19      Q.   All right.  Did you have an animal control
20   unit you could call to assist you?
21      A.   Not at that time.
22      Q.   Okay.  Do you have one now?
23      A.   No.
24      Q.   When Charles Roper was -- have to look at the
25   term -- a training reserve officer?  Is that correct?
```