## Page 1

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF MISSOURI
3    SOUTHEASTERN DIVISION
4
5    ROBIN MESEY and JENNIFER MESEY,  )
6        Plaintiffs,        )
7    vs.                    )
8    CITY OF VAN BUREN, MISSOURI, et )Case No. 1:19-CV-71 SNLJ
9    al.,                   )
10       Defendants.        )
11
12
13
14
15       DEPOSITION OF CHARLES ROPER
16    TAKEN ON BEHALF OF THE PLAINTIFF
17       AUGUST 25, 2020
18
19
20
21
22
23
24
25

## Page 3

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF MISSOURI
3    SOUTHEASTERN DIVISION
4
5    ROBIN MESEY and JENNIFER MESEY,  )
6        Plaintiffs,        )
7    vs.                    )
8    CITY OF VAN BUREN, MISSOURI, et  )Case No. 1:19-CV-71 SNLJ
9    al.,                   )
10       Defendants.        )
11
12       DEPOSITION OF CHARLES ROPER, produced,
13    sworn and examined on AUGUST 25, 2020, between the
14    hours of eight o'clock in the forenoon and six o'clock
15    in the afternoon of that day, at the Phelps County
16    Courthouse, 200 North Main Street, Rolla, Missouri,
17    before Sarah J. Pokorski, a Certified Court Reporter
18    and Notary Public within and for the State of
19    Missouri, in a certain cause now pending in the United
20    States District Court, Eastern District of Missouri,
21    Southeastern Division, between ROBIN MESEY and
22    JENNIFER MESEY, Plaintiffs vs. CITY OF VAN BUREN,
23    MISSOURI, et al., Defendants; on behalf of the
24    Plaintiffs.
25

## Page 2

1            I N D E X
2
3    QUESTIONS BY:              PAGE
4    Mr. Schottel              5
5    Mr. Phillips             53
6    Mr. Schottel             57
7
8
9
10
11        EXHIBITS
12
13    EXHIBIT                  PAGE
14    1                        15
15    2                        16
16    3                        17
17    4                        17
18    5                        17
19
20       (Exhibits retained by Mr. Schottel.)
21
22
23
24
25

## Page 4

1         A P P E A R A N C E S
2
3    For the Plaintiffs:
     Schottel & Associates, P.C.
4    James W. Schottel, Jr.
     906 Olive Street
5    St. Louis, Missouri  63101
     314-421-0350
6    jwsj@schotteljustice.com
7
8    For the Defendants:
     Fisher, Patterson, Sayler & Smith, LLP
9    Portia C. Kayser
     1010 Market Street
10   Suite 1650
     St. Louis, Missouri  63101
11   314-561-3675
     pkayser@fisherpatterson.com
12
13
     Keck & Phillips, LLC
14   Damon S. Phillips
     3140 East Division Street
15   Springfield, Missouri  65802-2408
     417-890-8989
16   damon@kpwlawfirm.com
17
18   Court Reporter:
     Sarah J. Pokorski, CCR
19   Missouri CCR No. 745
     Alaris Litigation Services
20   711 North Eleventh Street
     St. Louis, Missouri  63101
21   314-644-2191
     1-800-280-DEPO
22
23
24
25

1 (Pages 1 to 4)

Page 5

1    IT IS HEREBY STIPULATED AND AGREED by and
2  between counsel for the Plaintiffs and counsel for the
3  Defendants that this deposition may be taken in
4  shorthand by Sarah J. Pokorski, CCR, a Certified Court
5  Reporter and Notary Public, and afterwards transcribed
6  into typewriting; and the signature of the witness is
7  expressly reserved.
8    * * * * *
9    CHARLES ROPER,
10  Of lawful age, produced, sworn and examined on behalf
11  of the plaintiff, deposes and says:
12
13  (Starting time of the deposition:  2:56 p.m.)
14
15    DIRECT EXAMINATION
16  QUESTIONS BY MR. SCHOTTEL:
17    Q.  Good afternoon.  Could you state and spell
18  your name, please.
19    A.  Charles Roper.  And spell my whole name, or
20  just last name?
21    Q.  Last name is fine.
22    A.  R-O-P-E-R.
23    Q.  Okay.  And your middle name?
24    A.  Lee.
25    Q.  And are you married?

Page 6

1    A.  Yes.
2    Q.  And what's your wife's name?
3    A.  Donna Roper.
4    Q.  What's the highest grade of education you've
5  completed?
6    A.  I've got some college.
7    Q.  And have you had any specialized training?
8    A.  Yeah.  I'm an EMT and a police officer.
9    Q.  Where did you get your training to become a
10  police officer?
11    A.  At Three Rivers Community College.
12    Q.  What city is that in?
13    A.  Poplar Bluff.
14    Q.  And when did you first become a licensed
15  police officer?  Just a year is fine.
16    A.  I think it was 2016.
17    Q.  And who was your first law enforcement
18  employment with?
19    A.  I -- it would be the Carter County Sheriff's
20  Office.
21    Q.  And do you still work for Carter County
22  Sheriff's --
23    A.  No.
24    Q.  Why did that employment end?
25    A.  I was offered more money.

Page 7

1    Q.  And at some point did you begin working as a
2  police officer for the City of Van Buren?
3    A.  Yes.
4    Q.  What year was that?
5    A.  It would have been in 2016 also.
6    Q.  Are you still a police officer with the City
7  of Van Buren?
8    A.  I am again.  Yeah.
9    Q.  What -- so from 2016 to current, was there a
10  lapse of you working for the City of Van Buren?
11    A.  Yeah.
12    Q.  And what time frame --
13    A.  I quit there at the City in 2017 after the
14  flood.
15    Q.  And when did you start working again?
16    A.  2019.  Yeah.
17    Q.  With the City of Van Buren Police Department,
18  what ranks have you held?
19    A.  Officer.
20    Q.  And I forgot the question -- to ask it at the
21  beginning.  We always have to ask.  Are you under the
22  influence of any substance, whether prescription or
23  non-prescription, that would affect your ability to
24  understand my questions?
25    A.  No, sir.

Page 8

1    Q.  We all assume that, but we have to ask it
2  anyway.  What year were you born?
3    A.  1984.
4    MR. SCHOTTEL:  Can we go off the record for
5  a second.
6    MS. KAYSER:  Yes.
7    (OFF THE RECORD.)
8    MR. SCHOTTEL:  Back on the record.
9    Q.  (BY MR. SCHOTTEL)  My name is James
10  Schottel, Jr.  I am the attorney for the -- I say
11  their last name wrong.  You guys looked surprised, but
12  I -- the Meseys, I believe, and -- in this lawsuit
13  against yourself, against the City, and the chief.
14  I'm going to be asking you a series of questions like
15  I have.  You've done a good job of giving a verbal
16  response.  I know you have a mask on, so if the court
17  reporter has any issues hearing, we may have to scoot
18  you closer, ask you to speak louder, because the court
19  reporter's taking everything down today.  The other
20  kind of basic rules -- and all of us have gone through
21  these when -- when they took my client's deposition --
22  is to try to wait until I finish my answer, and then
23  give your answer, even if you know what the answer is.
24  Oftentimes, people are eager to answer a question, oh,
25  I know this -- this one, I'm going to answer it.

2 (Pages 5 to 8)

CHARLES ROPER  8/25/2020

Page 9

1    Because when we're talking over each other, it doesn't
2    look good on the -- on the transcript.  Because like I
3    said, the court reporter's taking everything down,
4    so -- fair enough?
5        A.  Fair enough.
6        Q.  All right.  Like I said, I don't expect this
7    deposition to take very long, but if you'd like to
8    take a break for any reason, use the restroom,
9    whatever it may be, just let us know, and we can take
10   a break at that time.  In your employment with the
11   City of Van Buren, what are your basic duties as a
12   police officer?
13       A.  I protect the citizens of Van Buren.
14       Q.  And what I was trying to get at is you're
15   basically a patrol officer.  Is that correct?
16       A.  Yes, sir.
17       Q.  Okay.  And do you have your own vehicle?
18       A.  No.  We share vehicles.
19       Q.  Okay.  So when you patrol the streets, you
20   have a partner, or do you just use someone else's car?
21   Is that what you mean by share?
22       A.  We have -- we have three vehicles there, and
23   we all share those three vehicles.  And I -- I work by
24   myself.  Everybody else works by theirself.
25       Q.  Okay.  That's what I was getting at.  Because

Page 10

1    it's different with every department, so -- can we
2    take a break real quick.
3        MS. KAYSER:  Sure.
4        (OFF THE RECORD.)
5        MR. SCHOTTEL:  Okay.  Back on the record.
6        Q.  (BY MR. SCHOTTEL)  All right.  Before we --
7    I asked you about your training.  And can you
8    briefly -- well, first, who conducted your training
9    when you became a police officer?
10       A.  The Missouri Sheriff's Association.
11       Q.  Okay.  And is that -- that was the one on --
12   in Poplar Bluff.  Right?
13       A.  Yes, sir.
14       Q.  Did you receive any additional training from
15   the City of Van Buren?
16       A.  We have to do 24 hours a year of CEUs.
17       Q.  Yeah.  Can you -- before you became a police
18   officer, can you describe the training you went
19   through on using a firearm as a police officer.
20       A.  What do you mean?  Because I don't -- I don't
21   understand what you mean.
22       Q.  All right.  I'm assuming in Poplar Bluff when
23   you went through the training course, they had some
24   training with -- relating to firearms.  Is that
25   correct?

Page 11

1        A.  Yes, sir.
2        Q.  Okay.  And can you describe what that
3    training consisted of.  Did you fire at targets?  You
4    know, did they teach you -- you know, what did they
5    teach you?  That's what I was trying to get to.
6        A.  We -- we fired at paper targets at multiple
7    different ranges.  We had a stress course that
8    involved shooting where we had to get our heart rate
9    up, run and shoot, stuff like that.
10       Q.  And in your training, what kind of firearm
11   did you use?
12       A.  I had a Glock 22.
13       Q.  Okay.  Is that a common firearm with police
14   departments nowadays?
15       A.  I -- not necessarily.  I mean, everybody kind
16   of carries what they want.
17       Q.  Okay.  Do you currently carry a Glock 22?
18       A.  No, sir.
19       Q.  Okay.  What do you carry now?
20       A.  I have a Glock 21.
21       Q.  Okay.  I believe the date of the incident
22   subject to this case was April 22nd, 2019.  Does that
23   sound right?
24       A.  No.
25       Q.  Okay.

Page 12

1        A.  It was before then.
2        Q.  Maybe -- that was maybe a date this report
3    was prepared.
4        MR. PHILLIPS:  Jim, if it helps --
5        MR. SCHOTTEL:  Yeah.  I just don't have it
6    off the top of my head.
7        MR. PHILLIPS:  My understanding is that
8    your complaint of incident was February 22nd, 2019.
9    Does that sound right?
10       Q.  (BY MR. SCHOTTEL)  Does that sound right to
11   you to the date of the incident, according to your --
12       MR. PHILLIPS:  Hold on.  Let's --
13       MR. SCHOTTEL:  I just want to make sure
14   we're all --
15       MR. PHILLIPS:  Why don't we go off the
16   record.
17       MR. SCHOTTEL:  Sure.
18       (OFF THE RECORD.)
19       MR. SCHOTTEL:  Back on the record.
20       Q.  (BY MR. SCHOTTEL)  After reviewing the
21   records, does February 22nd, 2019 -- does that sound
22   about right for the date of the incident that's the
23   subject of this case?
24       A.  Yes, sir.
25       Q.  Okay.  Were you carrying a firearm that day?

3 (Pages 9 to 12)

## CHARLES ROPER  8/25/2020

### Page 13

1    A.  The date of the incident?  Yes, sir.
2    Q.  Okay.  And where were you -- where on your
3  person were you carrying it?
4    A.  On my right hip.
5    Q.  Okay.  And I'm assuming you wear a holster on
6  your right hip.
7    A.  Yes, sir.
8    Q.  All right.  And is it -- can -- was it
9  concealed on that day?
10    A.  No, sir.
11    Q.  Okay.  On that day, did you -- do you have to
12  have a permit to carry a concealed weapon?
13    A.  No.  State of Missouri doesn't require that.
14    Q.  And on February 22nd, 2019, what kind of
15  weapon were you carrying?
16    A.  It was a Springfield XD-S.
17    Q.  Okay.  And what is the capacity of that gun?
18    A.  Seven plus one.
19    Q.  And I know what that means, but could you
20  just give an explanation what that means, seven plus
21  one.
22    A.  Yes, sir.  It means it can hold seven in the
23  magazine and one in the chamber.
24    Q.  Okay.  And is -- is the chamber in that gun
25  in the handle?  In the grip.  I'm sorry.

### Page 14

1    A.  What do you mean?  The --
2    Q.  Where are the bullets held within the gun?
3    A.  In the magazine.
4    Q.  And how is the magazine attached to the gun?
5    A.  In the mag well.  I'm not -- I'm not sure --
6    Q.  All right.  They have -- the magazines are
7  attached to handguns in different ways.  Right?  Some
8  go in -- in the grip.
9    A.  Yes, sir.
10    Q.  Right?  I was just trying to figure out how
11  that magazine is situated --
12    A.  Oh.  Yeah.
13    Q.  -- with that gun.
14    A.  It's -- it's in the grip.
15    Q.  Okay.  Didn't mean to confuse you.
16    A.  No.  You're fine.
17    Q.  Outside of the handgun that you had said you
18  were carrying on your hip, where -- did you have any
19  other handguns that you were carrying that day?
20    A.  No, sir.
21    Q.  In your work as a police officer, do
22  you ever carry more than one handgun?
23    A.  No, sir.
24    Q.  And if an officer -- police officer does
25  carry more than one handgun, can you just describe

### Page 15

1  where the other locations on your body or on your
2  person that you could carry or holster a handgun.
3    A.  I mean, I guess you could put them pretty
4  much anywhere.  I mean, I -- I don't carry a secondary
5  one, so I honestly don't know.
6    Q.  Gotcha.  Okay.  And I mean, I've seen -- or
7  you watch the movies, you see other, you know,
8  officers with handguns with -- I've seen them like
9  around people's ankles, or -- so is that what you mean
10  like by the holster, you can put them wherever you
11  want, or wherever they can attach to?
12    A.  They sell multiple different kinds of
13  holsters.
14    Q.  Okay.  Thanks for clearing that up for me.
15  Okay.  I've got these marked, but if you could initial
16  them for me, that would be great.  And hand it to
17  opposing counsel.
18      MR. PHILLIPS:  You want some help there?
19      MR. SCHOTTEL:  Yeah.  If you could hand it
20  to the court reporter for me.
21      (EXHIBIT 1 MARKED FOR THE RECORD.)
22    Q.  (BY MR. SCHOTTEL)  If you could just look
23  through that from front to back.  I just want to make
24  sure you take a good look at that.
25    A.  Okay.  I do know what this is.  Yeah.

### Page 16

1    Q.  All right.  And I just wanted you to identify
2  those are your answers to the interrogatories that we
3  had sent to you.  Is that correct?
4    A.  Yes, sir.
5    Q.  Okay.  And did that bear your signature on
6  the back of the interrogatory answers?
7    A.  Yes, sir.
8    Q.  All right.
9      (EXHIBIT 2 MARKED FOR THE RECORD.)
10    Q.  (BY MR. SCHOTTEL)  And just for the record,
11  Exhibit 2's been marked.  Can you identify what --
12  what Exhibit 2 is.
13    A.  It's the answers to affirmative defense of
14  defendant Charles Roper.
15    Q.  All right.  And that was drafted by your
16  attorney and filed in the case.  That's just basically
17  your answer to our complaint in the case.  Is that
18  fair to say?
19    A.  Yes, sir.
20    Q.  All right.  Okay.  Okay.  And I'll be asking
21  some questions about all these documents in a little
22  bit.  I just want to get them all marked and have you
23  look through them so you can identify them.  So -- I
24  find it easier to do that instead of jumping around.
25  Damon, grab -- pull a couple more pages.  I do have

4 (Pages 13 to 16)

**CHARLES ROPER  8/25/2020**

Page 17

1   them Bates marked.  Man, there's a lot of pages in
2   there.
3         THE REPORTER:  Sorry.  I can't really hear
4   you.  Did you want to go off the record, or --
5         MR. SCHOTTEL:  We can go off the record for
6   a second while we get this together.
7         (OFF THE RECORD.)
8         (EXHIBIT 3 MARKED FOR THE RECORD.)
9      Q.  (BY MR. SCHOTTEL)  And Exhibit 3 is the
10  Carter -- Carter County Sheriff's Department
11  investigation file with respect to the incident that's
12  subject to this case.  And I just wanted to ask you if
13  you received a copy.  I know your attorney's received
14  a copy.  If you received a copy as well.  Have you
15  seen all of it?  Part of it?  Some of it?
16     A.  I -- I went down and requested a copy.
17  Mine's not that thick.
18     Q.  Okay.
19        (EXHIBIT 4 MARKED FOR THE RECORD.)
20        MS. KAYSER:  Do you want me to take this
21  one so she can start initialing it?
22        MR. SCHOTTEL:  Sure.  Absolutely.
23        (EXHIBIT 5 MARKED FOR THE RECORD.)
24     Q.  (BY MR. SCHOTTEL)  And I think I left off at
25  Exhibit 4.  Have you seen Exhibit 4 before?  I'm sure

Page 18

1   you have.
2      A.  Yes.  It's my --
3      Q.  And can you identify what that is.
4      A.  It's my employment application.
5      Q.  And who was that -- the employment
6   application for?
7      A.  I believe this is for the Van Buren Police
8   Department.  Yeah.
9      Q.  Yeah.  Okay.  All right.  And have you seen
10  Exhibit 5 before?
11     A.  It's our city code book.
12     Q.  Okay.  And particularly, did you look at
13  the -- all the pages of Exhibit 5?
14     A.  I've looked over them.  Yes.  They pretty
15  much pertain to dogs.
16     Q.  Okay.  And is it fair to say they pertain to
17  dogs and -- being leashed, and kind of violations?  Is
18  that fair to say?
19     A.  Yes, sir.
20     Q.  Okay.  All right.  On -- on the date of the
21  incident, did you witness your father-in-law's dog in
22  an altercation with another dog?
23     A.  I -- there was no altercation.  His dog was
24  laying on the ground.
25     Q.  Whose dog was laying --

Page 19

1      A.  My father-in-law's.  Sorry.
2      Q.  Okay.  And when did you first see your
3   father-in-law's dog?
4      A.  As I approached the intersection.
5      Q.  And what is your father-in-law's dog's name?
6      A.  Draco.
7      Q.  Can you spell that for me.
8      A.  I think he spells it D-R-A-C-O.
9      Q.  Okay.  And how old is Draco now?
10     A.  Well, he's deceased now.
11     Q.  When did he pass away?
12     A.  Would have been May or June of this year.
13     Q.  Well, at the time he passed away, how old was
14  he?
15     A.  Don't quote me on it, but I believe my
16  father-in-law said he was like 16 years old.  He was
17  an old dog.  That's the best to my ability I know.
18     Q.  And what kind of breed was Draco, if you
19  know?
20     A.  He was a mixed breed, as best I know.
21     Q.  All right.  So on the date of the incident,
22  do you remember was it the -- when you first saw
23  Draco, was it in the morning time?  Afternoon?
24  Evening?
25     A.  I think this would have been around noon,

Page 20

1   because we were getting hungry for lunch.  So it would
2   have been somewhere around that time.
3      Q.  And you said -- were you driving at the time
4   you saw Draco?
5      A.  Yes, sir.
6      Q.  What were you driving?
7      A.  My son's Ford Escape.
8      Q.  And why were you driving your son's car at
9   the time?
10     A.  Because mine was broke.
11     Q.  And how old is your son?
12     A.  He's 20.
13     Q.  And was there anyone else in the vehicle with
14  you when you were driving and saw Draco that day?
15     A.  My wife.
16     Q.  Was she in the passenger's seat?
17     A.  Yes, sir.
18     Q.  And I'm sorry.  Could you describe again
19  where Draco was on -- he was on the ground?  Is that
20  what you said?
21     A.  Yes, sir.  It was on Independence Street,
22  where Independence and Dale meet.
23     Q.  So was he in the middle of the street, or off
24  to the side, or by the curb, or --
25     A.  Well, there's no curb.  I mean --

5 (Pages 17 to 20)

CHARLES ROPER  8/25/2020

Page 21

1  Q.  Oh.
2  A.  It would have -- yeah.  It would have been
3  middle.  Yeah.  It had to have been middle-ish area.
4  Q.  Okay.
5  A.  The road's not very wide.
6  Q.  And what did you do when you saw him on the
7  ground?
8  A.  I stopped the vehicle, and stepped out and
9  yelled at the dogs to get off of him.
10  Q.  What were the dogs -- you said dogs as
11  plural.  Was there more than one?
12  A.  Yes, sir.
13  Q.  How many dogs were there near Draco when you
14  first saw them?
15  A.  Two.
16  Q.  And what were those dogs doing at the time
17  you saw Draco?
18  A.  The smaller dog was biting at like I do
19  believe his paws -- his front paws.  And then the
20  bigger one was behind him, and had him by the throat,
21  neck, whichever way.
22  Q.  Did -- did you know either of these two dogs
23  by name on that day?
24  A.  No, sir.
25  Q.  Can you describe what those two dogs looked

Page 22

1  like.
2  A.  White and brown.
3  Q.  Were both of them the same color, or --
4  A.  Honestly, I don't know.
5  Q.  Prior to the -- this day when you saw those
6  two dogs near Draco, had you seen those two dogs
7  before?
8  A.  Yes, sir.
9  Q.  And where had you seen those two dogs before?
10  A.  In my father-in-law's yard, attacking Draco.
11  Q.  And that's before this day?
12  A.  Yes, sir.
13  Q.  How many times would you say you saw that
14  happen before that day?
15  A.  That I personally witnessed was one.
16  Q.  Do you know of any other person that
17  witnessed that?
18  A.  My father-in-law.
19  Q.  And what is your father-in-law's name?
20  A.  Jeffrey Walberg.
21  Q.  At the time of this occurrence when you saw
22  Draco, was Draco on a leash?
23  A.  No.
24  Q.  With respect to your father -- or I'm
25  sorry -- what kind of residence did your father-in-law

Page 23

1  live in there?
2  A.  He had a house.
3  Q.  Did the house have a back yard?
4  A.  Yes, sir.
5  Q.  Was it fenced in?
6  A.  No, sir.
7  Q.  Did the house have a front yard?
8  A.  Yes.
9  Q.  Was that -- was the front yard fenced in?
10  A.  No, sir.
11  Q.  How often had you visited your father-in-law
12  at his house there?
13  A.  I -- when I lived in Van Buren, we visited
14  him almost every day.
15  Q.  And was that at the time of this incident?
16  Around the time of this incident?
17  A.  No.  I already had my house in Doniphan.
18  Q.  Okay.  So since you had a house in Doniphan
19  at this time, how often would you be able to go see
20  your father-in-law?
21  A.  At least once a month.  Very minimum, once a
22  month.
23  Q.  Did your father-in-law keep Draco inside most
24  of the time, or was he an outside dog, or was he both?
25  A.  He was an inside dog.

Page 24

1  Q.  When you -- did you park your vehicle at some
2  point?  When you -- when you arrived and saw Draco,
3  did you park your vehicle at some point?
4  A.  I stopped in the middle of the road.
5  Q.  Okay.  Did you put your vehicle in park so it
6  wouldn't roll?
7  A.  Yes, sir.
8  Q.  All right.  What road was that when you
9  parked your vehicle?
10  A.  Be Dale Street.
11  Q.  Okay.  What street did your father-in-law
12  live on?
13  A.  Dale Street.
14  Q.  Prior to the day of this incident, did you
15  know the owner of the two dogs that were near Draco
16  when you saw them?
17  A.  Yes.
18  Q.  And who were the owners?
19  A.  Jennifer and Robin Mesey.
20  Q.  And how did you know them?
21  A.  They were good friends with my wife.
22  Q.  Okay.  What did you do after you parked your
23  vehicle in the middle of Dale Street?
24  A.  I got out and yelled at the dogs to get away
25  from him.

6 (Pages 21 to 24)

CHARLES ROPER  8/25/2020

---

Page 25

1    Q.  Now, you're referring to the two dogs that
2  were near Draco.  Is that right?
3    A.  That were on him?  Yes.
4    Q.  So at the time you got out, they were on top
5  of your father-in-law's dog?
6    A.  Yes, sir.
7    Q.  At the time of this incident, did Draco have
8  a collar on?
9    A.  I honestly don't know.
10    Q.  Okay.  Did the other two dogs have a collar
11  on?
12    A.  I didn't pay attention.
13    Q.  Okay.  I'm assuming you got out of your truck
14  first before you started yelling at the dogs.
15    A.  Yes, sir.
16    Q.  That was a statement by me, so that was bad.
17  So would you agree with the statement that I made that
18  you got out of the truck before you started yelling at
19  the dogs?
20    A.  Yes, sir.
21    Q.  What did your wife, Donna, do at that time?
22    A.  I -- I'm not 100-percent sure, because she
23  was behind me.
24    Q.  And how did she get behind you?
25    A.  She was in the vehicle.

---

Page 26

1    Q.  So how did she exit your vehicle?
2    A.  Through the door.
3    Q.  Through the same door that you got out of?
4    A.  I don't know.  I very seriously doubt it, but
5  I don't know.
6    Q.  Okay.  Well, I'm just -- I'm just trying to
7  figure out how she was in the passenger's seat and
8  then wound up behind you.  If you know.
9    A.  Because I was standing in front of the
10  vehicle.
11    Q.  Oh, okay.  Were you standing directly in
12  front of the middle of the vehicle, or were you to
13  either side of the vehicle?
14    A.  I would have been on the driver's side of the
15  vehicle.
16    Q.  What happened after you yelled at the dogs?
17    A.  Neither dog let go of him.  I fired one
18  warning shot into the ground.
19    Q.  And are you referring to the gun that you had
20  on your hip?
21    A.  Yes, sir.
22    Q.  What type of surface was the ground that you
23  fired the shot into?
24    A.  Grass and dirt.
25    Q.  So the vehicle that you were driving was

---

Page 27

1  parked, and you went -- did you go closer to the side
2  of the street, or did the street have grassy areas in
3  it?
4    A.  The -- the road they were on runs east and
5  west.  Back behind them was a grassy yard.  Or
6  correction.  The road -- Independence runs north and
7  south.  Dale runs east and west.
8    Q.  When you fired the shot into the ground,
9  where was your wife, Donna?
10    A.  Still would have been behind me.  Because I
11  didn't see her.
12    Q.  How close to the dogs were you when you fired
13  the warning shot?
14    A.  I would say three to five feet, give or take.
15    Q.  Were they directly in front of you?
16    A.  They might have been off to the left a little
17  bit.
18    Q.  Were the two dogs and your father-in-law's
19  dog -- were they on a grassy area, or in the street?
20    A.  They were on the blacktop.
21    Q.  And what happened after you fired the warning
22  shot?
23    A.  My gun jammed and I had to clear it.
24    Q.  Can you describe what you mean by your gun
25  jammed.

---

Page 28

1    A.  The empty casing didn't eject, and a -- a
2  loaded cartridge was trying to go in at the same time.
3    Q.  Had you had that happen to you with that gun
4  before?
5    A.  No, sir.
6    Q.  So after you fired the warning shot, the gun
7  jammed?
8    A.  Yes, sir.
9    Q.  And if the gun was jammed, you would not have
10  been able to fire another shot.  Is that true?
11    A.  Not until you clear the jam.
12    Q.  Okay.  Did you clear the jam?
13    A.  Yes, sir.
14    Q.  How did you clear the jam?
15    A.  I dropped the magazine, and racked the slide,
16  cleared it.
17    Q.  After that, did you put the magazine back in
18  the gun?
19    A.  Yes, sir.
20    Q.  When you put the magazine in the gun, does a
21  round automatically go in the chamber?
22    A.  In that gun, it does.
23    Q.  And what did you do after you put the
24  magazine back in the gun?
25    A.  That's when my wife walked around me.

---

7 (Pages 25 to 28)

CHARLES ROPER  8/25/2020

Page 29

1    Q.  On which side of you did she walk around you?
2    A.  On my right side.
3    Q.  And where were you standing at this point
4  with respect to your truck?
5    A.  I would have been in front of it still,
6  towards the driver's side.
7    Q.  Okay.  After you firing a warning shot and
8  yelling at the dogs, were the dogs -- the two dogs
9  that were near your father-in-law's dog, were they
10  ignoring you?
11    A.  The smaller one ran off, went on up
12  Independence Street up the hill.
13    Q.  Do you know if you struck that dog with a
14  bullet or not?
15    A.  I honestly don't believe so, because I seen
16  the grass fly.
17    Q.  What happened after that other dog ran off?
18    A.  My wife walked around me, said that she was
19  going to break it up.  And that's when the bigger dog
20  let go of Draco, and was coming after her.  And then
21  that's when I fired the shot and stopped him from
22  attacking my wife.
23    Q.  Can you describe how the other dog was
24  attacking your wife.
25    A.  It didn't attack her.  It was coming after

Page 30

1  her to try and attack her, teeth showing, barking,
2  acting aggressive.  I mean, I don't know how to
3  explain it.
4    Q.  So you mentioned its teeth were showing.
5    A.  Yes, sir.
6    Q.  How close were you to the dog when you saw
7  the teeth showing?
8    A.  We were still within that three to five-feet
9  range.
10    Q.  And what else did you observe about that dog?
11    A.  What -- I don't know.  My family's always
12  called it hackles.  The hair on the back of their neck
13  and on their tail was raised.  His tail was stiff.  He
14  was in attack mode.
15    Q.  How do you know that the dog was in attack
16  mode?
17    MS. KAYSER:  Asked and answered.  He's
18  already described it.
19    Q.  (BY MR. SCHOTTEL.)  Subject to that, you can
20  answer the question.
21    A.  Okay.  Because his teeth were showing, and
22  his hackles were raised, and he was coming after my
23  wife.
24    Q.  And can you describe what you mean coming
25  after your wife.

Page 31

1    A.  He was --
2    MS. KAYSER:  Objection.
3    MR. PHILLIPS:  He was -- oh, sorry.
4    MS. KAYSER:  Asked and answered.  You can
5  answer it one more time.
6    THE WITNESS:  It was physically coming
7  toward her.
8    Q.  (BY MR. SCHOTTEL.)  Walking towards her?
9    A.  I -- it didn't take but two steps.
10    Q.  Can you describe what that means, it didn't
11  take but two steps.
12    A.  I don't know if you can classify it as a
13  walk, a jog, a run.  It didn't -- we were -- we were
14  within three feet.  Reactionary gap is 21 feet.  We
15  were way inside that.  So it didn't take a bunch of
16  steps before I protected my wife.
17    Q.  And I think you testified you thought the dog
18  was going to attack your wife.
19    A.  I knew the dog was coming after my wife.
20    Q.  How did you know that?
21    A.  Because it was looking straight at her.
22    Q.  Okay.  Have you ever seen -- prior to this
23  date, have you ever seen a dog attack a human before?
24    A.  Yes.
25    Q.  Where?

Page 32

1    A.  That dog attacked my father-in-law.
2    Q.  And can you describe that dog attacking your
3  father-in-law.
4    A.  It come running at him, and Draco stepped in
5  the way, and the dogs got to fighting, he fell to the
6  ground.  I believe it was Robbie was the one that come
7  down there and drug the dog off.
8    Q.  But the dog ended up going after Draco?
9    A.  I think Draco went after him to prevent -- to
10  save its owner.
11    Q.  Well, if you had seen that dog allegedly
12  attack your father-in-law, why would you go out and
13  get very close to that dog?
14    A.  Because I care for animals.  I don't want you
15  sitting here thinking that I'm just some kind of
16  heartless person.  I'm not.
17    Q.  Before you even exited your vehicle, had you
18  intended to shoot the dog?
19    A.  Absolutely not.
20    Q.  Then what was your intention when you got out
21  of your vehicle with respect to those two dogs --
22    A.  To --
23    Q.  -- and Draco?
24    A.  Oh, sorry.  To get -- get them to stop, and
25  to make sure Draco was still alive.

ALARIS LITIGATION SERVICES
www.alaris.us
Phone: 1.800.280.3376
Fax: 314.644.1334
EXHIBIT A

CHARLES ROPER  8/25/2020

Page 33

1    Q.   But you've testified that you've seen -- that
2  you've allegedly seen that dog be aggressive toward a
3  human before.
4    A.   Yes, sir.
5    Q.   Did you have anything else outside of your
6  weapon to protect you from the dog?
7    A.   No, sir.
8    Q.   Outside of yelling at the dogs, did you have
9  any other plan to separate the dogs?
10   A.   Not at the moment.  No.
11   Q.   From the time you got out of your vehicle,
12  how long did it take you to draw your weapon?
13   A.   I -- I took a few steps.  So maybe a minute.
14  Two minutes.  Somewhere in there.
15   Q.   At the time you -- or I'm sorry.  After you
16  fired the warning shot, you fired a shot at -- at the
17  other dog.  Correct?  Because one -- one dog ran off,
18  so you did fire a shot at the second dog.
19   A.   One more time.  Sorry.  I didn't understand
20  what you were meaning.
21   Q.   Well, I believe you testified -- and correct
22  me if I'm wrong -- when you fired the warning shot,
23  one of the two dogs ran off.  Is that correct?
24   A.   Yes, sir.
25   Q.   Okay.  So there was one other dog that you

Page 34

1  knew to be the Meseys'.  Correct?
2    A.   Yes.
3    Q.   And your wife was friends with the Meseys.
4  Is that correct?
5    A.   Yes.
6    Q.   And on that day, is it fair to say that she
7  knew where they were living?
8    A.   Yes.  We were standing in front of their
9  house.
10   Q.   Did you go to their house and ask them for
11  help to get their dogs away from Draco?
12   A.   No.
13   Q.   Why not?
14   A.   We yelled at them.  Nobody answered.  There
15  was no vehicles there.  I wasn't even sure if they
16  were there.
17   Q.   Were they there?
18   A.   Yes.
19   Q.   Did you knock on the door or bang on the
20  door?
21   A.   No.  When I walked up there, they came
22  outside.
23   Q.   Well, prior to you confronting the dogs, did
24  you walk up to their door and bang on their door?
25   A.   No.

Page 35

1    Q.   Why not?
2    A.   Okay.  I didn't because they were killing my
3  father-in-law's dog.  Or I -- I'm not 100-percent sure
4  at that time if it was dead or if he was still alive.
5  So --
6    Q.   Well, apparently he was alive.  Right?
7    A.   Yes.
8    Q.   Would it have been a reasonable thing to try
9  to contact the Meseys because they're their dogs, and
10  they would have a better chance to remove them from
11  the situation?
12   A.   In a general sense, or on that day?
13   Q.   On that day.
14   A.   No.
15   Q.   Why not?
16   A.   Like I said, I wasn't sure if the dog was
17  already dead or not.
18   Q.   Why weren't you sure if the dog was dead or
19  not?
20   A.   There was two dogs attacking him.  He's
21  laying on the ground.
22   Q.   Did you see any blood?
23   A.   Yeah.  There was -- there was blood.
24   Q.   Where was the blood?
25   A.   It was coming from his ear and his neck.

Page 36

1    Q.   Are there any pictures of the blood?
2    A.   No, sir.  Not unless the sheriff's department
3  has pictures.  I don't know.
4    Q.   I didn't see any.
5    A.   Okay.
6    Q.   I don't know.  Did you?
7    A.   I -- I don't remember seeing any.  But I'm
8  not going to say that they didn't get some.
9    Q.   All right.  Did you take any?
10   A.   No, sir.
11   Q.   Why not?
12   A.   Because I was taken down to the sheriff's
13  office.
14   Q.   In general, where do you carry your police
15  badge?
16   A.   It stays on my vest.
17   Q.   And you didn't have your vest on that day.
18  Correct?
19   A.   I didn't even have a vest yet.  No.
20   Q.   Okay.  Did you know the Meseys' dogs by name?
21   A.   No, sir.
22   Q.   So you didn't know that the bigger dog's name
23  was Max?
24   A.   Not until I read the report.  No.
25   Q.   Okay.  And you didn't know the smaller dog's

9 (Pages 33 to 36)

CHARLES ROPER  8/25/2020

Page 37

1    name was Nina?
2        A.  I didn't even know that one was theirs.
3        Q.  How many total shots did you fire that day?
4        A.  Two.
5        Q.  Do you have any knowledge of whether or not
6    both Max and Nina were shot by a bullet?
7        A.  Okay.  So which one's Max and which
8    one's Nina?  Max was the bigger one.  Correct?
9        Q.  Correct.
10       A.  I know he was shot by a bullet.
11       Q.  Did you know Nina was shot by a bullet?
12       A.  They -- they had said something about that
13   whenever they sent text messages to my wife.  Yeah.
14       Q.  Do you think you were the one that shot Nina
15   by the bullet?
16       A.  No, sir.
17       Q.  Was there anyone else at that location when
18   this occurrence happened that had a gun?
19       A.  I -- there's no way I could know that.
20       Q.  That you saw.  That you observed.
21       A.  Not that I seen.  No.
22       Q.  If you could take a look at Exhibit 2.  On
23   the third page, I believe, the -- Paragraph 17 at the
24   top.
25       A.  Okay.

Page 38

1        Q.  And do you see it says and that one of
2    plaintiff's dogs turned aggressively toward answering
3    defendant's wife.  That means Donna.
4        A.  Yes, sir.
5        Q.  Okay.  And do you know what turned
6    aggressively -- or could you describe or explain that
7    any further.
8        A.  Not any further than I already have.  I
9    mean -- no.
10       Q.  And this was part of an answer filed with the
11   court on August 23rd, 2019.  Does that sound right?
12       A.  Oh.  Yes, sir.
13       Q.  All right.  Did you give a -- or I'm sorry.
14   Were you interrogated or questioned by the Crawford
15   County Sheriff's Department when they were doing their
16   investigation?
17       A.  No.
18           MS. KAYSER:  Carter County.
19           MR. SCHOTTEL:  Oh, I'm sorry.  Did I say --
20           THE WITNESS:  Yeah.  You said Crawford.
21   That's what threw me off.
22       Q.  (BY MR. SCHOTTEL)  Crawford.  I'm sorry.
23   It's been a long day.  Exhibit 3.  Let's just go to
24   that.  In that investigation, did you give any kind of
25   written statement about what occurred?

Page 39

1        A.  Yes, sir.
2        Q.  All right.  Can you look at Page 83.
3            MS. KAYSER:  I think they're marked --
4        Q.  (BY MR. SCHOTTEL)  They're marked in the
5    upper right --
6        A.  Oh, top corner.
7        Q.  -- corner to make things easier.  I may have
8    the page number wrong, but I think I'm close.
9        A.  83 was my wife's.
10       Q.  All right.
11       A.  Mine's 84.
12       Q.  84.  Could you take a moment and read through
13   your statement.
14       A.  Okay.
15       Q.  Could I take a look at it.
16       A.  Yes, sir.
17       Q.  I only got one copy, because my copier went
18   on the fritz.  In your statement -- and the date of
19   this is 2/22/19 -- would that have been the date of
20   the incident, or --
21       A.  Yes, sir.
22       Q.  Yes.  Okay.  So did you give this statement
23   shortly after the incident occurred?
24       A.  Yes, sir.
25       Q.  Do you think your memory is better right

Page 40

1    after something happens, or several months after
2    something happens?
3            MS. KAYSER:  Objection.  Calls for
4    speculation.  To the extent you can answer.
5            THE WITNESS:  I -- I'm not a doctor.  I
6    have no clue for the answer to that one.
7        Q.  (BY MR. SCHOTTEL)  No.  I'm not asking you
8    to be a doctor.  I'm asking your own opinion about
9    your own memory, how you remember things.  So would
10   you remember something better right after it happens,
11   or after several months has -- have passed?
12       A.  It would have to be closer to the incident
13   happening.
14       Q.  Okay.  So your testimony is your memory is
15   closer to when an incident happens?
16       A.  Yes, sir.
17       Q.  In this statement, did you use the word
18   aggressive or aggressively anywhere?
19       A.  I don't believe so.
20       Q.  You don't believe so?
21       A.  I don't think I did.
22       Q.  You can double-check.
23       A.  I was going to say, I don't remember.  I
24   don't see the word aggressive in there.
25       Q.  Not to you or towards your wife.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334
EXHIBIT A

CHARLES ROPER  8/25/2020

Page 41

1    A.  I don't see the word aggressive in my
2  statement at all.
3    Q.  All right.  But in subsequent statements, you
4  used the word aggressively.
5    A.  Okay.
6    Q.  Why would you say that the dogs were
7  aggressive at a later date, and not right after the
8  incident occurred?
9    A.  This is a statement.  This is not a story of
10  the whole event.
11    Q.  You gave a statement that talks about the
12  dog.
13    A.  Right.
14    Q.  Walking towards your wife in that statement.
15    A.  Okay.
16    Q.  Okay.  And you didn't say aggressively.
17    A.  Okay.
18    Q.  And my question was why would you use the
19  word aggressively many months after the incident, and
20  not right after the incident happened?
21    A.  Because --
22    MS. KAYSER:  To the extent that -- he can
23  use whatever words he wants.  This is a crazy, vague
24  and ambiguous question.
25    MR. SCHOTTEL:  No.  It's pretty

Page 42

1  straight-forward.
2    MS. KAYSER:  If you have an answer,
3  Charles, feel free to --
4    MR. PHILLIPS:  I'm going to join in that.
5  I'd also object that it mischaracterizes his previous
6  testimony.  He didn't say that he never described the
7  dog as being aggressive closer in time to the
8  incident.  If you're asking him specifically about
9  that statement, that's one thing.  If you're asking
10  him about what he told people at or near the scene,
11  that's a different thing.  Subject to that, you can
12  answer to the best of your ability.
13    THE WITNESS:  I -- I don't know what you
14  want from me.  I really don't.
15    Q.  (BY MR. SCHOTTEL.)  All right.  In your
16  statement that you gave on the date of
17  the incident, can you read what you stated about the
18  dog walking towards your wife.
19    A.  As she approached the dog, the dog released
20  the dog and came at her.
21    Q.  Okay.  Okay.  Can I see this.
22    A.  Yes, sir.
23    Q.  All right.  There you go.  And you accurately
24  stated your sentence that it came at her.  And when I
25  asked you before on August 23rd in a document filed

Page 43

1  with the court, it states and that one of plaintiff's
2  dogs turned aggressively toward answering defendant's
3  wife.  So you didn't say in your statement that the
4  dog aggressively turned toward your wife.
5    MS. KAYSER:  And I object to the form.
6  Whatever words are used, they say exactly the same
7  thing.
8    THE WITNESS:  You need me to read it again?
9    Q.  (BY MR. SCHOTTEL)  No.  I'm just asking you.
10  You did not put in your statement that the dog turned
11  aggressively towards your wife.
12    A.  No.  It's not wrote like that in there.
13    Q.  Okay.  And can I get the -- the previous page
14  that your -- your wife's statement.  And for the
15  record, this is Page 83 of Exhibit 3.  Did your wife
16  state in her statement that the dog aggressively
17  turned and came at her?
18    MS. KAYSER:  Objection.  Do you just want
19  him to read the statement into the record?
20    MR. SCHOTTEL:  No.  I'm just asking the
21  question.
22    MS. KAYSER:  He didn't write it.
23    MR. SCHOTTEL:  I know.
24    THE WITNESS:  I haven't read her statement.
25    Q.  (BY MR. SCHOTTEL.)  Well, we've got a second

Page 44

1  to read it.
2    MS. KAYSER:  Why don't you read it out loud
3  so it's on the record.
4    THE WITNESS:  Okay.  Was leaving my
5  father's house -- Jeffrey Walberg -- when we seen
6  three dogs in the road fighting.  I pointed out to my
7  husband -- Charles Roper -- that the dog lying on the
8  ground was my father's.  We stepped out of the vehicle
9  to try and break them apart.  My husband fired a
10  warning shot at the ground, and one dog left.  The
11  other dog didn't move, so I went to them to try and
12  break them up.  The dog came towards me and my husband
13  shot the other dog.
14    Q.  Did your wife use the word aggressively?
15    A.  I don't see it.
16    Q.  You didn't see it.  So is that a no?
17    A.  Not from what I read on there.  No.
18    Q.  If you could look at Plaintiff's Exhibit 1,
19  please.  And I'll be more specific in a second.  Page
20  10.  And looking at Interrogatory Number 20.  And it
21  states please state whether or not the Van Buren
22  Police Department had policies or procedures in place
23  for officers to follow while being considered off
24  duty.  Question:  If your answer is in the
25  affirmative, please describe those policies and

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                            Fax: 314.644.1334
EXHIBIT A

CHARLES ROPER  8/25/2020

Page 45

1  procedures.  Could you just read your answer to that
2  question.
3      A.  There were no formal policy or procedures in
4  place at the time of the incident.
5      Q.  And I noticed you said there were no formal
6  policy or procedures.  Were there informal policy and
7  procedures?
8      A.  I'd only been there for three days.  I don't
9  know.
10     Q.  I was just curious why you stated there were
11 no formal, instead of -- why you clarified formal.
12 That's all I was asking.
13     A.  Oh, I have --
14     Q.  Not trying to trick you.
15     A.  No.  You're -- you're fine.
16     Q.  Okay.  And you said you were familiar with
17 Exhibit 5, the leash laws.  Is that correct?
18     A.  I've seen them since they've been printed
19 out.  Yeah.
20     Q.  When the bigger dog that you know you shot --
21 or admitted you shot -- when you shot the bigger dog,
22 the bigger dog did not have a leash on.  Is that
23 correct?
24     A.  No, sir.
25     Q.  When you shot the bigger dog without the

Page 46

1  leash, were you enforcing the leash laws that were in
2  place?
3      A.  No, sir.
4      Q.  Then what was your ultimate purpose in firing
5  your weapon at the bigger dog?
6          MS. KAYSER:  Objection.  Asked and
7  answered.
8          THE WITNESS:  To protect my wife.
9      Q.  (BY MR. SCHOTTEL.)  Give me a couple minutes
10 to look through and we should be finished.  I missed
11 something.  Could you take a look at Plaintiff's
12 Exhibit 4.  Just take a look at it.  It's your
13 application for employment with City of Van Buren.
14 Right?  And could you look at the last page entitled
15 the oath of office.  And could you read that for me
16 into the record.
17     A.  Okay.  It says I, Charles Roper, do solemnly
18 swear that I possess the qualifications for the
19 position of police officer as prescribed by law; that
20 I will support the Constitution of the United States,
21 and of the State of Missouri, the provisions of all
22 laws of the state affecting cities of this class, and
23 the ordinances of the City of Van Buren, Missouri; and
24 faithfully demean myself in office, so help me God.
25     Q.  And what was the date that you had signed

Page 47

1  that oath of office?
2      A.  1/30/2019.
3      Q.  And whose signature is below there?
4      A.  Below mine, or --
5      Q.  Yes.  Below yours.
6      A.  That's the city clerk.  I think her name was
7  Jeri Platt.
8      Q.  Okay.  And that was just like a notary seal.
9  Is that correct?
10     A.  Yes, sir.
11     Q.  All right.  Before you shot the bigger dog,
12 did your wife, Donna, make any comments to you like
13 shoot the dog?
14     A.  No.
15     Q.  No?  Okay.  Could you describe your wife's
16 reaction after you shot the dog as it was -- it was
17 near her?
18     A.  Like she walked over there to try and see if
19 she could check on Draco, and then she got in the
20 truck and went back down to my father-in-law's.
21     Q.  How close was your wife to the dog when
22 you -- to the bigger dog when you shot it?
23     A.  I pulled her back behind me.  So if I was
24 three to four foot, she was probably, you know, four
25 to five.

Page 48

1      Q.  So you pulled her -- you pulled your wife
2  behind you before shooting the dog?
3      A.  Yes.
4      Q.  What did the dog do when you pulled your wife
5  behind you?
6      A.  Nothing different.
7      Q.  Did it stand in front of you?
8      A.  It was still coming your direction.  This was
9  a very quick time this happened.
10     Q.  But if you pulled your wife behind you, then
11 you were in between the dog and --
12     A.  And her.
13     Q.  -- your wife.
14     A.  Yes.
15     Q.  Right.  So that's what I was asking.
16     A.  Okay.
17     Q.  What did the dog do when you pulled your wife
18 directly behind you?
19     A.  Well, I don't think it was directly behind
20 me, but behind me.  But it didn't do anything
21 different.  It was still approaching us.  You know.
22     Q.  So it was approaching you as well.
23     A.  Well, whenever I put her behind me, I guess
24 yeah, it would have been approaching me.
25     Q.  Was the dog barking at the time?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                    Fax: 314.644.1334
EXHIBIT A

CHARLES ROPER  8/25/2020

Page 49

1    A.  Yes.
2    Q.  So at the time you shot the bigger dog, your
3  wife was behind you?
4    A.  Yes.
5    Q.  Where on the dog did you hit it?
6    A.  I aimed for the head.  I don't know exactly
7  where I hit it.
8    Q.  Pretty good shot.  When officers describe
9  different things in dealing with citizens and things,
10  what is -- or -- are matters or circumstances
11  sometimes referred to as threats?
12        MS. KAYSER:  Objection.  Vague.  If you can
13  answer that question, go ahead.
14    Q.  (BY MR. SCHOTTEL)  So if you have a gun
15  that -- someone with a gun who is positioned in a
16  house, would that person sometimes be referred to as a
17  threat?
18        MS. KAYSER:  Objection.  Vague.  Calls for
19  speculation.
20        THE WITNESS:  I guess it could be.  I've
21  never been in that situation, so I don't know.
22    Q.  (BY MR. SCHOTTEL)  Okay.  By putting your
23  wife behind you, had you not protected her from the
24  dog?
25    A.  Maybe.  I mean, can't guarantee anything.

Page 50

1  The dog didn't stop coming at us, so I felt not.
2    Q.  Can you describe what the dog looked like
3  just before you pulled the trigger and shot it.
4        MS. KAYSER:  Objection.  Asked and
5  answered.
6        THE WITNESS:  It's a brown and white dog.
7    Q.  (BY MR. SCHOTTEL)  Any -- any distinctive
8  features that made you alarmed about the dog that it
9  was going to hurt you?
10    A.  Yeah.  It was growling, it was barking,
11  showing its teeth, hackles were raised, tail was
12  stiff.
13    Q.  What happened to the dog after you shot it?
14    A.  It fell to the ground and didn't move.
15    Q.  So how many shots during that occasion did
16  you shoot from your weapon?
17        MS. KAYSER:  Objection.  Asked and
18  answered.  You can answer it one more time.
19        THE WITNESS:  Two.
20    Q.  (BY MR. SCHOTTEL)  Okay.  And just so I'm
21  clear about that gun -- and I'm not trying to ask an
22  asked and answered question -- but that gun had how
23  many in the magazine?
24    A.  Seven.
25    Q.  The gun that you had on that day.

Page 51

1    A.  Yeah.  Seven.
2    Q.  Seven.  And then there was one in the
3  chamber, so it would have been eight?
4    A.  Yes, sir.
5    Q.  All right.  Could you hand me Exhibit 3 real
6  quick.  This'll be my final question, I think.  All
7  right.  Damon, you want to give me a quick hand and
8  make this go faster.  Just help me flip a couple pages
9  over.
10        MR. PHILLIPS:  Sure.  Just tell me when.
11        MR. SCHOTTEL:  Yeah.  Just a couple more
12  pages.  Okay.  I think that might be --
13        MS. KAYSER:  Don't start that yawning.
14        THE WITNESS:  I'm always tired.  I work a
15  lot.
16    Q.  (BY MR. SCHOTTEL)  Before I ask this final
17  question -- when your gun jammed, and you unjammed --
18  you unjammed it.  Correct?
19    A.  Yes, sir.
20    Q.  And how did you do that again, briefly?
21    A.  I dropped the magazine and racked the
22  chamber.
23    Q.  Okay.  So what would have happened to that
24  bullet that was jammed?
25    A.  It probably -- it should have fell out.

Page 52

1  That's usually how you clear a jam, is they fall out
2  on the ground.
3    Q.  Okay.  Do you remember whether it did fall on
4  the ground?
5    A.  I believe so.  I believe there's a picture of
6  it laying on the ground, too.
7    Q.  Okay.  This is Bates Number 3 in Exhibit 3.
8  It says that there were a quantity of five live rounds
9  returned to owner.  Returned to you.  Does that sound
10  right?
11    A.  I -- I believe so.  Because I even asked them
12  why I didn't get my other rounds back.  But yeah.
13  I've got that same property receipt at home.
14    Q.  Would that be consistent with firing two
15  rounds?
16    A.  Not according to that paper.  No.
17    Q.  Okay.  So that would be inconsistent with
18  your testimony of firing two rounds.
19        MS. KAYSER:  Objection as to form.  It's
20  consistent with what's on the form that you gave him.
21  But he already testified that he didn't get everything
22  back.
23        MR. SCHOTTEL:  No.  I'm just saying with
24  the form.  I'm not going into his testimony.
25        THE WITNESS:  Yeah.  You'll have to ask the

13 (Pages 49 to 52)

CHARLES ROPER  8/25/2020

## Page 53

1   deputy.
2       Q.   (BY MR. SCHOTTEL.)  The form -- the form is
3   not consistent with your testimony of firing two
4   rounds.
5       A.   No.
6       MR. SCHOTTEL:  Okay.  All right.  I think
7   that's all the questions I have.
8       MR. PHILLIPS:  Mind if I power through
9   about two minutes worth of questions before we get
10  kicked out of here?
11      THE WITNESS:  You're fine.
12          CROSS-EXAMINATION
13  QUESTIONS BY MR. PHILLIPS:
14      Q.   Okay.  So you were driving your son's Ford
15  Escape.  Right?
16      A.   Yes, sir.
17      Q.   Was that a police vehicle?
18      A.   No, sir.
19      Q.   Were you in uniform?
20      A.   No, sir.
21      Q.   The weapon that you used to defend your wife,
22  was that a gun that was given to you by the police
23  department?
24      A.   No, sir.
25      Q.   Was that your personal weapon?

## Page 54

1       A.   Yes, sir.
2       Q.   When you were defending your wife, were you
3   on your way back after visiting your father-in-law?
4       A.   Yes, sir.
5       Q.   Was that a social visit?
6       A.   Yes, sir.
7       Q.   Had you been visiting him in your capacity as
8   a police officer?
9       A.   No, sir.
10      Q.   When you left his residence, were you leaving
11  to go and do police work?
12      A.   No, sir.
13      Q.   As of the date of this incident, you had
14  become a reserve police officer within days of that
15  date.  Is that right?
16      A.   Yes, sir.
17      Q.   And at that same time, you were also a
18  reserve deputy with the Ripley County Sheriff's
19  Office.  Is that right?
20      A.   Yes, sir.
21      Q.   And you were also working with the Butler
22  County EMS.  Is that right?
23      A.   Yes, sir.
24      Q.   And you were also working with West Carter
25  County Ambulance.  Is that right?

## Page 55

1       A.   Okay.  If I was already working at West
2   Carter I wasn't working at Butler.  Sorry.
3       Q.   Okay.
4       A.   I can't remember exactly which one.  I was
5   working for one of the ambulance services at the time.
6   Yes.
7       Q.   Okay.  And in fact, you're even wearing an
8   EMS shirt right now; aren't you?
9       A.   Yes, sir.
10      Q.   So you were working in some capacity doing
11  EMS work, and you were a reserve deputy at the same
12  time as this incident.  Correct?
13      A.   Yes, sir.
14      Q.   Okay.  Did this incident have anything to do
15  with your being a reserve deputy?
16      A.   No, sir.
17      Q.   Did this incident have anything to do with
18  your being an EMS worker?
19      A.   No, sir.
20      Q.   Did this incident have anything to do with
21  you being a police officer?
22      A.   No, sir.
23      Q.   One last question.  And I'm sorry to pry on
24  this.  You said that Draco had passed away, it sounded
25  like within the last few months.  Is that right?

## Page 56

1       A.   Yeah.  It hasn't been too long ago.
2       Q.   Okay.
3       A.   It was -- it was May or June of this year.
4   Yeah.
5       Q.   Okay.  How was his health after he was
6   attacked by these two dogs?
7       A.   I didn't see him every day until my
8   father-in-law brought him over to my house when he
9   moved in with us for a while.  When he brought him to
10  my house, he was in very bad health.
11      Q.   Okay.
12      A.   They said they believed he had had a stroke.
13      Q.   Okay.
14      A.   So he was -- horrible health.  He had -- he
15  was blind.  He was deaf.  Had a few teeth left.  I
16  mean, he was an old dog.
17      Q.   Okay.  Did you place Mr. or Mrs. Mesey under
18  arrest that day?
19      A.   No, sir.
20      Q.   Did you issue either of them a ticket?
21      A.   No, sir.
22      MR. PHILLIPS:  All right.  No other
23  questions.
24      MS. KAYSER:  I have none.  Do you have any
25  follow-ups?

14 (Pages 53 to 56)

**CHARLES ROPER  8/25/2020**

## Page 57

1    MR. SCHOTTEL:  Yeah.  I have just two quick
2  follow-ups.
3         REDIRECT EXAMINATION
4  QUESTIONS BY MR. SCHOTTEL:
5    Q.  When you were hired by the City of Van Buren
6  as a police officer, did they give you any kind of
7  firearm?
8    A.  No, sir.
9    Q.  Was it the -- when you were hired by the City
10  of Van Buren as a police officer, were you required to
11  purchase your own firearm?
12    A.  They have guns that they can give us.  We
13  have our choice.
14    Q.  Okay.  So you have a choice.  You can use
15  your own, purchase your own, or you can use one of the
16  guns that they have at the station.  Is that correct?
17    A.  Yes, sir.
18    Q.  All right.  And were you given any citations
19  as a result of this incident with the Meseys' dogs and
20  your father-in-law's dog?
21    A.  No, sir.
22    Q.  You weren't given a property-damage citation?
23    A.  No.  Citations are handed out by city police
24  officers.  This was investigated by the county.
25    Q.  Okay.  Were you given anything by the county?

## Page 58

1    A.  No.  I was told that they were going to
2  possibly press charges, that I needed to speak to the
3  prosecutor.
4    Q.  Okay.  I believe there's a citation in
5  Exhibit 3, but I'm not going to ask about it if he
6  doesn't know about it, I guess.  It was maybe never
7  filed, so --
8    A.  Yeah.  I never seen anything.
9    Q.  If you -- you never had to go to court for
10  anything?
11    A.  No, sir.
12    Q.  That's fair enough.  So nothing further from
13  me.
14    MS. KAYSER:  All right.  We'll read and
15  sign.
16    THE REPORTER:  And who gets a copy?
17    MS. KAYSER:  I'll take an eTran.
18    MR. PHILLIPS:  Same.
19    THE REPORTER:  And what kind of copy do you
20  get, sir?
21    MS. KAYSER:  What kind of copy do you want?
22    MR. SCHOTTEL:  Oh, I'll take an eTran.
23  Sorry.
24
25    (Ending time of the deposition:  5:01 p.m.)

## Page 59

1         CERTIFICATE OF REPORTER
2  STATE OF MISSOURI  )
3              ) ss.
4  COUNTY OF PHELPS   )
5
6      I, Sarah J. Pokorski, Certified Court
7  Reporter within and for the State of Missouri, do
8  hereby certify that the witness whose testimony
9  appears in the foregoing deposition was duly sworn by
10  me; that the testimony of said witness was taken by me
11  to the best of my ability and thereafter reduced to
12  typewriting under my direction; that I am neither
13  counsel for, related to, nor employed by any of the
14  parties to the action in which this deposition was
15  taken, and further that I am not a relative or
16  employee of any attorney or counsel employed by the
17  parties thereto, nor financially or otherwise
18  interested in the outcome of the action.
19
20         Sarah Pokorski, CCR 745
21
22
23
24
25

## Page 60

1         ALARIS LITIGATION SERVICES
2
3  September 1, 2020
4
5  Portia C. Kayser
   Fisher, Patterson, Sayler & Smith, LLP
   1010 Market Street
6  Suite 1650
   St. Louis, Missouri  63101
7
   IN RE: ROBIN MESEY and JENNIFER MESEY v. CITY OF
8      VAN BUREN, MISSOURI, et al.
9  Dear Ms. Kayser:
10  Please find enclosed your copies of the deposition of
   CHARLES ROPER taken on August 25, 2020 in the
11  above-referenced case. Also enclosed is the original
   signature page and errata sheets.
12
   Please have the witness read your copy of the
13  transcript, indicate any changes and/or corrections
   desired on the errata sheets, and sign the signature
14  page before a notary public.
15
   Please return the errata sheets and notarized
16  signature page within 30 days to our office at 711 N
17  11th Street, St. Louis, MO 63101 for filing.
18
19  Sincerely,
20
21
22
23  Sarah J. Pokorski
24
25  Enclosures

15 (Pages 57 to 60)

CHARLES ROPER  8/25/2020

Page 61

1       ERRATA SHEET
        Witness Name: CHARLES ROPER
2       Case Name: ROBIN MESEY and JENNIFER MESEY v. CITY OF
            VAN BUREN, MISSOURI, et al.
3       Date Taken: AUGUST 25, 2020
4
5       Page #_____  Line #_____
6       Should read: _____
7       Reason for change: _____
8
9       Page #_____  Line #_____
10      Should read: _____
11      Reason for change: _____
12
13      Page #_____  Line #_____
14      Should read: _____
15      Reason for change: _____
16
17      Page #_____  Line #_____
18      Should read: _____
19      Reason for change: _____
20
21      Page #_____  Line #_____
22      Should read: _____
23      Reason for change: _____
24
25      Witness Signature: _____

Page 62

1       STATE OF _____)
2
3       COUNTY OF _____)
4
5       I, CHARLES ROPER, do hereby certify:
6           That I have read the foregoing deposition;
7           That I have made such changes in form
8       and/or substance to the within deposition as might
9       be necessary to render the same true and correct;
10          That having made such changes thereon, I
11      hereby subscribe my name to the deposition.
12          I declare under penalty of perjury that the
13      foregoing is true and correct.
14          Executed this _____ day of _____,
15      20____, at _____.
16
17
18
19          _____
20          CHARLES ROPER
21
22          _____
23          NOTARY PUBLIC
24      My Commission Expires:
25

16 (Pages 61 to 62)

CHARLES ROPER  8/25/2020

## A

ability 7:23
19:17 42:12
59:11
able 23:19
28:10
above-refere...
60:11
Absolutely
17:22 32:19
accurately
42:23
acting 30:2
action 59:14,18
additional 10:14
admitted 45:21
affect 7:23
affirmative 16:13
44:25
afternoon 3:15
5:17 19:23
age 5:10
aggressive
30:2 33:2
40:18,24 41:1
41:7 42:7
aggressively
38:2,6 40:18
41:4,16,19
43:2,4,11,16
44:14
ago 56:1
agree 25:17
AGREED 5:1
ahead 49:13
aimed 49:6
al 1:10 3:9,23
60:8 61:2
Alaris 4:19 60:1
alarmed 50:8
alive 32:25
35:4,6
allegedly 32:11
33:2
altercation
18:22,23

ambiguous
41:24
ambulance
54:25 55:5
and/or 60:13
62:8
animals 32:14
ankles 15:9
answer 8:22,23
8:23,24,25
16:17 30:20
31:5 38:10
40:4,6 42:2
42:12 44:24
45:1 49:13
50:18
answered 30:17
31:4 34:14
46:7 50:5,18
50:22
answering 38:2
43:2
answers 16:2,6
16:13
anyway 8:2
apart 44:9
apparently 35:6
appears 59:9
application 18:4
18:6 46:13
approached
19:4 42:19
approaching
48:21,22,24
April 11:22
area 21:3 27:19
areas 27:2
arrest 56:18
arrived 24:2
asked 10:7
30:17 31:4
42:25 46:6
50:4,17,22
52:11
asking 8:14
16:20 40:7,8
42:8,9 43:9

43:20 45:12
48:15
Associates 4:3
Association
10:10
assume 8:1
assuming 10:22
13:5 25:13
attach 15:11
attached 14:4,7
attack 29:25
30:1,14,15
31:18,23 32:12
attacked 32:1
56:6
attacking 22:10
29:22,24
32:2 35:20
attention 25:12
attorney 8:10
16:16 59:16
attorney's 17:13
August 1:17 3:13
38:11 42:25
60:10 61:3
automatically
28:21

## B

back 8:8 10:5
12:19 15:23
16:6 23:3 27:5
28:17,24
30:12 47:20
47:23 52:12
52:22 54:3
bad 25:16 56:10
badge 36:15
bang 34:19,24
barking 30:1
48:25 50:10
basic 8:20 9:11
basically 9:15
16:16
Bates 17:1 52:7
bear 16:5
beginning 7:21

behalf 1:16 3:23
5:10
believe 8:12
11:21 18:7 19:15
21:19 29:15
32:6 33:21
37:23 40:19
40:20 52:5,5
52:11 58:4
believed 56:12
best 19:17,20
42:12 59:11
better 35:10
39:25 40:10
bigger 21:20
29:19 36:22
37:8 45:20,21
45:22,25
46:5 47:11,22
49:2
bit 16:22 27:17
biting 21:18
blacktop 27:20
blind 56:15
blood 35:22,23
35:24 36:1
Bluff 6:13 10:12
10:22
body 15:1
book 18:11
born 8:2
break 9:8,10
10:2 29:19
44:9,12
breed 19:18,20
briefly 10:8
51:20
broke 20:10
brought 56:8,9
brown 22:2
50:6
bullet 29:14
37:6,10,11,15
51:24
bullets 14:2
bunch 31:15
Buren 1:9 3:8

3:22 7:2,7,10
7:17 9:11,13
10:15 18:7
23:13 44:21
46:13,23 57:5
57:10 60:8
61:2
Butler 54:21
55:2

## C

C 4:1,9 60:4
called 30:12
Calls 40:3 49:18
capacity 13:17
54:7 55:10
car 9:20 20:8
care 32:14
carries 11:16
carry 11:17,19
13:12 14:22,25
15:2,4 36:14
carrying 12:25
13:3,15 14:18
14:19
Carter 6:19,21
17:10,10 38:18
54:24 55:2
cartridge 28:2
case 1:9 3:8
11:22 12:23
16:16,17 17:12
60:11 61:2
casing 28:1
cause 3:19
CCR 4:18,19 5:4
59:20
certain 3:19
CERTIFICATE
59:1
Certified 3:17
5:4 59:6
certify 59:8
62:5
CEUs 10:16
chamber 13:23
13:24 28:21

CHARLES ROPER  8/25/2020

51:3,22
chance 35:10
change 61:7,11
  61:15,19,23
changes 60:13
  62:7,10
charges 58:2
Charles 1:15
  3:12 5:9,19
  16:14 42:3
  44:7 46:17
  60:10 61:1
  62:5,20
check 47:19
chief 8:13
choice 57:13,14
circumstances
  49:10
citation 57:22
  58:4
citations 57:18
  57:23
cities 46:22
citizens 9:13
  49:9
city 1:9 3:8,22
  6:12 7:2,6,10
  7:13,17 8:13
  9:11 10:15 18:11
  46:13,23 47:6
  57:5,9,23
  60:7 61:2
clarified 45:11
class 46:22
classify 31:12
clear 27:23
  28:11,12,14
  50:21 52:1
cleared 28:16
clearing 15:14
clerk 47:6
client's 8:21
close 27:12
  30:6 32:13
  39:8 47:21
closer 8:18 27:1
  40:12,15 42:7

clue 40:6
code 18:11
collar 25:8,10
college 6:6,11
color 22:3
come 32:4,6
coming 29:20
  29:25 30:22
  30:24 31:6,19
  35:25 48:8
  50:1
comments
  47:12
Commission
  62:24
common 11:13
Community 6:11
complaint 12:8
  16:17
completed 6:5
concealed 13:9
  13:12
conducted 10:8
confronting
  34:23
confuse 14:15
considered
  44:23
consisted 11:3
consistent
  52:14,20 53:3
Constitution
  46:20
contact 35:9
copier 39:17
copies 60:10
copy 17:13,14,14
  17:16 39:17
  58:16,19,21
  60:12
corner 39:6,7
correct 9:15
  10:25 16:3
  33:17,21,23
  34:1,4 36:18
  37:8,9 45:17
  45:23 47:9

51:18 55:12
  57:16 62:9,13
correction 27:6
corrections
  60:13
counsel 5:2,2
  15:17 59:13,16
county 3:15 6:19
  6:21 17:10
  38:15,18 54:18
  54:22,25
  57:24,25 59:4
  62:3
couple 16:25
  46:9 51:8,11
course 10:23
  11:7
court 1:1 3:1,17
  3:20 4:18 5:4
  8:16,18 9:3
  15:20 38:11
  43:1 58:9
  59:6
Courthouse
  3:16
Crawford 38:14
  38:20,22
crazy 41:23
CROSS-EXA...
  53:12
curb 20:24,25
curious 45:10
current 7:9
currently 11:17
_____
          D
D 2:1
D-R-A-C-O 19:8
Dale 20:22
  24:10,13,23
  27:7
Damon 4:14
  16:25 51:7
damon@kpwl...
  4:16
date 11:21 12:2
  12:11,22 13:1

18:20 19:21
  31:23 39:18,19
  41:7 42:16
  46:25 54:13
  54:15 61:3
day 3:15 12:25
  13:9,11 14:19
  20:14 21:23
  22:5,11,14
  23:14 24:14
  34:6 35:12,13
  36:17 37:3
  38:23 50:25
  56:7,18 62:14
days 45:8 54:14
  60:17
dead 35:4,17,18
deaf 56:15
dealing 49:9
Dear 60:9
deceased 19:10
declare 62:12
defend 53:21
defendant 16:14
defendant's
  38:3 43:2
Defendants 1:11
  3:10,23 4:8
  5:3
defending 54:2
defense 16:13
demean 46:24
department
  7:17 10:1 17:10
  18:8 36:2
  38:15 44:22
  53:23
departments
  11:14
deposes 5:11
deposition 1:15
  3:12 5:3,13
  8:21 9:7
  58:25 59:9,14
  60:10 62:6,8
  62:11
deputy 53:1

54:18 55:11,15
describe 10:18
  11:2 14:25
  20:18 21:25
  27:24 29:23
  30:24 31:10
  32:2 38:6
  44:25 47:15
  49:8 50:2
described
  30:18 42:6
desired 60:13
different 10:1
  11:7 14:7 15:12
  42:11 48:6,21
  49:9
DIRECT 5:15
direction 48:8
  59:12
directly 26:11
  27:15 48:18,19
dirt 26:24
distinctive 50:7
District 1:1,2 3:1
  3:2,20,20
Division 1:3 3:3
  3:21 4:14
doctor 40:5,8
document
  42:25
documents
  16:21
dog 18:21,22,23
  18:25 19:3,17
  21:18 23:24
  23:25 25:5
  26:17 27:19
  29:9,13,17,19
  29:23 30:6,10
  30:15 31:17,19
  31:23 32:1,2,7
  32:8,11,13,18
  33:2,6,17,17,18
  33:25 35:3,16
  35:18 41:12
  42:7,18,19,19
  42:20 43:4,10

CHARLES ROPER  8/25/2020

43:16 44:7,10
44:11,12,13
45:20,21,22
45:25 46:5
47:11,13,16,21
47:22 48:2,4
48:11,17,25
49:2,5,24
50:1,2,6,8,13
56:16 57:20
dog's 19:5
36:22,25
dogs 18:15,17
21:9,10,10,13
21:16,22,25
22:6,6,9
24:15,24 25:1
25:10,14,19
26:16 27:12,18
29:8,8,8 32:5
32:21 33:8,9
33:23 34:11,23
35:9,20
36:20 38:2
41:6 43:2 44:6
56:6 57:19
doing 21:16
38:15 55:10
Doniphan 23:17
23:18
Donna 6:3
25:21 27:9
38:3 47:12
door 26:2,3
34:19,20,24
34:24
double-check
40:22
doubt 26:4
Draco 19:6,9,18
19:23 20:4,14
20:19 21:13,17
22:6,10,22,22
23:23 24:2,15
25:2,7 29:20
32:4,8,9,23
32:25 34:11

47:19 55:24
drafted 16:15
draw 33:12
driver's 26:14
29:6
driving 20:3,6,8
20:14 26:25
53:14
dropped 28:15
51:21
drug 32:7
duly 59:9
duties 9:11
duty 44:24

_____
E
_____

E 2:1 4:1,1
eager 8:24
ear 35:25
easier 16:24
39:7
east 4:14 27:4,7
Eastern 1:2 3:2
3:20
education 6:4
eight 3:14 51:3
either 21:22
26:13 56:20
eject 28:1
Eleventh 4:20
else's 9:20
employed
59:13,16
employee
59:16
employment
6:18,24 9:10
18:4,5 46:13
empty 28:1
EMS 54:22
55:8,11,18
EMT 6:8
enclosed 60:10
60:11
Enclosures
60:25
ended 32:8

enforcement
6:17
enforcing 46:1
entitled 46:14
errata 60:11,13
60:16 61:1
Escape 20:7
53:15
et 1:9 3:8,23
60:8 61:2
eTran 58:17,22
Evening 19:24
event 41:10
everybody 9:24
11:15
exactly 43:6
49:6 55:4
EXAMINATION
5:15 57:3
examined 3:13
5:10
Executed 62:14
Exhibit 2:13
15:21 16:9,11
16:12 17:8,9,19
17:23,25,25
18:10,13 37:22
38:23 43:15
44:18 45:17
46:12 51:5
52:7 58:5
Exhibits 2:11,20
exit 26:1
exited 32:17
expect 9:6
Expires 62:24
explain 30:3
38:6
explanation
13:20
expressly 5:7
extent 40:4
41:22

_____
F
_____

fact 55:7
fair 9:4,5 16:18

18:16,18 34:6
58:12
faithfully 46:24
fall 52:1,3
familiar 45:16
family's 30:11
faster 51:8
father 22:24
father's 44:5,8
father-in-law
19:16 22:18,25
23:11,20,23
24:11 32:1,3,12
54:3 56:8
father-in-law's
18:21 19:1,3,5
22:10,19 25:5
27:18 29:9
35:3 47:20
57:20
features 50:8
February 12:8
12:21 13:14
feel 42:3
feet 27:14 31:14
31:14
fell 32:5 50:14
51:25
felt 50:1
fenced 23:5,9
fighting 32:5
44:6
figure 14:10
26:7
file 17:11
filed 16:16 38:10
42:25 58:7
filing 60:18
final 51:6,16
financially 59:17
find 16:24 60:10
fine 5:21 6:15
14:16 45:15
53:11
finish 8:22
finished 46:10
fire 11:3 28:10

33:18 37:3
firearm 10:19
11:10,13 12:25
57:7,11
firearms 10:24
fired 11:6 26:17
26:23 27:8,12
27:21 28:6
29:21 33:16,16
33:22 44:9
firing 29:7 46:4
52:14,18 53:3
first 6:14,17 10:8
19:2,22 21:14
25:14
Fisher 4:8 60:5
five 27:14 47:25
52:8
five-feet 30:8
flip 51:8
flood 7:14
fly 29:16
follow 44:23
follow-ups
56:25 57:2
foot 47:24
Ford 20:7 53:14
foregoing 59:9
62:6,13
forenoon 3:14
forgot 7:20
form 43:5 52:19
52:20,24
53:2,2 62:7
formal 45:3,5,11
45:11
four 47:24,24
frame 7:12
free 42:3
friends 24:21
34:3
fritz 39:18
front 15:23 21:19
23:7,9 26:9,12
27:15 29:5
34:8 48:7
further 38:7,8

CHARLES ROPER  8/25/2020

58:12 59:15

**G**

gap 31:14
general 35:12
   36:14
getting 9:25
   20:1
give 8:23 13:20
   27:14 38:13,24
   39:22 46:9
   51:7 57:6,12
given 53:22
   57:18,22,25
giving 8:15
Glock 11:12,17
   11:20
go 8:4 12:15
   14:8 17:4,5
   23:19 26:17
   27:1 28:2,21
   29:20 32:12
   34:10 38:23
   42:23 49:13
   51:8 54:11
   58:9
God 46:24
going 8:14,25
   29:19 31:18
   32:8 36:8
   40:23 42:4
   50:9 52:24
   58:1,5
good 5:17 8:15
   9:2 15:24
   24:21 49:8
Gotcha 15:6
grab 16:25
grade 6:4
grass 26:24
   29:16
grassy 27:2,5
   27:19
great 15:16
grip 13:25 14:8
   14:14
ground 18:24

**H**

hackles 30:12
   30:22 50:11
hair 30:12
hand 15:16,19
   51:5,7
handed 57:23
handgun 14:17
   14:22,25 15:2
handguns 14:7
   14:19 15:8
handle 13:25
happen 22:14
   28:3
happened
   26:16 27:21
   29:17 37:18
   41:20 48:9
   50:13 51:23
happening
   40:13
happens 40:1,2
   40:10,15
head 12:6 49:6

health 56:5,10
   56:14
hear 17:3
hearing 8:17
heart 11:8
heartless 32:16
held 7:18 14:2
help 15:18 34:11
   46:24 51:8
helps 12:4
highest 6:4
hill 29:12
hip 13:4,6 14:18
   26:20
hired 57:5,9
hit 49:5,7
hold 12:12 13:22
holster 13:5
   15:2,10
holsters 15:13
home 52:13
honestly 15:5
   22:4 25:9
   29:15
horrible 56:14
hours 3:14 10:16
house 23:2,3,7
   23:12,17,18
   34:9,10 44:5
   49:16 56:8,10
human 31:23
   33:3
hungry 20:1
hurt 50:9
husband 44:7,9
   44:12

**I**

identify 16:1,11
   16:23 18:3
ignoring 29:10
incident 11:21
   12:8,11,22 13:1
   17:11 18:21
   19:21 23:15,16
   24:14 25:7
   39:20,23

40:12,15 41:8
   41:19,20 42:8
   42:17 45:4
   54:13 55:12,14
   55:17,20
   57:19
inconsistent
   52:17
Independence
   20:21,22 27:6
   29:12
indicate 60:13
influence 7:22
informal 45:6
initial 15:15
initialing 17:21
inside 23:23,25
   31:15
intended 32:18
intention 32:20
interested
   59:18
interrogated
   38:14
interrogatories
   16:2
interrogatory
   16:6 44:20
intersection
   19:4
investigated
   57:24
investigation
   17:11 38:16,24
involved 11:8
issue 56:20
issues 8:17

**J**

J 3:17 4:18 5:4
   59:6 60:23
jam 28:11,12,14
   52:1
James 4:4 8:9
jammed 27:23
   27:25 28:7,9
   51:17,24

Jeffrey 22:20
   44:5
Jennifer 1:6 3:5
   3:22 24:19
   60:7 61:2
Jeri 47:7
Jim 12:4
job 8:15
jog 31:13
join 42:4
Jr 4:4 8:10
jumping 16:24
June 19:12 56:3
jwsj@schottelj…
   4:6

**K**

Kayser 4:9 8:6
   10:3 17:20
   30:17 31:2,4
   38:18 39:3
   40:3 41:22
   42:2 43:5,18
   43:22 44:2
   46:6 49:12,18
   50:4,17 51:13
   52:19 56:24
   58:14,17,21
   60:4,9
Keck 4:13
keep 23:23
kicked 53:10
killing 35:2
kind 8:20 11:10
   11:15 13:14
   18:17 19:18
   22:25 32:15
   38:24 57:6
   58:19,21
kinds 15:12
knew 31:19 34:1
   34:7
knock 34:19
know 8:16,23
   8:25 9:9 11:4
   11:4 13:19 15:5
   15:7,25 17:13

---

**ALARIS LITIGATION SERVICES**

EXHIBIT A

CHARLES ROPER  8/25/2020

19:17,19,20
21:22 22:4,16
24:15,20 25:9
26:4,5,8
29:13 30:2,11
30:15 31:12,20
36:3,6,20,22
36:25 37:2,10
37:11,19 38:5
42:13 43:23
45:9,20 47:24
48:21 49:6,21
58:6
knowledge
37:5

**L**
lapse 7:10
law 6:17 46:19
lawful 5:10
laws 45:17 46:1
46:22
lawsuit 8:12
laying 18:24,25
35:21 52:6
leash 22:22
45:17,22 46:1
46:1
leashed 18:17
leaving 44:4
54:10
Lee 5:24
left 17:24 27:16
44:10 54:10
56:15
Let's 12:12
38:23
licensed 6:14
Line 61:5,9,13,17
61:21
Litigation 4:19
60:1
little 16:21 27:16
52:8
live 23:1 24:12
52:8
lived 23:13
living 34:7

LLC 4:13
LLP 4:8 60:5
loaded 28:2
location 37:17
locations 15:1
long 9:7 33:12
38:23 56:1
look 9:2 15:22
15:24 16:23
18:12 37:22
39:2,15 44:18
46:10,11,12,14
looked 8:11
18:14 21:25
50:2
looking 31:21
44:20
lot 17:1 51:15
loud 44:2
louder 8:18
Louis 4:5,10,20
60:6,18
lunch 20:1
lying 44:7

**M**
mag 14:5
magazine 13:23
14:3,4,11 28:15
28:17,20,24
50:23 51:21
magazines 14:6
Main 3:16
Man 17:1
marked 15:15,21
16:9,11,22 17:1
17:8,19,23
39:3,4
Market 4:9
60:5
married 5:25
mask 8:16
matters 49:10
Max 36:23 37:6
37:7,8
mean 9:21
10:20,21 11:15

14:1,15 15:3,4
15:6,9 20:25
27:24 30:2,24
38:9 49:25
56:16
meaning 33:20
means 13:19,20
13:22 31:10
38:3
meet 20:22
memory 39:25
40:9,14
mentioned 30:4
Mesey 1:6,6 3:5
3:5,21,22
24:19 56:17
60:7,7 61:2,2
Meseys 8:12
34:3 35:9
Meseys' 34:1
36:20 57:19
messages 37:13
middle 5:23
20:23 21:3
24:4,23 26:12
middle-ish 21:3
Mind 53:8
mine 20:10 47:4
Mine's 17:17
39:11
minimum 23:21
minute 33:13
minutes 33:14
46:9 53:9
mischaracteri...
42:5
missed 46:10
Missouri 1:2,9
3:2,8,16,19,20
3:23 4:5,10,15
4:19,20 10:10
13:13 46:21,23
59:2,7 60:6,8
61:2
mixed 19:20
MO 60:18
mode 30:14,16

moment 33:10
39:12
money 6:25
month 23:21,22
months 40:1,11
41:19 55:25
morning 19:23
13:22 31:10
move 44:11
50:14
moved 56:9
movies 15:7
multiple 11:6
15:12

**N**
N 2:1 4:1 60:17
name 5:18,19
5:20,21,23
6:2 8:9,11 19:5
21:23 22:19
36:20,22 37:1
47:6 61:1,2
62:11
near 21:13 22:6
24:15 25:2
29:9 42:10
47:17
necessarily
11:15
necessary 62:9
neck 21:21
30:12 35:25
need 43:8
needed 58:2
neither 26:17
59:12
never 42:6
49:21 58:6,8
58:9
Nina 37:1,6,8,11
37:14
non-prescripti...
7:23
noon 19:25
north 3:16 4:20
27:6
notarized 60:16

notary 3:18 5:5
47:8 60:14
62:23
noticed 45:5
nowadays 11:14
number 39:8
44:20 52:7

**O**
o'clock 3:14,14
oath 46:15 47:1
object 42:5
43:5
Objection 31:2
40:3 43:18
46:6 49:12,18
50:4,17 52:19
observe 30:10
observed 37:20
occasion 50:15
occurred 38:25
39:23 41:8
occurrence
22:21 37:18
offered 6:25
office 6:20
36:13 46:15
46:24 47:1
54:19 60:17
officer 6:8,10,15
7:2,6,19 9:12
9:15 10:9,18,19
14:21,24,24
46:19 54:8,14
55:21 57:6,10
officers 15:8
44:23 49:8
57:24
Oftentimes
8:24
oh 8:24 14:12
21:1 26:11 31:3
32:24 38:12
38:19 39:6
45:13 58:22
okay 5:23 9:17
9:19,25 10:5,11

CHARLES ROPER  8/25/2020

11:2,13,17,19,21
11:25 12:25
13:2,5,11,17,24
14:15,21 15:6
15:14,15,25
16:5,20,20
17:18 18:9,12
18:16,20 19:2
19:9 21:4
23:18 24:5,11
24:22 25:10
25:13 26:6,11
28:12 29:7
30:21 31:22
33:25 35:2
36:5,20,25
37:7,23 38:5
39:14,22
40:14 41:5,15
41:16,17 42:21
42:21 43:13
44:4 45:16
46:17 47:8,15
48:16 49:22
50:20 51:12
51:23 52:3,7
52:17 53:6,14
55:1,3,7,14
56:2,5,11,13,17
57:14,25 58:4
old 19:9,13,16,17
20:11 56:16
Olive 4:4
once 23:21,21
one's 37:7,8
opinion 40:8
opposing 15:17
ordinances
46:23
original 60:11
outcome 59:18
outside 14:17
23:24 33:5,8
34:22
owner 24:15
32:10 52:9
owners 24:18

**P**

P 4:1,1
P.C 4:3
p.m 5:13 58:25
page 2:3,13
37:23 39:2,8
43:13,15 44:19
46:14 60:11,14
60:17 61:5,9
61:13,17,21
pages 16:25
17:1 18:13 51:8
51:12
paper 11:6 52:16
Paragraph
37:23
park 24:1,3,5
parked 24:9,22
27:1
part 17:15 38:10
particularly
18:12
parties 59:14,17
partner 9:20
pass 19:11
passed 19:13
40:11 55:24
passenger's
20:16 26:7
patrol 9:15,19
Patterson 4:8
60:5
paws 21:19,19
pay 25:12
penalty 62:12
pending 3:19
people 8:24
42:10
people's 15:9
perjury 62:12
permit 13:12
person 13:3
15:2 22:16
32:16 49:16
personal 53:25
personally

22:15
pertain 18:15,16
Phelps 3:15
59:4
Phillips 2:5 4:13
4:14 12:4,7,12
12:15 15:18
31:3 42:4
51:10 53:8,13
56:22 58:18
physically 31:6
picture 52:5
pictures 36:1,3
pkayser@fish...
4:11
place 44:22
45:4 46:2
56:17
plaintiff 1:16 5:11
plaintiff's 38:2
43:1 44:18
46:11
Plaintiffs 1:7 3:6
3:22,24 4:3
5:2
plan 33:9
Platt 47:7
please 5:18
44:19,21,25
60:10,12,16
plural 21:11
plus 13:18,20
point 7:1 24:2,3
29:3
pointed 44:6
Pokorski 3:17
4:18 5:4 59:6
59:20 60:23
police 6:8,10,15
7:2,6,17 9:12
10:9,17,19 11:13
14:21,24 18:7
36:14 44:22
46:19 53:17
53:22 54:8,11
54:14 55:21
57:6,10,23

policies 44:22
44:25
policy 45:3,6,6
Poplar 6:13
10:12,22
Portia 4:9 60:4
position 46:19
positioned
49:15
possess 46:18
possibly 58:2
power 53:8
prepared 12:3
prescribed
46:19
prescription
7:22
press 58:2
pretty 15:3 18:14
41:25 49:8
prevent 32:9
previous 42:5
43:13
printed 45:18
prior 22:5 24:14
31:22 34:23
probably 47:24
51:25
procedures
44:22 45:1,3,6
45:7
produced 3:12
5:10
property 52:13
property-dam...
57:22
prosecutor
58:3
protect 9:13
33:6 46:8
protected 31:16
49:23
provisions
46:21
pry 55:23
public 3:18 5:5
60:14 62:23

pull 16:25
pulled 47:23
48:1,4,10,17
50:3
purchase 57:11
57:15
purpose 46:4
put 15:3,10 24:5
28:17,20,23
43:10 48:23
putting 49:22

**Q**

qualifications
46:18
quantity 52:8
question 7:20
8:24 30:20
41:18,24 43:21
44:24 45:2
49:13 50:22
51:6,17 55:23
questioned
38:14
questions 2:3
5:16 7:24 8:14
16:21 53:7,9
53:13 56:23
57:4
quick 10:2 48:9
51:6,7 57:1
quit 7:13
quote 19:15

**R**

R 4:1
R-O-P-E-R 5:22
racked 28:15
51:21
raised 30:13,22
50:11
ran 29:11,17
33:17,23
range 30:9
ranges 11:7
ranks 7:18
rate 11:8

CHARLES ROPER  8/25/2020

reaction 47:16
Reactionary
    31:14
read 36:24
    39:12 42:17
    43:8,19,24
    44:1,2,17 45:1
    46:15 58:14
    60:12 61:6,10
    61:14,18,22
    62:6
real 10:2 51:5
really 17:3 42:14
reason 9:8 61:7
    61:11,15,19,23
reasonable
    35:8
receipt 52:13
receive 10:14
received 17:13
    17:13,14
record 8:4,7,8
    10:4,5 12:16,18
    12:19 15:21
    16:9,10 17:4,5
    17:7,8,19,23
    43:15,19 44:3
    46:16
records 12:21
REDIRECT 57:3
reduced 59:11
referred 49:11
    49:16
referring 25:1
    26:19
related 59:13
relating 10:24
relative 59:15
released 42:19
remember
    19:22 36:7
    40:9,10,23
    52:3 55:4
remove 35:10
render 62:9
report 12:2
    36:24

reporter 3:17
    4:18 5:5 8:17
    15:20 17:3
    58:16,19 59:1
    59:7
reporter's 8:19
    9:3
requested 17:16
require 13:13
required 57:10
reserve 54:14
    54:18 55:11,15
reserved 5:7
residence
    22:25 54:10
respect 17:11
    22:24 29:4
    32:21
response 8:16
restroom 9:8
result 57:19
retained 2:20
return 60:16
returned 52:9,9
reviewing 12:20
right 9:6 10:6,12
    10:22 11:23
    12:9,10,22
    13:4,6,8 14:6,7
    14:10 16:1,8,15
    16:20 18:9,20
    19:21 24:8
    25:2 29:2
    35:6 36:9
    38:11,13 39:2
    39:5,10,25
    40:10 41:3,7
    41:13,20 42:15
    42:23 46:14
    47:11 48:15
    51:5,7 52:10
    53:6,15 54:15
    54:19,22,25
    55:8,25
    56:22 57:18
    58:14
Ripley 54:18

Rivers 6:11
road 24:4,8
    27:4,6 44:6
road's 21:5
Robbie 32:6
Robin 1:6 3:5,21
    24:19 60:7
    61:2
roll 24:6
Rolla 3:16
Roper 1:15 3:12
    5:9,19 6:3
    16:14 44:7
    46:17 60:10
    61:1 62:5,20
round 28:21
rounds 52:8,12
    52:15,18 53:4
rules 8:20
run 11:9 31:13
running 32:4
runs 27:4,6,7

――――――
S
――――――
S 4:1,14
Sarah 3:17 4:18
    5:4 59:6,20
    60:23
save 32:10
saw 19:22 20:4
    20:14 21:6,14
    21:17 22:5,13
    22:21 24:2,16
    30:6 37:20
saying 52:23
Sayler 4:8 60:5
says 5:11 38:1
    46:17 52:8
scene 42:10
Schottel 2:4,6
    2:20 4:3,4
    5:16 8:4,8,9
    8:10 10:5,6
    12:5,10,13,17
    12:19,20 15:19
    15:22 16:10
    17:5,9,22,24

30:19 31:8
38:19,22 39:4
40:7 41:25
42:15 43:9,20
43:23,25 46:9
49:14,22 50:7
50:20 51:11,16
52:23 53:2,6
57:1,4 58:22
scoot 8:17
seal 47:8
seat 20:16 26:7
second 8:5 17:6
    33:18 43:25
    44:19
secondary 15:4
see 15:7 19:2
    23:19 27:11
    35:22 36:4
    38:1 40:24
    41:1 42:21
    44:15,16 47:18
    56:7
seeing 36:7
seen 15:6,8
    17:15,25 18:9
    22:6,9 29:15
    31:22,23 32:11
    33:1,2 37:21
    44:5 45:18
    58:8
sell 15:12
sense 35:12
sent 16:3 37:13
sentence 42:24
separate 33:9
September
    60:3
series 8:14
seriously 26:4
services 4:19
    55:5 60:1
seven 13:18,20
    13:22 50:24
    51:1,2
share 9:18,21
    9:23

SHEET 61:1
sheets 60:11,13
    60:16
sheriff's 6:19,22
    10:10 17:10
    36:2,12 38:15
    54:18
shirt 55:8
shoot 11:9 32:18
    47:13 50:16
shooting 11:8
    48:2
shorthand 5:4
shortly 39:23
shot 26:18,23
    27:8,13,22
    28:6,10 29:7
    29:21 33:16,16
    33:18,22 37:6
    37:10,11,14
    44:10,13
    45:20,21,21
    45:25 47:11,16
    47:22 49:2,8
    50:3,13
shots 37:3
    50:15
showing 30:1,4
    30:7,21 50:11
side 20:24
    26:13,14 27:1
    29:1,2,6
sign 58:15
    60:13
signature 5:6
    16:5 47:3
    60:11,13,17
    61:25
signed 46:25
Sincerely 60:20
sir 7:25 9:16
    10:13 11:1,18
    12:24 13:1,7,10
    13:22 14:9,20
    14:23 16:4,7
    16:19 18:19
    20:5,17,21

CHARLES ROPER  8/25/2020

21:12,24 22:8
22:12 23:4,6
23:10 24:7
25:6,15,20
26:21 28:5,8
28:13,19 30:5
33:4,7,24
36:2,10,21
37:16 38:4,12
39:1,16,21,24
40:16 42:22
45:24 46:3
47:10 51:4,19
53:16,18,20
53:24 54:1,4,6
54:9,12,16,20
54:23 55:9,13
55:16,19,22
56:19,21 57:8
57:17,21 58:11
58:20
sitting 32:15
situated 14:11
situation 35:11
49:21
six 3:14
slide 28:15
smaller 21:18
29:11 36:25
Smith 4:8 60:5
SNLJ 1:9 3:8
social 54:5
solemnly 46:17
son 20:11
son's 20:7,8
53:14
sorry 13:25 17:3
19:1 20:18
22:25 31:3
32:24 33:15
33:19 38:13,19
38:22 55:2
55:23 58:23
sound 11:23
12:9,10,21
38:11 52:9
sounded 55:24

south 27:7
Southeastern
1:3 3:3,21
speak 8:18 58:2
specialized 6:7
specific 44:19
specifically
42:8
speculation
40:4 49:19
spell 5:17,19
19:7
spells 19:8
Springfield 4:15
13:16
ss 59:3
St 4:5,10,20
60:6,18
stand 48:7
standing 26:9,11
29:3 34:8
start 7:15 17:21
51:13
started 25:14,18
Starting 5:13
state 3:18 5:17
13:13 43:16
44:21 46:21
46:22 59:2,7
62:1
stated 42:17,24
45:10
statement
25:16,17
38:25 39:13
39:18,22
40:17 41:2,9,11
41:14 42:9,16
43:3,10,14,16
43:19,24
statements 41:3
states 1:1 3:1,20
43:1 44:21
46:20
station 57:16
stays 36:16
stepped 21:8

32:4 44:8
steps 31:9,11,16
33:13
stiff 30:13 50:12
STIPULATED
5:1
stop 32:24 50:1
stopped 21:8
24:4 29:21
story 41:9
straight 31:21
straight-forwa...
42:1
street 3:16 4:4,9
4:14,20 20:21
20:23 24:10,11
24:13,23 27:2
27:2,19 29:12
60:5,18
streets 9:19
stress 11:7
stroke 56:12
struck 29:13
stuff 11:9
subject 11:22
12:23 17:12
30:19 42:11
subscribe 62:11
subsequent
41:3
substance 7:22
62:8
Suite 4:10 60:6
support 46:20
sure 10:3 12:13
12:17 14:5
15:24 17:22
17:25 25:22
32:25 34:15
35:3,16,18
51:10
surface 26:22
surprised 8:11
swear 46:18
sworn 3:13 5:10
59:9

**T**
tail 30:13,13
50:11
take 9:7,8,9
10:2 15:24
17:20 27:14
31:9,11,15
33:12 36:9
37:22 39:12
39:15 46:11,12
58:17,22
taken 1:16 5:3
36:12 59:10,15
60:10 61:3
talking 9:1
talks 41:11
targets 11:3,6
teach 11:4,5
teeth 30:1,4,7
30:21 50:11
56:15
tell 51:10
testified 31:17
33:1,21 52:21
testimony 40:14
42:6 52:18,24
53:3 59:8,10
text 37:13
Thanks 15:14
theirs 37:2
theirself 9:24
thereon 62:10
thereto 59:17
thick 17:17
thing 35:8 42:9
42:11 43:7
things 39:7
40:9 49:9,9
think 6:16 17:24
19:8,25 31:17
32:9 37:14
39:3,8,25
40:21 47:6
48:19 51:6,12
53:6
thinking 32:15

third 37:23
This'll 51:6
thought 31:17
threat 49:17
threats 49:11
three 6:11 9:22
9:23 27:14
30:8 31:14
44:6 45:8
47:24
threw 38:21
throat 21:20
ticket 56:20
time 5:13 7:12
9:10 19:13,23
20:2,3,9 21:16
22:21 23:15,16
23:19,24 25:4
25:7,21 28:2
31:5 33:11,15
33:19 35:4
42:7 45:4
48:9,25 49:2
50:18 54:17
55:5,12 58:25
times 22:13
tired 51:14
today 8:19
told 42:10 58:1
top 12:6 25:4
37:24 39:6
total 37:3
training 6:7,9
10:7,8,14,18
10:23,24 11:3
11:10
transcribed 5:5
transcript 9:2
60:13
trick 45:14
trigger 50:3
truck 25:13,18
29:4 47:20
true 28:10 62:9
62:13
try 8:22 30:1
35:8 44:9,11

ALARIS LITIGATION SERVICES
www.alaris.us       Phone: 1.800.280.3376       Fax: 314.644.1334
EXHIBIT A

47:18
trying 9:14 11:5
  14:10 26:6
  28:2 45:14
  50:21
turned 38:2,5
  43:2,4,10,17
two 21:15,22,25
  22:6,6,9
  24:15 25:1,10
  27:18 29:8
  31:9,11 32:21
  33:14,23
  35:20 37:4
  50:19 52:14,18
  53:3,9 56:6
  57:1
type 26:22
typewriting 5:6
  59:12

U
ultimate 46:4
understand
  7:24 10:21
  33:19
understanding
  12:7
uniform 53:19
United 1:1 3:1,19
  46:20
unjammed 51:17
  51:18
upper 39:5
use 9:8,20 11:11
  40:17 41:18,23
  44:14 57:14,15
usually 52:1

V
v 60:7 61:2
vague 41:23
  49:12,18
Van 1:9 3:8,22
  7:2,7,10,17 9:11
  9:13 10:15 18:7
  23:13 44:21

46:13,23 57:5
57:10 60:8
61:2
vehicle 9:17
  20:13 21:8
  24:1,3,5,9,23
  25:25 26:1,10
  26:12,13,15,25
  32:17,21 33:11
  44:8 53:17
vehicles 9:18
  9:22,23 34:15
verbal 8:15
vest 36:16,17,19
violations 18:17
visit 54:5
visited 23:11,13
visiting 54:3,7
vs 1:8 3:7,22

W
W 4:4
wait 8:22
Walberg 22:20
  44:5
walk 29:1 31:13
  34:24
walked 28:25
  29:18 34:21
  47:18
walking 31:8
  41:14 42:18
want 11:16 12:13
  15:11,18,23
  16:22 17:4,20
  32:14 42:14
  43:18 51:7
  58:21
wanted 16:1
  17:12
wants 41:23
warning 26:18
  27:13,21 28:6
  29:7 33:16,22
  44:10
wasn't 34:15
  35:16 55:2

watch 15:7
way 21:21 31:15
  32:5 37:19
  54:3
ways 14:7
We'll 58:14
we're 9:1 12:14
we've 43:25
weapon 13:12
  13:15 33:6,12
  46:5 50:16
  53:21,25
wear 13:5
wearing 55:7
went 10:18,23
  17:16 27:1
  29:11 32:9
  39:17 44:11
  47:20
weren't 35:18
  57:22
west 27:5,7
  54:24 55:1
whichever 21:21
white 22:2 50:6
wide 21:5
wife 20:15
  24:21 25:21
  27:9 28:25
  29:18,22,24
  30:23,25
  31:16,18,19
  34:3 37:13
  38:3 40:25
  41:14 42:18
  43:3,4,11,15
  44:14 46:8
  47:12,21 48:1
  48:4,10,13,17
  49:3,23 53:21
  54:2
wife's 6:2 39:9
  43:14 47:15
witness 5:6
  18:21 31:6
  38:20 40:5
  42:13 43:8,24

44:4 46:8
49:20 50:6,19
51:14 52:25
53:11 59:8,10
60:12 61:1,25
witnessed
  22:15,17
word 40:17,24
  41:1,4,19 44:14
words 41:23
  43:6
work 6:21 9:23
  14:21 51:14
  54:11 55:11
worker 55:18
working 7:1,10
  7:15 54:21,24
  55:1,2,5,10
works 9:24
worth 53:9
wouldn't 24:6
wound 26:8
write 43:22
written 38:25
wrong 8:11
  33:22 39:8
wrote 43:12

X
X 2:1
XD-S 13:16

Y
yard 22:10 23:3
  23:7,9 27:5
yawning 51:13
yeah 6:8 7:8,11
  7:16 10:17 12:5
  14:12 15:19,25
  18:8,9 21:2,3
  35:23 37:13
  38:20 45:19
  48:24 50:10
  51:1,11 52:12
  52:25 56:1,4
  57:1 58:8
year 6:15 7:4

8:2 10:16 19:12
56:3
years 19:16
yelled 21:9
  24:24 26:16
  34:14
yelling 25:14,18
  29:8 33:8

Z

0

1
1 2:14 15:21
  44:18 60:3
1-800-280-DE...
  4:21
1/30/2019 47:2
1:19-CV-71 1:9
  3:8
10 44:20
100-percent
  25:22 35:3
1010 4:9 60:5
11th 60:18
15 2:14
16 2:15 19:16
1650 4:10 60:6
17 2:16,17,18
  37:23
1984 8:3

2
2 2:15 16:9,12
  37:22
2's 16:11
2/22/19 39:19
2:56 5:13
20 20:12 44:20
  62:15
200 3:16
2016 6:16 7:5,9
2017 7:13
2019 7:16 11:22
  12:8,21 13:14
  38:11

CHARLES ROPER  8/25/2020

| | | | |
|---|---|---|---|
| **2020** 1:17 3:13<br>    60:3,10 61:3<br>**21** 11:20 31:14<br>**22** 11:12,17<br>**22nd** 11:22 12:8<br>    12:21 13:14<br>    42:16<br>**23rd** 38:11<br>    42:25<br>**24** 10:16<br>**25** 1:17 3:13<br>    60:10 61:3<br><br>_____ **3** _____<br>**3** 2:16 17:8,9<br>    38:23 43:15<br>    51:5 52:7,7<br>    58:5<br>**30** 60:17<br>**314-421-0350**<br>    4:5<br>**314-561-3675**<br>    4:11<br>**314-644-2191**<br>    4:21<br>**3140** 4:14<br><br>_____ **4** _____<br>**4** 2:17 17:19,25<br>    17:25 46:12<br>**417-890-8989**<br>    4:15<br><br>_____ **5** _____<br>**5** 2:4,18 17:23<br>    18:10,13 45:17<br>**5:01** 58:25<br>**53** 2:5<br>**57** 2:6<br><br>_____ **6** _____<br>**63101** 4:5,10,20<br>    60:6,18<br>**65802-2408**<br>    4:15<br><br>_____ **7** _____<br>**711** 4:20 60:17 | **745** 4:19 59:20<br><br>_____ **8** _____<br>**83** 39:2,9 43:15<br>**84** 39:11,12<br><br>_____ **9** _____<br>**906** 4:4 | | |