Transcript of the Testimony of

# ROBIN MESEY

August 19, 2020

MESEY vs CITY OF VAN BUREN

1:19-CV-71



Alpha Reporting & Video
Phone:  417-887-4110

transcripts@alphareportingservice.com
www.alphareportingservice.com

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

EXHIBIT B

Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MISSOURI
2                 SOUTHEASTERN DIVISION

3

4    ROBIN MESEY and
     JENNIFER MESEY,
5
                     Plaintiffs,
6
               vs.            Case No. 1:19-CV-71
7
     CITY OF VAN BUREN,
8    MISSOURI, et al.,

9                    Defendants.

10

11

12          DEPOSITION OF MR. ROBIN MESEY,

13   produced, sworn, and examined on Wednesday,

14   August 19, 2020, at 11:21 a.m. of that day, at

15   the Phelps County Courthouse, 200 Main Street,

16   Rolla, Missouri, before me, ERICA A. WHITE, CCR,

17   in the above-captioned cause; taken on behalf

18   of the Defendants City of Van Buren and

19   Chief Alonzo Bradwell.

20

21

22

23             ALPHA REPORTING & VIDEO
                 1911 S. National
24                  Suite 405
              Springfield, Missouri 65804
25               (417)887-4110

EXHIBIT B

Robin Mesey

MESEY vs CITY OF VAN BUREN                                           8/19/2020

Page 2

```
1            A P P E A R A N C E S
2
3  For Plaintiff:    MR. JAMES W. SCHOTTEL, JR.
                      SCHOTTEL & ASSOCIATES, P.C.
4                     906 Olive Street
                      St. Louis, MO  63101
5                     (314)421-0350
6  For Defendants     MR. DAMON S. PHILLIPS
   City of Van Buren  KECK & PHILLIPS
7  and Bradwell:      3140 E. Division Street
                      Springfield, MO  65802
8                     (417)890-8989
9  For Defendant      MS. PORTIA C. KAYSER
   Charles Roper:     FISHER PATTERSON
10                    SAYLER & SMITH
                      1010 Market Street
11                    Suite 1650
                      St. Louis, MO  63101
12                    (314)561-3675
13 Also Present:      Ms. Jennifer Mesey
14
15               I N D E X
16
   Testimony of
17 MR. ROBIN MESEY:
18                                     Page
19 By Mr. Phillips:                     4
20 By Ms. Kayser:                      49
21 REPORTER'S CERTIFICATE:             64
22
23
24 Phonetic spellings are signified by: (ph.).
25 Exactly as stated: (sic).
```

Page 3

```
1            E X H I B I T S
2  EXHIBIT      DESCRIPTION        PAGE
3  RM 1         Interrogatory answers   48
4  RM 2         Van Buren Police        51
                Department incident
5               report
6  (Originals of Exhibits 1 and 2 were attached to
   the original transcript.  Scans sent to
7  Mr. Phillips, Ms. Kayser, and Mr. Schottel.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1  Whereupon,
2               MR. ROBIN MESEY,
3  Plaintiff herein, being produced, sworn, and
4  examined, testified as follows:
5               EXAMINATION
6  BY MR. PHILLIPS:
7  Q.  Could you please state your name?
8  A.  Robin Mesey.
9  Q.  Mesey?
10 A.  Mesey, M-e-s-e-y.  Mesey.
11 Q.  Okay.  Mr. Mesey, my name is Damon Phillips.  I
12     represent the City of Van Buren and Chief Bradwell.
13     And you understand that you've sued those two
14     clients of mine in this lawsuit.  Correct?
15 A.  Yes.
16 Q.  I'm going to ask you some questions today.  After
17     I've asked you some questions, I imagine that other
18     attorneys may have questions for you as well.  Do
19     you understand that you're under oath?
20 A.  Yes.
21 Q.  And you understand that what you say today has to be
22     the truth just as if you were in a court of law?
23 A.  Yes.
24 Q.  Have you ever been in a deposition before?
25 A.  No.
```

Page 5

```
1  Q.  In ordinary speech people have a tendency to speak
2      over each other.  You and I haven't done that yet,
3      but I wouldn't be surprised if we did because that's
4      just how people talk.  I'm going to try and be aware
5      as we talk that we're making a record and so I'm
6      going to try not to speak over you.  And I apologize
7      if I do.  I'd ask you to do the same and try not to
8      speak over me.  Is that okay?
9  A.  Yes.
10 Q.  When I ask you questions, sometimes I think you're
11     probably going to know the answer pretty quickly and
12     other times, unfortunately, I may word a question
13     poorly, and it may be confusing.  Can you agree to
14     tell me if I ask you a badly worded question so I
15     can try and rephrase it?
16 A.  Yes.
17 Q.  By the same token if you answer a question, is it
18     fair for me to assume that you believed you
19     understood the question?
20 A.  Yes.
21 Q.  I don't really think we're going to take a great
22     deal of time today.  But if there's a point during
23     the deposition where you feel you need to take a
24     break either to use the restroom, get a drink, or
25     just stretch your legs, can you agree to tell me
```

Robin Mesey

MESEY vs CITY OF VAN BUREN                                           8/19/2020

Page 6

1      that so that we can take a break?
2   A.  Yes.
3   Q.  Okay.  You stated your name on the record.  Have you
4       ever had any other names?
5   A.  No.
6   Q.  What's your current age?
7   A.  I'm 41.
8   Q.  What's your date of birth?
9   A.  November 1st, 1978.
10  Q.  And, Mr. Mesey, I'm not trying to pry into your
11      medical background or anything like that, but I do
12      need to know if you're currently under the influence
13      of any medication or any substance that you think
14      may interfere with your ability to understand the
15      questions today.
16  A.  No.
17  Q.  And I understand that you're married; is that right?
18  A.  Yes.
19  Q.  And what's your spouse's name?
20  A.  Jennifer Mesey.
21  Q.  And is she in the courtroom with us today?
22  A.  Yes.
23  Q.  I don't -- I apologize for putting you on the spot
24      with this question, but how long have you been
25      married?

Page 7

1   A.  Since 2016.
2   Q.  Okay.  Do you have any children?
3   A.  Yes.
4   Q.  Could you state their names and ages?
5   A.  Michael.  He's 18.  Yeah.  18.  Chloe.  She is 16 --
6       or 17.  She just turned 17.  Charlie.  He's 13.  And
7       Robbie.  He's 14.
8   Q.  And do they all have the same last name as you?
9   A.  No.  Charlie and Robbie have the same.  And Michael
10      and Chloe, their last name is Huffman.
11  Q.  I'm sorry?
12  A.  Huffman.
13  Q.  How do you spell that?
14  A.  H-u-f-f-m-a-n.
15  Q.  Do any of them live with you?
16  A.  Two of them.
17  Q.  Which two?
18  A.  Robbie and Charles.
19  Q.  And where do the other two live?
20  A.  With their aunt.
21  Q.  I don't need an address exactly, but can you tell me
22      what town they live in?
23  A.  Alton, Illinois.
24  Q.  Okay.  What is your home address?
25  A.  1115 Earl Street, Van Buren, Missouri.

Page 8

1   Q.  Is that the same place that you were living during
2       the incident at issue in this lawsuit?
3   A.  No, it is not.
4   Q.  How long have you been at this Earl Street address?
5   A.  We've -- we've owned the home for ten years, but
6       there was a short period of time right after the
7       flood that we stayed with her father.  And that's
8       where the incident took place, over there.
9   Q.  Okay.
10          MR. SCHOTTEL:  Objection.  Nonresponsive.
11          Try to answer the question again.  I don't
12      think you answered it.
13          MR. PHILLIPS:  I feel he answered it.
14          MR. SCHOTTEL:  I thought you said how long, a
15      time period.
16          MR. PHILLIPS:  That's fine.  I was really
17      looking for an approximation.
18          MR. SCHOTTEL:  Okay.
19  Q.  (By Mr. Phillips) So you have owned the Earl Street
20      address for several years, but after the flood that
21      affected Van Buren, there was a period of time where
22      you lived with your father-in-law?
23  A.  Correct.
24  Q.  And it was at your father-in-law's residence -- or
25      at least around there that that incident occurred;

Page 9

1       right?
2   A.  Yes.
3   Q.  Who lives with you at the Earl Street address other
4       than your wife and the two kids you mentioned?
5       Anyone else?
6   A.  No.
7   Q.  Do you remember the address of your father-in-law,
8       where this incident occurred?
9   A.  I believe it was 1512 Dale Street.
10  Q.  And was that also in Van Buren, Missouri?
11  A.  Yes.
12  Q.  During the approximate time frame of this incident,
13      who lived at that location?
14  A.  Myself, my wife, three of our children, and my
15      wife's father.
16  Q.  And which three of your children were living there?
17  A.  It would have been Robbie, Charlie, and Michael.
18  Q.  What's your wife's father's name?
19  A.  Michael Mester.
20  Q.  How do you spell the last name?
21  A.  M-e-s-t-e-r.
22  Q.  What type of dwelling is that?
23  A.  What do you mean?
24  Q.  Is it a house?  An apartment?
25  A.  Okay.  It's a house.

EXHIBIT B

Robin Mesey

MESEY vs CITY OF VAN BUREN                                           8/19/2020

Page 10

1  Q.  How many stories are there?
2  A.  One.
3  Q.  How many bedrooms?
4  A.  Two.
5  Q.  And you were staying there because of the flood;
6      right?
7  A.  Yes.  While I was working on our home re-- -- doing
8      some remodeling.
9  Q.  Sounds like it was pretty cramped, huh?
10 A.  Uh-huh.
11 Q.  Do you remember -- and I don't need an exact date,
12     but approximately how long you were at that
13     location?
14 A.  Maybe around a year.
15 Q.  Do you remember roughly when the flood was?
16 A.  April of 2017.
17 Q.  And that's fine.
18 A.  Somewhere in there.
19 Q.  You said that you were working on your house during
20     this time frame while living with your father-in-law;
21     is that right?
22 A.  Correct.
23 Q.  What is it that you do -- or did for a living back
24     then?
25 A.  What was I doing?  At that point in time I was

Page 11

1      unemployed.
2  Q.  Could you describe your educational background?
3  A.  High school.
4  Q.  Do you have a high school diploma?
5  A.  No, I do not.  I dropped out of high school.
6  Q.  What was the highest grade you made it through?
7  A.  Tenth.
8  Q.  Do you have a GED?
9  A.  No.
10 Q.  Do you have any vocational training?
11 A.  Lots of industrial construction training, stuff like
12     that employment wise.
13 Q.  Like on-the-job type stuff?
14 A.  Yeah.
15 Q.  Have you ever been found guilty of or pled guilty to
16     a crime?
17 A.  Yes.  Traffic tickets and I had a misdemeanor theft
18     charge.
19 Q.  Where was that at?
20 A.  Carter County.
21 Q.  Do you remember approximately when that was?
22 A.  2003, I believe.
23 Q.  What did you get in that?
24 A.  It was, like, six months' probation, something like
25     that.

Page 12

1  Q.  I understand 2003 was quite a while ago.  Do you
2      remember the specific disposition that you got?
3  A.  What do you mean?
4  Q.  Well, do you remember if you got six months'
5      probation with a year of jail backup sentence or
6      anything like that or you just remember being on
7      probation?
8  A.  I believe it was probation with community service.
9  Q.  Okay.  And that was through Carter County?
10 A.  Yes.
11 Q.  Any other crimes that you can remember?
12 A.  No.
13 Q.  You referred to some traffic incidents; is that
14     right?
15 A.  Yes.
16 Q.  What kind of traffic incidents were those?
17 A.  I've gotten a speeding ticket, seat belt ticket, I
18     believe.
19 Q.  Okay.  Nothing else?
20 A.  No.
21 Q.  How are you currently employed?
22 A.  I do mechanic work.
23 Q.  Where at?
24 A.  From home.
25 Q.  Are you self-employed?

Page 13

1  A.  Yeah.
2  Q.  Do you have a company?
3  A.  No.  Just by reference from people I do work for.
4  Q.  Okay.  So when you do work for people, it's just you
5      doing it in your own name; right?
6  A.  Correct.
7  Q.  Do you have a website, advertisements, that sort of
8      thing?
9  A.  No.
10 Q.  Just all word of mouth?
11 A.  Yes.
12 Q.  What kind of mechanic work do you do?
13 A.  Everything except diesel.  Anything gas engine
14     related.
15 Q.  Okay.  So motor vehicles?
16 A.  Correct.
17 Q.  Lawn mowers?
18 A.  Yes.
19 Q.  And how long have you been employed in that
20     capacity?
21 A.  Since I was a young teenager.  I've been doing it
22     all my life.
23 Q.  Okay.  Have you also had other jobs?
24 A.  Yes.
25 Q.  When was the last time you had another job?

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                 8/19/2020

Page 14

1   A.  2017.  I was a -- I did demolition through the
2       Local 110 out of St. Louis.
3   Q.  Could you just basically or generally describe what
4       that entailed?
5   A.  We demoed, like, Truman College in Kirksville,
6       Missouri.  We did that for a remodel.  He went in
7       and did the demolition so the guys could come in and
8       build a new -- just get rid of the old so they can
9       put the new in.
10  Q.  Were you anybody's employee?
11  A.  Yes.
12  Q.  Okay.  What was the name of your employer?
13  A.  Midwest Service Group.
14  Q.  And how long did you work for Midwest Service Group?
15  A.  A year and a half.
16  Q.  And that was in the time frame of 2017?
17  A.  2016 through two thousand -- well, it was from -- I
18      started in May of 2016.  And then it ended.  It was
19      about a year.  May of 2017.
20  Q.  Have you ever been a police or a law enforcement
21      officer?
22  A.  No.
23  Q.  Do you have any law enforcement training?
24  A.  No.
25  Q.  Have you ever been in the military?

Page 15

1   A.  No.
2   Q.  Have you ever worked as a dog trainer?
3   A.  No.
4   Q.  Have you ever worked as a dog breeder?
5   A.  No.
6   Q.  Have you ever worked for the city of Van Buren?
7   A.  No.
8   Q.  Have you ever worked for a municipality or local
9       government directly?
10  A.  No.
11  Q.  Other than that job you had between 2016 and 2017,
12      did you have other jobs before that?
13  A.  Yes.
14  Q.  What did you do before that?
15          MR. SCHOTTEL:  Objection.  Irrelevant.  We're
16      not making a claim for lost wages.
17          Subject to that, you can answer the question.
18  A.  '99 to, I believe, '02, I did industrial painting.
19  Q.  (By Mr. Phillips) Okay.  Is it your understanding
20      that the incident we're talking about in this
21      lawsuit was on February 22nd, 2019?
22  A.  Yes.
23  Q.  All right.  And as I understand it, essentially
24      you're unhappy about an incident involving two dogs;
25      is that right?

Page 16

1           MR. SCHOTTEL:  Objection to the form.  It's
2       vague and it -- you're discussing what you
3       understand.  So I would ask that you rephrase the
4       question.  It's confusing, but --
5           MR. PHILLIPS:  If your client understands the
6       question, he can answer it.
7   Q.  (By Mr. Phillips) And if you don't understand the
8       question, let me know, and I will be happy to
9       rephrase it, Mr. Mesey.
10  A.  Could you repeat the question?  I'm sorry.
11  Q.  You're claiming that two dogs were injured in this
12      incident; right?
13  A.  Yes.
14  Q.  And you're accusing Officer Roper of shooting and
15      killing one of those dogs; right?
16          MR. SCHOTTEL:  Objection.  Vague the way it's
17      phrased.
18          Subject to the objection, you can answer the
19      question.
20  A.  Could you repeat it?
21  Q.  (By Mr. Phillips) Are you claiming that
22      Officer Roper shot and killed one of your dogs?
23  A.  Yes.
24  Q.  What was that dog's name?
25  A.  Max.

Page 17

1   Q.  What kind of dog was it?
2   A.  American Bulldog.
3   Q.  Was it registered with any association?  Like --
4   A.  Do you mean as far as, like --
5   Q.  Like, the American Kennel Club.
6   A.  No, it was not.
7   Q.  Any other association?
8   A.  No.
9   Q.  Was this a show dog?
10  A.  No.
11  Q.  How would you describe the fur coloring?
12  A.  Brown, white, and black.
13  Q.  What was its approximate weight?
14  A.  85 pounds -- 80, 85, somewhere in there.
15  Q.  Did it have any specialized training such as being a
16      helper dog?
17  A.  No.
18  Q.  Did the dog have a regular veterinarian?
19  A.  Yes.
20  Q.  Who?
21  A.  Dr. Fox in Fairdealing, Missouri.
22  Q.  I'm sorry.  In where?
23  A.  Fairdealing.
24  Q.  Was the dog current on its shots?
25  A.  Yes.  I believe he got his shots at a different

EXHIBIT B

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                8/19/2020

---

Page 18

```
1        veterinarian, though.
2   Q.   Do you know where that was?
3   A.   He's been to two -- one was Hicks, I believe.  And
4        then he also went to Dr. Fox too.
5   Q.   Dr. Hicks?
6   A.   No.  Hicks is the name of the veterinary clinic in
7        Poplar Bluff.
8   Q.   Okay.  Any particular reason you switched vets?
9   A.   No.  That was just for that particular visit, for
10       one visit.
11  Q.   Was this your father-in-law's dog?
12  A.   No.
13  Q.   Where did you get the dog?
14  A.   We had his mother and father.  They bred, and we had
15       puppies.  He was one of the puppies.
16  Q.   So it's fair to say you didn't buy the dog; right?
17  A.   No.  We purchased his parents.
18  Q.   But no one paid for him?
19  A.   No.
20  Q.   Do you remember how much his parents cost?
21  A.   His father was $1,500.  And, I believe, I gave 500
22       for his mother.
23  Q.   Did you buy them both from the same place?
24  A.   No.
25  Q.   Where did you get the father?
```

Page 19

```
1   A.   From a friend of ours.  He could no longer keep the
2        dog.
3   Q.   And he charged you $1,500 for it?
4   A.   Uh-huh.
5   Q.   Sorry?
6   A.   Yes.  I'm sorry.
7   Q.   What was your friend's name?
8   A.   Greg.
9   Q.   What was his last name?
10  A.   Rector.
11  Q.   How do you spell that?
12  A.   R-e-c-t-o-r.
13  Q.   Are you still in contact with Mr. Rector?
14  A.   No.
15  Q.   Do you know where Mr. Rector lives?
16  A.   No.
17  Q.   When was the last time you spoke with Mr. Rector?
18  A.   Four years -- four years ago, something like that.
19  Q.   When did you pay Mr. Rector $1,500 for the -- this
20       dog's father?
21  A.   Nine years ago.
22  Q.   Do you remember how you paid?  Cash, check, charge?
23  A.   It would have been cash.
24  Q.   Did that cash come from both you and your wife?
25  A.   Yes.
```

Page 20

```
1   Q.   What were you doing for a living nine years ago?
2   A.   Was working through Grassham Chevrolet in Van Buren,
3        Missouri.
4   Q.   Doing what?
5   A.   Mechanic/detailing.
6   Q.   Do you remember the name of your boss?
7   A.   Jeff Keene.
8   Q.   Do you remember the address that you worked at?
9   A.   402 Main Street, I believe.
10  Q.   You said that you paid $500 for the mother; right?
11  A.   Uh-huh.
12  Q.   I'm sorry.  Is that --
13  A.   Yes.  I'm sorry.
14  Q.   I don't mean to pick on you with that.  It's just
15       that we've got a record.
16  A.   Right.
17  Q.   Who did you pay $500 to for the mother?
18  A.   I found an ad on Craigslist.  There was a breeder.
19  Q.   And when did you buy the mother?
20  A.   I believe 2014.
21  Q.   Do you remember the name of the breeder?
22  A.   No.
23  Q.   Do you remember where the breeder was located?
24  A.   No.
25  Q.   What kind of dog was the father?
```

Page 21

```
1   A.   American Bulldog.
2   Q.   What kind of dog was the mother?
3   A.   American Bulldog.
4   Q.   Do you have any understanding as to why one of them
5        cost 1,500 and the other cost 500?
6   A.   The one was -- at that time when we got the father,
7        he was -- or, no, the mother.  What was that?  There
8        was papers actually on the father that we were
9        supposed to receive and didn't.  And the mother had
10       no papers.
11  Q.   And Mr. Rector represented to you that he was a
12       purebred Bulldog?
13  A.   Oh, yes.
14  Q.   Okay.
15  A.   I mean, I knew -- yes.
16  Q.   All right.  And this -- one of their -- one of their
17       offspring was Max?
18  A.   Correct, yes.
19  Q.   Okay.  So before this incident, did you live with
20       Max at the Earl Street residence?
21  A.   Yes.
22  Q.   And then the flood occurred and you lived with Max
23       and your wife and kids at her father's residence;
24       correct?
25  A.   Yes.
```

Robin Mesey

MESEY vs CITY OF VAN BUREN                                          8/19/2020

Page 22

1   Q.  Did Max have a doghouse or some sort of outside
2       shelter at your father-in-law's place?
3   A.  Yes.
4   Q.  Was that in a backyard?  A side yard?  Or where?
5   A.  Backyard.
6   Q.  Was that a fenced backyard?
7   A.  No.
8   Q.  Was Max free to roam?
9   A.  No.
10  Q.  What kept him in the backyard?
11  A.  His enclosure was completely -- it was enclosed.
12  Q.  So there was an enclosure in the backyard that
13      contained a little shelter area where he stayed?
14  A.  Yes.
15  Q.  How many dogs were in there?
16  A.  Him and his mother.
17  Q.  Other than that enclosure in the backyard, were
18      there any other devices, like electronic fence or
19      leashes or chains or anything else to keep them from
20      roaming?
21  A.  We also had a camper trailer back there that we
22      would stay in from time to time.  And other than --
23      they never -- they were always enclosed.  Not free
24      to roam.
25  Q.  And I'm not trying to put words in your mouth.  I

Page 23

1       want to make sure what you were trying to tell me.
2       Were you saying that there was a camper back there
3       that you would stay in?
4   A.  Yes.
5   Q.  And that sometimes Max would stay in there with you?
6   A.  Yes.
7   Q.  Okay.  Did Max ever stay inside the residence itself?
8   A.  Yes.
9   Q.  Was Max housebroken?
10  A.  Yes.
11  Q.  Approximately how old was Max at the time of this
12      incident?
13  A.  Two.
14  Q.  Prior to this incident, had Max, to your knowledge,
15      been involved in any fights with other dogs?
16  A.  One.
17  Q.  Tell me about that.
18  A.  There's a black dog that lived down the street that
19      came over into our yard as we were walking him
20      around for him to go to the bathroom.  And the dog
21      approached him and they were sniffling back and
22      forth.  The other dog became aggressive, so my dog
23      defended himself and got aggressive right back.
24  Q.  Was that other dog unrestrained and just roaming?
25  A.  Yes.

Page 24

1   Q.  Do you know who owned that other dog?
2   A.  I do not know their name.
3   Q.  Were they a neighbor?
4   A.  Yes.
5   Q.  Do you know what kind of dog that was?
6   A.  It was a mixed breed.
7   Q.  Was there anyone with the dog or was the dog just
8       roaming?
9   A.  Just roaming.
10  Q.  Who was with you?
11  A.  Me and Max.  And then after my wife heard the tussle,
12      she came out and assisted me in breaking up the
13      fight.
14          MR. SCHOTTEL:  Objection.  Nonresponsive.
15      The question has been answered.
16  Q.  (By Mr. Phillips) So this dog approaches Max and
17      they're starting to be aggressive towards each
18      other; right?
19  A.  The other dog started to be aggressive.
20  Q.  And your dog got aggressive back; correct?
21  A.  Correct.
22  Q.  And at that point you start trying to pull them
23      apart; is that right?
24  A.  Correct.
25  Q.  And your wife is able to hear this; correct?

Page 25

1   A.  Yes.
2   Q.  And she comes out of the house and assists you;
3       right?
4   A.  Yes.  As well did the owner of the dog after he
5       heard the tussle.
6   Q.  Okay.  So the owner of the dog was also able to
7       hear?
8   A.  (Nods head.)
9   Q.  "Yes"?
10  A.  Yes.
11  Q.  And then he comes out too?
12  A.  Yes.
13  Q.  And then the three of you are able to split up the
14      dogs?
15  A.  Yes.
16  Q.  Okay.  Do you remember approximately when that
17      occurred?
18  A.  Probably three or four months prior to the -- his
19      death.
20  Q.  And this was at that same residence, your
21      father-in-law's residence?
22  A.  Yes.
23  Q.  Did you have any other incidents with that neighbor
24      or that neighbor's dog?
25  A.  No.

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                    8/19/2020

Page 26

1   Q.   And Max is -- Max is deceased; is that correct?
2   A.   Yes.
3   Q.   Your lawsuit references a second dog; is that fair?
4   A.   Yes.
5   Q.   What was the second dog's name?
6   A.   Nina.
7   Q.   Was Nina Max's mother?
8   A.   Yes.
9   Q.   And Nina and Max, were they the only dogs that were
10       living with you at your father-in-law's residence?
11  A.   No.  We have a little brown Chihuahua also.
12  Q.   What's that dog's name?
13  A.   Bella.
14  Q.   Is that B-e-l-l-a?
15  A.   Yes.
16  Q.   What kind of dog -- is Nina still with us?
17  A.   No, she is not.
18  Q.   When did Nina pass away?
19  A.   About four months ago.
20  Q.   What kind of dog was Nina?
21  A.   American Bulldog.
22  Q.   Okay.  And she's the one that you got from the
23       breeder?
24  A.   Yes.
25  Q.   And I think you already said she didn't have any

Page 27

1        papers; is that right?
2   A.   Yes.
3   Q.   See, that's an example of a badly worded question.
4   A.   They were an option.  No.  But he wanted more money
5        for me to get the papers.
6   Q.   Okay.
7   A.   There was a set price with the papers and there was
8        a set price --
9            MR. SCHOTTEL:  Objection.  There's no
10       question.
11           Let him ask a question.
12           THE WITNESS:  All right.
13  Q.   (By Mr. Phillips) So was it your understanding when
14       you were in the negotiations to purchase Nina that
15       you could pay one price to get her without papers
16       and another price to get her with papers?
17  A.   Yes.
18  Q.   And you went with the lower price; correct?
19  A.   Yes.
20  Q.   And I think I understand what the answer to this is,
21       but was the dog registered with the American Kennel
22       Club or any other similar organization?
23  A.   I'm not -- I'm not sure on which one.
24  Q.   Okay.
25  A.   But, yes, one of them.

Page 28

1   Q.   But you don't have any documentation?
2   A.   Do not.
3   Q.   And you don't know the organization?
4   A.   Do not.
5   Q.   Was this a show dog?
6   A.   No.
7   Q.   Could you describe her fur coloring?
8   A.   Brown and white.
9   Q.   And approximately how much did she weigh at the time
10       of this incident?
11  A.   65 pounds.
12  Q.   Did she have any specialized training, like being a
13       helper dog?
14  A.   No.
15  Q.   Did she have a regular veterinarian?
16  A.   Yes.
17  Q.   Is that Dr. Fox?
18  A.   Yes.
19  Q.   Any other vets?
20  A.   Just the one that she seen after this incident.
21  Q.   Who was that?
22  A.   Mountain View Animal Clinic.  I'm not for sure of
23       the veterinarian's name.
24  Q.   Why did you take her to Mountain View Animal Clinic
25       instead of Dr. Fox?

Page 29

1   A.   Closer.
2   Q.   Is there any difference between the way -- I'm
3        thinking how best to phrase this.  Did Nina stay in
4        the same shelter or enclosed area that Max did?
5   A.   Yes.
6   Q.   And did she sometimes stay in the trailer that you
7        referenced earlier in connection with Max in the
8        backyard?
9   A.   Yes.
10  Q.   And did she sometimes stay in the residence just
11       like Max?
12  A.   Yes.
13  Q.   Is there any difference between the way you -- the
14       steps you took to keep control of Nina versus the
15       steps you took to control Max?
16  A.   No.
17  Q.   Prior to the incident that is at issue in this
18       lawsuit, are you aware of Nina being in any fights
19       with other dogs?
20  A.   No.
21  Q.   After this incident, are you aware of Nina being in
22       any fights with other dogs?
23  A.   No.
24  Q.   Going back to Max, are you aware of Max attacking
25       anyone or being aggressive with anyone before this

Robin Mesey

MESEY vs CITY OF VAN BUREN                                      8/19/2020

Page 30

1    incident?
2  A. No.
3  Q. Going back to Nina.  Are you aware of any incident
4     where Nina has attacked a human being or been
5     aggressive towards a human being?
6  A. No.
7  Q. Let's talk about the date of this incident.  Okay?
8  A. Yes.
9  Q. You were at this 1512 Dale Street residence that
10    belonged to your father-in-law; correct?
11 A. Yes.
12 Q. Immediately prior to you going outside and this
13    scene unfolding, who was with you in the house?
14 A. As I was going outside?
15 Q. No.  I'm sorry.  Immediately prior to that, who was
16    with you in the house before you step outside?
17 A. Me and my wife.
18 Q. Was anyone else there?
19 A. No.
20 Q. Okay.  You start to step outside; is that right?
21 A. Yes.
22 Q. Why did you start to step outside?
23 A. I heard two gunshots.
24 Q. You heard two gunshots.  What do you do?
25 A. I jump up, step outside.

Page 31

1  Q. Then what happens?
2  A. I look around.  I see the officer in the street,
3     look 20 feet from him, and see my dog laying in the
4     road.
5  Q. When you say "the officer," are you talking about
6     Officer Roper?
7  A. Yes.
8  Q. Had you ever seen Officer Roper before?
9  A. Yes.
10 Q. Did you know who Officer Roper was?
11 A. Yes.
12 Q. How did you know who he was?
13 A. It's a small town.  Everybody knows everybody.
14 Q. Well, do you remember ever meeting him before?
15 A. Yes.
16 Q. Where did you meet him at?
17 A. My wife was friends with his wife.
18 Q. Okay.  Had you ever socialized with the Ropers?
19 A. No.
20 Q. Well, when you say that his wife was friends with
21    your wife, how did they know each other?
22 A. Past tense.  As teenagers growing up together.
23 Q. Okay.  Did they go to school together?
24 A. Yes.
25 Q. Do you know -- that's fine.  So you were not friends

Page 32

1     with the Ropers during this time frame; is that
2     fair?
3  A. No.
4  Q. And that's a badly worded question.
5        Were you friends with the Ropers during this
6     time frame?
7  A. I was never friends with them.  That was my wife --
8     she was once upon a time my wife's friend.
9  Q. Okay.  Had you ever been to the Ropers' house?
10 A. No.
11 Q. Had they ever been to your house?
12 A. She has.  Their -- her son and his wife's son are
13    friends.
14 Q. When you say --
15 A. They have a son and she has a son, and they're both
16    friends.
17       MR. SCHOTTEL:  Objection.  Nonresponsive.  I
18    think the question was "has she been to your house."
19       Subject to the objection, you can answer the
20    question.
21 Q. (By Mr. Phillips) Let's try and break it down a
22    little more.  Okay.  Have you ever been to the
23    Ropers' house?
24 A. No.
25 Q. Have the Ropers ever been to your house?

Page 33

1  A. Yes.
2  Q. Did you meet them at your house?
3        MR. SCHOTTEL:  Objection.  Vague as to
4     "them," whether it was one or both.
5        MR. PHILLIPS:  I said "Ropers."
6        MR. SCHOTTEL:  Well, it could be the wife or
7     the husband.  If you want to break it down, that
8     would be a little bit better.
9        But subject to that, you can answer.
10 Q. (By Mr. Phillips) Fine.  We'll just break it down a
11    little more.
12       Has Mr. Roper ever been to a place where you
13    live?
14 A. Yes.
15 Q. Okay.  Other than the incident that we're talking
16    about in this lawsuit?
17 A. Yes.
18 Q. When did that occur?
19 A. Probably one of the times his wife was picking up
20    her son.
21 Q. So Mr. Roper's wife came to your house with
22    Mr. Roper to pick up her son?
23 A. He may have been waiting in the vehicle while she
24    was picking her son up.
25 Q. Okay.  Did you see Mr. Roper and Mrs. Roper outside

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                    8/19/2020

Page 34

1        the day of this incident?
2   A.   Right outside the house, only one.
3   Q.   At some point did you also see Mrs. Roper there?
4   A.   She was down the street.
5   Q.   Okay.  What were you doing at home when you first
6        heard the gunshots?
7   A.   We were in the recliner and heard the shots and got
8        up and went outside.
9   Q.   Okay.  Prior to hearing the gunshots, had you heard
10       any barking?
11  A.   No.
12  Q.   So you go outside.  And the first things that you
13       see are Max and Mr. Roper; is that right?
14  A.   Yes.
15  Q.   And what happens then?
16  A.   He was standing out there with his sidearm in his
17       hand making sure that my dog was deceased.
18  Q.   Well, what do you mean by that?  What was he doing?
19  A.   Like, waiting to see if he needed to fire another
20       shot to finish him off.
21  Q.   How do you know that?
22  A.   Because he was investigating his body with his
23       sidearm out.
24  Q.   What was -- okay.  What was he physically doing?
25  A.   Standing there observing him with his sidearm out.

Page 35

1   Q.   So he was looking at Max with his gun out?
2   A.   (Nods head.)
3   Q.   "Yes"?
4   A.   Yes.
5   Q.   Was Roper wearing a police uniform?
6   A.   I don't remember what he was wearing.
7   Q.   Do you remember what kind of vehicle Roper was in or
8        occupying?
9   A.   There was no vehicle outside.  His vehicle was down
10       the street.
11  Q.   Okay.  What kind of vehicle was that?
12  A.   They have a black -- I'm not sure what it is.  I
13       don't know.
14  Q.   Was it a police vehicle?
15  A.   I don't know.  I don't know.
16  Q.   Did it have lights on top of it?
17  A.   Their personal vehicle was down there.  It was a
18       black SUV.
19  Q.   Okay.  So they had their personal vehicle?
20  A.   That was down there, yes.
21  Q.   Did you see any police vehicles there that you
22       associated with the Ropers?
23  A.   I didn't observe the area that well to really know.
24       I don't know.  I was too worried about the incident.
25  Q.   Okay.  So you see Roper is looking at Max.  What

Page 36

1        happens next?
2   A.   I walk out there and observe my dog, watch him take
3        his last breath.  I look at him.  He's just standing
4        there with his sidearm out.  And I asked him why did
5        he -- "Why did you shoot my dog?"
6   Q.   And what did he tell you?
7   A.   He was -- he was fighting Draco.  I guess that's the
8        name of his father-in-law's dog.
9   Q.   Had you ever heard of or seen Draco before?
10  A.   I have heard of him.
11  Q.   Do you know what kind of dog Draco was?
12  A.   I have no idea.
13  Q.   Do you remember if you had ever seen Draco before?
14  A.   I believe I did once.  They lived all the way at the
15       end of the dead-end street.  I never went down that
16       way really.
17       MR. SCHOTTEL:  Objection.  Nonresponsive to
18       the question.
19  Q.   (By Mr. Phillips) Do you remember where you saw or
20       think you saw Draco?
21  A.   At the father-in-law's house.
22  Q.   Had you been to the father-in-law's house?
23  A.   Not exactly there, but down there.
24  Q.   And when we say "the father-in-law," you're talking
25       about Mr. Roper's father-in-law?

Page 37

1   A.   Correct.
2   Q.   Do you remember his name?
3   A.   I believe Jeff.
4   Q.   Do you remember his last name?
5   A.   Wahlberg.
6   Q.   Do you know how to spell it?
7   A.   No.
8   Q.   Okay.  So you're outside, you're speaking with
9        Roper.  Are there other people around outside with
10       you guys?
11  A.   No.
12  Q.   At some point do you see other people outside?
13  A.   Not in our area, no.
14  Q.   Are there other people that are coming out just to
15       look around or something?
16  A.   There were people down at the end of the street.
17  Q.   Do you know who they were?
18  A.   His wife and stepchildren.
19  Q.   And we're talking about Mrs. Roper and her kids?
20  A.   Yes.
21  Q.   Do you know her kids' names?
22  A.   Yes.
23  Q.   What are their names?
24  A.   Jacob, Devon, Kailee or Kylea, something like that.
25  Q.   Do you know their approximate ages?

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                8/19/2020

Page 38

1   A. No.
2   Q. Okay.  So you see the Ropers, their kids.  Anyone
3      else?
4   A. No.  I wasn't observing everyone out there.  I was
5      worried about my dog.
6   Q. Okay.  So you've spoken with Roper.  He tells you
7      why he shot Max.  What happens next?
8   A. He told me that he got in a fight with Draco.  And
9      after that I just kind of -- I had to get away from
10     him because I was upset.  My wife came out and she
11     was upset.  I believe they exchanged a few words,
12     and then I had to distance myself from the situation.
13  Q. What did you do?
14  A. I just kind of stepped off to the side to be by
15     myself for a moment.
16  Q. While you were off on the side to be by yourself,
17     were you aware of what was going on between your
18     wife and the Ropers?
19  A. Yes.
20  Q. In general, what was happening there?
21  A. They were discussing -- I knew what was going on.  I
22     was just keeping myself from commenting.
23  Q. Was anybody yelling?
24  A. What do you mean "yelling"?  Like --
25  Q. Do you want me to define the word "yelling"?

Page 39

1   A. Do you mean angrily screaming or loudly talking?
2   Q. I mean yelling, whatever you think that means.
3   A. My wife and -- was asking him about what was going
4      on too.  She was getting loud, yeah.
5   Q. How was Mr. Roper behaving?
6   A. Nervous.
7   Q. So you go off to the side, you're hearing this.
8      What do you do next?
9   A. About that time is when police officers started
10     showing up.
11  Q. Okay.  Do you -- did you know any of those people?
12  A. Which people?
13  Q. Well, you said "officers started showing up."  Did
14     more than one show up?
15  A. Yes.
16  Q. Okay.  Do you know who showed up?
17  A. One was Eudaley.  He's a sheriff's deputy.  And
18     there was also another Van Buren police officer too.
19  Q. Did you know that Van Buren police officer?
20  A. That one, no, I do not.
21  Q. Do you know his name?
22  A. No.
23  Q. Prior to this incident, to your knowledge, had you
24     ever interacted with that Van Buren police officer?
25  A. I'm sure I've spoken to him before in the -- small

Page 40

1      town.
2   Q. Just in passing?
3   A. Uh-huh, yes.
4   Q. Was that officer in uniform?
5   A. Yes.
6   Q. Did he arrive in a patrol vehicle?
7   A. Yes.
8   Q. You also said that a deputy showed up?
9   A. Yes.
10  Q. Was that Justin Eudaley?
11  A. Yes.
12  Q. Had you ever interacted with him before?
13  A. No.
14  Q. Was he in uniform?
15  A. Yes.
16  Q. Was he in a patrol vehicle?
17  A. Yes.
18  Q. Did you speak with the uniformed Van Buren officer?
19  A. After everything settled down, he came inside the
20     residence and spoke to us.  Yes.
21  Q. Do you remember in general what it is that he said
22     to you?
23  A. Just questioned us about the situation, what we
24     observed, I believe.
25  Q. Was the deputy with him while this is going on?

Page 41

1   A. The -- I'm sorry.  Did you say the police officer
2      come in and question us?  It was the deputy who
3      questioned us.
4   Q. Okay.  Okay.
5   A. Yes.
6   Q. So the deputy came inside and questioned you?
7   A. Yes.
8   Q. Did the officer come inside and question you at all?
9   A. No.
10  Q. Do you remember what, if anything, the officer did?
11  A. He handed the case over to the deputy.
12  Q. Okay.  Do you know if the deputy spoke with the
13     Ropers after that or before that?
14  A. Yes.
15  Q. Were you able to see the deputy speak with the
16     Ropers?
17  A. Yes.
18  Q. Do you know what Mrs. Roper does for a living?
19  A. No.
20  Q. Do you have any reason to believe that Officer Roper
21     was working or on duty at the time of this incident?
22  A. I don't know.
23  Q. Are you familiar with Sheriff Richard Stephens?
24  A. Yes.
25  Q. How do you know him?

Robin Mesey

MESEY vs CITY OF VAN BUREN                                                    8/19/2020

Page 42

1   A.  The sheriff of Carter County.
2   Q.  Could you describe the nature of your relationship
3       with him?
4   A.  There isn't one.
5   Q.  Did you ever interact with him before this incident?
6   A.  No.
7   Q.  Are you aware of any connection between
8       Sheriff Stephens and your wife?
9   A.  No.
10  Q.  Earlier I think you indicated that Roper told you
11      that your dogs were attacking another dog; is that
12      fair?
13          MR. SCHOTTEL:  Objection.  Misstates his
14      testimony.
15          Subject to that, you can answer the question.
16  A.  Repeat, please.
17  Q.  (By Mr. Phillips) What did Roper say to you about
18      why he shot Max?
19  A.  He was -- he was fighting Draco.
20  Q.  Okay.  Did you see Draco?
21  A.  No.
22  Q.  Are you aware of any prior incidents between your
23      dogs and Draco before this?
24  A.  No.
25  Q.  We've talked about Max quite a bit, but I haven't

Page 43

1       heard much about Nina.  Are you claiming that
2       Officer Roper shot Nina also?
3   A.  Yes.
4   Q.  Where was Nina while you were outside and witnessing
5       or seeing Officer Roper and Max?
6   A.  She was hiding behind the enclosure -- in between
7       the enclosure and the camper trailer.
8   Q.  Okay.  Is that in the backyard?
9   A.  Yes.
10  Q.  And then when you were outside interacting with
11      Roper and seeing Max, was that in the front yard or
12      the front part of the house?
13  A.  It's all -- the whole side of the house is open, so
14      it's really no front and back.  It's just -- yeah.
15      I was on the side.
16  Q.  So you were in a side area?
17  A.  Yes.
18  Q.  When did you first become aware of Nina hiding?
19  A.  When -- after all the police left, I went to look
20      for her.  I couldn't find her.  I walked around the
21      enclosure in the back of the yard, saw her laying on
22      the ground with her arm bleeding.  And she was only
23      walking on three legs.
24  Q.  And you kind of indicated, was that the right front
25      leg that was injured?

Page 44

1   A.  Front right elbow.
2   Q.  Okay.  What did you do then?
3   A.  I picked her up and took her inside and -- to
4       oversee the damage.
5   Q.  And did you do something to treat her?
6   A.  Took her to the vet.
7   Q.  When did you take her to the vet?
8   A.  That following morning.
9   Q.  Approximately what time of day did this incident
10      occur?
11  A.  Before noon, I want to say.
12  Q.  So the next morning you took Nina to the vet; right?
13  A.  Yes.
14  Q.  And was that the -- what was the name of the vet?
15  A.  It was the Mountain View Animal Clinic.
16  Q.  Okay.  And I understand that you're not a vet, but
17      could you describe what your understanding is as to
18      what they did to treat her?
19  A.  First, they thought they were going to have to
20      amputate it.  And then he wanted to try to save it.
21      So he fused it -- fused the elbow to make it solid
22      to where she could possibly still use it.
23  Q.  Okay.  Did she stay at the vet overnight?
24  A.  She stayed a few nights.
25  Q.  What -- what happened to Max?  Did you take Max's

Page 45

1       body to the vet?  Did you bury Max?
2   A.  I buried him.
3   Q.  Okay.  So Nina is at the animal clinic for at least
4       a few days; is that right?
5   A.  Yes.
6   Q.  And then she's released to you; right?
7   A.  Yes.
8   Q.  Did the clinic send her home with prescriptions?
9   A.  Yes.
10  Q.  Do you remember what they were?
11  A.  I don't recall the exact name.
12  Q.  Did she have any kind of supportive devices to help
13      her move around, that sort of thing?
14  A.  Yes.
15  Q.  Could you describe that?
16  A.  Like a cast type splint thing.
17  Q.  Was that something that stayed on her while she
18      healed and then was taken off?
19  A.  Yes.
20  Q.  Do you know roughly how long it took for her to
21      recover?
22  A.  She never recovered.
23  Q.  How so?  What was -- what was different from how she
24      was after this incident versus what she was like
25      before?

Robin Mesey

MESEY vs CITY OF VAN BUREN                                    8/19/2020

Page 46

1    A.   She walked on four legs before and then she walked
2         on three after.
3    Q.   She had all four, but she would only use three?
4    A.   Yes.
5    Q.   Who paid for Nina's treatment?
6    A.   No one.
7    Q.   Did the vet bills just go to collections or
8         something?
9    A.   We've paid partial.  It's not completely paid.
10   Q.   How much have you paid?
11   A.   I don't know right off the top of my head.
12   Q.   Do you have an understanding as to roughly how much
13        was left unpaid?
14   A.   I would have to refer to our documents.  I'm not
15        sure.
16   Q.   And you've already provided those documents to your
17        attorney to give to us; right?
18   A.   I believe so.
19   Q.   When you say that you had paid part of the vet
20        bills, was that you and your wife paying?
21   A.   Yes.
22   Q.   I'm just going to ask you:  What is it that you're
23        saying my clients did wrong?
24             MR. SCHOTTEL:  Objection to the form.  That's
25        not seeking facts.  You can rephrase the question,

Page 47

1         but I'm not going to let him answer a question like
2         that.  Discovery is intended to discover facts.
3              MR. PHILLIPS:  Sure.
4    Q.   (By Mr. Phillips) What facts do you think
5         demonstrate that my client did something wrong?
6              MR. SCHOTTEL:  Objection.  Overbroad, vague.
7              MR. PHILLIPS:  Are you serious?
8              MR. SCHOTTEL:  Uh-huh.
9              MR. PHILLIPS:  You're recommending he not
10        answer this question?
11             MR. SCHOTTEL:  Of course.  Asks for a legal
12        conclusion too.  I'm not going to let you sit there
13        and ask my client to make a legal conclusion.
14             MR. PHILLIPS:  I'm not asking him a legal
15        question.
16             MR. SCHOTTEL:  You are.
17             MR. PHILLIPS:  I'm asking liability.
18   Q.   (By Mr. Phillips) I'm asking you, Mr. Mesey,
19        morally, what is it my client did wrong in this
20        case?
21             MR. SCHOTTEL:  Morally?  Same objection.
22   Q.   (By Mr. Phillips) What -- Mr. Mesey, what connection
23        is there between this incident and my client?
24             MR. SCHOTTEL:  Same objection.  Calls for a
25        legal conclusion.  He's not an attorney.

Page 48

1              MR. PHILLIPS:  Okay.  And he can answer to
2         the best of his ability.
3              MR. SCHOTTEL:  I'm not going to let my client
4         make a legal conclusion.  You're asking questions,
5         legal questions.  If you want to argue about that
6         with me, that's fine, but this is a deposition to
7         discover facts.  It's beyond the scope of the rules.
8    Q.   (By Mr. Phillips) Mr. Mesey, are you going to do
9         what your attorney suggests and just not answer any
10        questions about what you think my client did wrong?
11        Mr. Mesey?
12             MR. SCHOTTEL:  As the questions are phrased,
13        I'm instructing you not to answer those questions.
14   Q.   (By Mr. Phillips) Mr. Mesey, are you following the
15        orders of your attorney?
16   A.   Yes.
17             (Deposition Exhibit 1 is marked for
18        identification.)
19   Q.   (By Mr. Phillips) Mr. Mesey, I'm going to show you
20        what's been marked as Exhibit 1, which I will
21        represent to you are your written interrogatory
22        answers.  What I would like you to do is review
23        those.  And after you're done reviewing, let me
24        know.
25   A.   Okay.

Page 49

1    Q.   Mr. Mesey, having reviewed those answers, are those
2         answers still accurate and correct?
3    A.   Yes.
4              MR. PHILLIPS:  Okay.  All right.  I pass the
5         witness unless you want to take a break.
6              MS. KAYSER:  I want to take a really quick
7         break and then we can come back.
8              (Break in proceedings from 12:29 p.m. to
9         12:34 p.m.)
10                        EXAMINATION
11   BY MS. KAYSER:
12   Q.   Hello, Mr. Mesey.  My name is Portia Kayser.  I
13        represent Charles Roper in this lawsuit.  I'm going
14        to probably jump around a little bit because I'm
15        just trying to fill in a couple of blanks from
16        Mr. Phillips' questioning.  Okay.  So if you don't
17        follow me, just let me know.
18   A.   Okay.
19   Q.   All right.  Do you have any pending charges against
20        you?
21   A.   No.
22   Q.   There aren't any charges for educational neglect?
23   A.   Yes, there is on that.
24   Q.   Okay.  And you're set for next Tuesday for a
25        disposition hearing on that; is that correct?

Robin Mesey

MESEY vs CITY OF VAN BUREN                                          8/19/2020

---

Page 50

1  A.  Correct.
2  Q.  Okay.  Do you recall how many charges are against
3      you?
4  A.  Two.  There was three, but two.  It's been reduced
5      to two.
6  Q.  Is that because Chloe went to live with her aunt?
7  A.  It's because Chloe is not my biological daughter.
8  Q.  Okay.  Are three still pending against your wife?
9  A.  She finalized hers.  I'm not sure the outcome.
10 Q.  When?
11 A.  I'm not sure.
12 Q.  Okay.  Are you familiar with a gentleman by name of
13     Brandon Smith?
14 A.  Yes.
15 Q.  Okay.  And how do you know Mr. Smith?
16 A.  He is the father-in-law's neighbor.
17 Q.  And does Mr. Smith have a dog?
18 A.  He has two.
19 Q.  Have you ever had any interactions with Mr. Smith
20     related to your dogs?
21 A.  My Chihuahua.
22 Q.  And can you tell me about that incident, please?
23 A.  He was riding his motorcycle down the street.  And
24     he said that a dog was nipping at his feet as he was
25     driving.  He thought that it was mine.  I took my

---

Page 51

1      Chihuahua down there and asked him if this was the
2      dog and he could not identify the dog, so he didn't
3      know.
4  Q.  Were the police called?
5  A.  Yes.
6          (Deposition Exhibit 2 is marked for
7      identification.)
8          MR. SCHOTTEL:  There you go, Robin.  Read the
9      second page.
10         While he's reading, I'll just state for the
11     record I'll have a running objection involving any
12     questions involving this incident because it was
13     after the incident subject to this case.  And it
14     also did not involve either of the two dogs that
15     Mr. Roper shot.
16         MS. KAYSER:  Your objection is noted.  Thank
17     you.
18 Q.  (By Ms. Kayser) Okay.  Are you familiar with the
19     incident that is described in that police report?
20 A.  Yes.
21 Q.  Were you aware that your wife was cited for having
22     an unrestrained dog?
23 A.  That ticket never was processed.
24 Q.  That's not my question.
25 A.  Yes, yes.

---

Page 52

1  Q.  And you are aware that your wife indicated that it
2      was, in fact, your dog that was identified by the
3      victim this case, Mr. Smith; correct?
4          MR. SCHOTTEL:  Objection.  Misstates the
5      report.
6          Subject to that, you can answer the question.
7  A.  Could you repeat, please?
8          MS. KAYSER:  Can you just read that back?
9          (The requested portion of the record was read
10     by the reporter.)
11 A.  She never indicated nothing to me.  I don't
12     understand what you mean.
13 Q.  (By Ms. Kayser) Okay.  Did she tell you that your
14     dog attacked the neighbor?
15 A.  No.  The police officer did.
16 Q.  Okay.  You talked earlier about an incident between
17     Max and another neighbor's dog; correct?
18 A.  Yes.
19 Q.  And does the name Darren Clark refresh your
20     recollection as to who that neighbor was?
21 A.  No.
22 Q.  Was Max injured in that scuffle with the neighbor's
23     dog?
24 A.  No.
25 Q.  Was Max ever injured prior to the date of the

---

Page 53

1      incident that we're here to talk about today?
2  A.  No.
3  Q.  What about Nina?  Had Nina ever been injured in any
4      way prior to the incident?
5  A.  No.
6  Q.  Okay.  What happened to Nina three or four months
7      ago?
8  A.  She got sick.
9  Q.  Do you know what she was sick with?
10 A.  She got heartworms.
11 Q.  How many litters did Nina have when you -- during
12     the time that you owned her?
13 A.  Two.
14 Q.  And what happened to the puppies from those litters?
15 A.  The first litter was the one Max was in.  We kept
16     Max and got rid of the other ones.
17 Q.  Okay.  And the second litter, when was that?
18 A.  A few years later.
19 Q.  Okay.  So Max was only two when he was killed.  Was
20     her second litter -- was Nina's second litter after
21     this incident or before?
22 A.  Before.
23 Q.  And what happened to those puppies?
24 A.  They didn't make it.
25 Q.  When you said you got rid of the other puppies from

---

Robin Mesey

MESEY vs CITY OF VAN BUREN                                              8/19/2020

Page 54

1       Max's litter, how many other dogs were there?
2   A.  Altogether, I believe she had ten.
3   Q.  And did all of those pups make it?
4   A.  No.
5   Q.  How many survived?
6   A.  Five boys, one girl.
7   Q.  Did you give away the other five puppies other than
8       Max or did you sell them -- how did they --
9   A.  Sold them.
10  Q.  How much did you sell them for?
11  A.  $200 per pup.
12  Q.  Same amount for the males and the females -- female?
13  A.  Yes.
14  Q.  I know that Mr. Phillips asked you a couple of
15      questions about Deputy Eudaley.  Did you know
16      Deputy Eudaley prior to this incident?
17  A.  I knew who he was.
18  Q.  Had you ever socialized with him?
19  A.  No.
20  Q.  How did you know who he was?
21  A.  Local law enforcement.
22  Q.  Do you know where Mr. Eudaley is now?
23  A.  No.
24  Q.  Are you aware that he's no longer with the sheriff's
25      department?

Page 55

1   A.  I have no idea.  No.
2   Q.  Do you have any idea where Mr. Eudaley lives?
3   A.  No.
4   Q.  Did your father-in-law have any dogs of his own that
5       were living in the home with you at the time of the
6       incident?
7   A.  No.
8   Q.  Is your Chihuahua a purebred or is it a mix?
9   A.  Mix.
10  Q.  Do you know what it's mixed with?
11  A.  No.
12  Q.  Has that dog had any incidents with biting other
13      dogs or being in scuffles with other dogs?
14  A.  No.
15  Q.  Other than the dog bite with Mr. Smith?
16  A.  No.
17  Q.  I would like to show you a clip from the body camera
18      video.
19          MS. KAYSER:  Would you like to see this
20      first, Jim?
21          MR. SCHOTTEL:  No.  I'll watch it at the same
22      time.
23  Q.  (By Ms. Kayser) Just a couple of minutes of it so I
24      can identify whether or not this is your other dog.
25          Did you see that dog that was out in front of

Page 56

1       the house?  Let me play it again.
2           MR. SCHOTTEL:  Can you pause it for a second?
3       Can you give us some background on who and when this
4       body camera is from?
5           MS. KAYSER:  Sure.  This is a body camera
6       video provided by Van Buren Police Department for
7       the officer who responded on the day of the
8       incident.
9   Q.  (By Ms. Kayser) I'll pause it right here.  Is this
10      light blue house the house that you were living in
11      at the time of the incident?
12  A.  Yes.
13  Q.  And that's your father-in-law's house?
14  A.  Yes.
15  Q.  Okay.  Can you identify from this still shot here
16      about where the dog run would be?
17  A.  It wasn't a run.
18  Q.  It was just an enclosure?
19  A.  Uh-huh.  Back there.  You can see the roof.
20  Q.  Okay.  So the enclosure in the backyard where you
21      kept the dog actually was a building with a roof on
22      it?
23  A.  Yes.
24  Q.  Okay.  Now, the dog that's coming down this driveway
25      or walkway in front of the house, is that one of

Page 57

1       your dogs?
2   A.  Yes.
3   Q.  Okay.  Is that Bella?
4   A.  Yes.
5   Q.  Okay.  And is Bella on a leash?
6   A.  She was outside with my son.
7   Q.  Okay.  That's not really my question.  Is she --
8   A.  No.
9   Q.  I'm not sure if I can see if there's, like, a chain
10      or something.  Is she restrained in that way?
11  A.  No.
12  Q.  No.  Do you have an electric fence that goes around
13      this property?
14  A.  No.
15  Q.  Okay.  Now, is this your wife that we're seeing in
16      the video now?
17  A.  Yes.
18  Q.  Standing there on the phone.
19          Do you hear that statement at the end where
20      your wife asked who let my dog out?
21  A.  Uh-huh.
22  Q.  Did you guys ever figure out who let the dog out of
23      the house?
24  A.  No one did.
25  Q.  Well, how did Max and Nina get out of the house?

Page 58

1  A.  They were actually -- he busted the door.
2  Q.  Who busted the door?
3  A.  Max.
4  Q.  Okay.  And did you hear him when he busted the door?
5  A.  No.
6  Q.  Had he ever busted the door before?
7  A.  No.
8  Q.  Now, do you recognize this vehicle?
9  A.  Yes.
10 Q.  That's a Van Buren police car; right?
11 A.  Yes.
12 Q.  Did you see my client, Mr. Roper, in a vehicle like
13     this on the day of the incident?
14 A.  I didn't.  Like I said, I didn't see a vehicle out
15     in front of the house.
16 Q.  Okay.  Did you see only this Van Buren police
17     vehicle or did you see a second Van Buren police
18     vehicle on the day of the incident?
19 A.  I didn't see -- no, I didn't see any vehicles.
20 Q.  Other than this one?  Well, this is parked out in
21     front of your house.  That's a bad question.  You're
22     right.
23         Did you see a police vehicle out in front of
24     your house?
25 A.  Several.

Page 59

1  Q.  Several.  How many from Van Buren?
2  A.  I don't know.  I wasn't paying attention.
3  Q.  Okay.  Do you know who's speaking right now in this
4      video, the gentleman in the blue jeans and the
5      T-shirt?
6  A.  Darren Clark.
7  Q.  Okay.  So you are familiar with Mr. Clark?
8  A.  Yes.
9  Q.  How do you know Mr. Clark?
10 A.  He lived across the street from Jeff Wahlberg.
11 Q.  Okay.  Do you recognize this gentleman?  It's
12     difficult, I know, because the officer's body cam
13     doesn't catch people's faces very often.  But do you
14     recognize that person?
15 A.  I don't see a face.
16 Q.  Now, that's my client, Charles Roper; right?
17 A.  Yes.
18 Q.  And did you see the vehicle that he was getting
19     something out of?  Are you familiar with that red
20     SUV?
21 A.  Yes.
22 Q.  Do you know whose vehicle that is?
23 A.  His son's.
24 Q.  Okay.  Do you recognize the other SUV vehicle that's
25     there?

Page 60

1  A.  Yes.
2  Q.  Do you know whose vehicle that is?
3  A.  That's her father's.
4  Q.  Okay.  Do you see what my client is wearing right
5      there?
6  A.  Yes.
7  Q.  Okay.  So he's in blue jeans and a jacket; right?
8  A.  Yes.
9  Q.  Do you see any police uniform attire on my client
10     right there?
11 A.  No.
12        MS. KAYSER:  Okay.  That is all I have from
13     this one.
14        MR. SCHOTTEL:  Since we're on the record,
15     where did you get the video from?
16        MS. KAYSER:  From the Van Buren Police
17     Department.
18        MR. SCHOTTEL:  Okay.  And did you turn this
19     over to us?
20        MR. PHILLIPS:  I don't know.
21        MR. SCHOTTEL:  That's the first time I've
22     seen this video, and I know we've asked.  Initial
23     disclosures requires disclosure of a video like
24     this.  So...
25        MR. PHILLIPS:  Rule 26 disclosures are

Page 61

1  documents that I intend to use.  It's not just any
2  document that could possibly relate to something.
3  And I honestly don't remember.  I've not looked
4  through my file to see what I gave you lately, but I
5  can certainly do so.
6        MR. SCHOTTEL:  Right.  Can you please turn
7  over this video?
8        MR. PHILLIPS:  Yeah.  If I have it, I will
9  turn it over to you.
10        MS. KAYSER:  There are two.  There is an
11  initial video from when Max was still in the road.
12  And then this is the second video.  So there's two
13  from Van Buren.
14        MR. SCHOTTEL:  Okay.  Do you --
15        MS. KAYSER:  And do you have all of the ones
16  from the Carter County Sheriff's Department as well?
17        MR. SCHOTTEL:  Did you subpoena them?
18        MS. KAYSER:  I did a Sunshine Law request to
19  Carter County and got theirs.  I don't know if you
20  received those as well.
21        MR. SCHOTTEL:  Okay.  But they are Van Buren?
22        MS. KAYSER:  These are Van Buren, yeah.
23        MR. SCHOTTEL:  And you represent Van Buren,
24  right, Damon?
25        MR. PHILLIPS:  I'm not objecting to giving

Robin Mesey

MESEY vs CITY OF VAN BUREN                                              8/19/2020

---

Page 62

1   you the video.  I just don't remember if I've given
2   it to you before.
3          MR. SCHOTTEL:  That's the first time I've
4   seen it.  I would remember if I had a copy.  But if
5   you could please turn those over, that would be
6   greatly appreciated.  Thank you.
7          Sorry about that, Portia.  You can continue.
8          MS. KAYSER:  That's just fine.
9          Sir, actually that's all the questions I have
10  for you.  I appreciate your time.
11         MR. SCHOTTEL:  Thank you.  We'll read.
12         THE COURT REPORTER:  Does everyone want an
13  etran?
14         MS. KAYSER:  Yes.
15         MR. PHILLIPS:  Yeah.
16         THE COURT REPORTER:  Do you want an etran?
17         MR. SCHOTTEL:  That would be fine.
18         (Witness excused at 12:59 p.m.)
19
20
21
22
23
24
25

---

Page 64

1                    REPORTER'S CERTIFICATE
2
    STATE OF MISSOURI  )
3                      )  ss
    COUNTY OF GREENE   )
4
5          I, ERICA WHITE, Certified Court
    Reporter, do hereby certify that the witness
6   was duly sworn by me; that the facts stated by
    me in the caption hereof are true; that the
7   said witness did make the above and foregoing
    answers in response to questions propounded as
8   shown; that I did, in stenotype, report said
    proceedings; and that the above and foregoing
9   typewritten pages contain a full, true, and
    correct transcription of my shorthand notes
10  taken on such occasion.  That presentment by me
    to the witness for signature was waived; that
11  the deposition will be thereafter by the
    witness read over, signed, and sworn to on or
12  before the date of trial; that said deposition
    is now herewith returned.
13
           I further certify that I am neither
14  attorney for, nor counsel for, nor related to,
    nor employed by any of the parties to the
15  action in which this deposition was taken; and,
    further, that I am not a relative or employee
16  of any attorney or counsel employed by the
    parties hereto, or financially interested in
17  the action.
18
19              *Erica White*
                ERICA A. WHITE, CCR
20
21
22
23          ALPHA REPORTING & VIDEO
               1911 S. National
24               Suite 405
            Springfield, Missouri 65804
25             (417)887-4110

---

Page 63

1              DEPONENT'S SIGNATURE PAGE
2
3
4
    In Re:  Mesey vs. City of Van Buren, et al.
5           1:19-CV-71; USDC
6
7   Taken:  August 19, 2020
8
                   - - - - -
9
10
           _____
11                 ROBIN MESEY
12
13
14         Subscribed and sworn to before me
15   this_____ day of _____ , 20 ____.
16
17
           _____
18               Notary Public
19               My commission expires:
20         _____
21
22
23
24
25

---

EXHIBIT B

Robin Mesey

MESEY vs CITY OF VAN BUREN                                    8/19/2020Index: $1,500..busted

**Exhibits**

**Exhibit 01** 48:17, 20

**Exhibit 02** 51:6

**$**

**$1,500** 18:21 19:3, 19

**$200** 54:11

**$500** 20:10,17

**0**

**02** 15:18

**1**

**1** 48:17,20

**1,500** 21:5

**110** 14:2

**1115** 7:25

**12:29** 49:8

**12:34** 49:9

**12:59** 62:18

**13** 7:6

**14** 7:7

**1512** 9:9 30:9

**16** 7:5

**17** 7:6

**18** 7:5

**1978** 6:9

**1st** 6:9

**2**

**2** 51:6

**20** 31:3

**2003** 11:22 12:1

**2014** 20:20

**2016** 7:1 14:17,18 15:11

**2017** 10:16 14:1,16, 19 15:11

**2019** 15:21

**22nd** 15:21

**26** 60:25

**4**

**402** 20:9

**41** 6:7

**5**

**500** 18:21 21:5

**6**

**65** 28:11

**8**

**80** 17:14

**85** 17:14

**9**

**99** 15:18

**A**

**ability** 6:14 48:2

**accurate** 49:2

**accusing** 16:14

**ad** 20:18

**address** 7:21,24 8:4,20 9:3,7 20:8

**advertisements** 13:7

**affected** 8:21

**age** 6:6

**ages** 7:4 37:25

**aggressive** 23:22, 23 24:17,19,20 29:25 30:5

**agree** 5:13,25

**Altogether** 54:2

**Alton** 7:23

**American** 17:2,5 21:1,3 26:21 27:21

**amount** 54:12

**amputate** 44:20

**angrily** 39:1

**animal** 28:22,24 44:15 45:3

**answers** 48:22 49:1,2

**anybody's** 14:10

**apartment** 9:24

**apologize** 5:6 6:23

**appreciated** 62:6

**approached** 23:21

**approaches** 24:16

**approximate** 9:12 17:13 37:25

**approximately** 10:12 11:21 23:11 25:16 28:9 44:9

**approximation** 8:17

**April** 10:16

**area** 22:13 29:4 35:23 37:13 43:16

**argue** 48:5

**arm** 43:22

**arrive** 40:6

**Asks** 47:11

**assisted** 24:12

**assists** 25:2

**association** 17:3,7

**assume** 5:18

**attacked** 30:4 52:14

**attacking** 29:24 42:11

**attention** 59:2

**attire** 60:9

**attorney** 46:17 47:25 48:9,15

**attorneys** 4:18

**aunt** 7:20 50:6

**aware** 5:4 29:18,21, 24 30:3 38:17 42:7, 22 43:18 51:21 52:1 54:24

**B**

**B-E-L-L-A** 26:14

**back** 10:23 22:21 23:2,21,23 24:20 29:24 30:3 43:14,21 49:7 52:8 56:19

**background** 6:11 11:2 56:3

**backup** 12:5

**backyard** 22:4,5,6, 10,12,17 29:8 43:8 56:20

**bad** 58:21

**badly** 5:14 27:3 32:4

**barking** 34:10

**basically** 14:3

**bathroom** 23:20

**bedrooms** 10:3

**behaving** 39:5

**believed** 5:18

**Bella** 26:13 57:3,5

**belonged** 30:10

**belt** 12:17

**bills** 46:7,20

**biological** 50:7

**birth** 6:8

**bit** 33:8 42:25 49:14

**bite** 55:15

**biting** 55:12

**black** 17:12 23:18 35:12,18

**blanks** 49:15

**bleeding** 43:22

**blue** 56:10 59:4 60:7

**Bluff** 18:7

**body** 34:22 45:1 55:17 56:4,5 59:12

**boss** 20:6

**boys** 54:6

**Bradwell** 4:12

**Brandon** 50:13

**break** 5:24 6:1 32:21 33:7,10 49:5, 7,8

**breaking** 24:12

**breath** 36:3

**bred** 18:14

**breed** 24:6

**breeder** 15:4 20:18,21,23 26:23

**brown** 17:12 26:11 28:8

**build** 14:8

**building** 56:21

**Bulldog** 17:2 21:1, 3,12 26:21

**Buren** 4:12 7:25 8:21 9:10 15:6 20:2 39:18,19,24 40:18 56:6 58:10,16,17 59:1 60:16 61:13, 21,22,23

**buried** 45:2

**bury** 45:1

**busted** 58:1,2,4,6

EXHIBIT B

Robin Mesey

MESEY vs CITY OF VAN BUREN                                        8/19/2020Index: buy..ended

**buy** 18:16,23 20:19

**C**

**called** 51:4

**Calls** 47:24

**cam** 59:12

**camera** 55:17 56:4, 5

**camper** 22:21 23:2 43:7

**capacity** 13:20

**car** 58:10

**Carter** 11:20 12:9 42:1 61:16,19

**case** 41:11 47:20 51:13 52:3

**cash** 19:22,23,24

**cast** 45:16

**catch** 59:13

**chain** 57:9

**chains** 22:19

**charge** 11:18 19:22

**charged** 19:3

**charges** 49:19,22 50:2

**Charles** 7:18 49:13 59:16

**Charlie** 7:6,9 9:17

**check** 19:22

**Chevrolet** 20:2

**Chief** 4:12

**Chihuahua** 26:11 50:21 51:1 55:8

**children** 7:2 9:14, 16

**Chloe** 7:5,10 50:6,7

**cited** 51:21

**city** 4:12 15:6

**claim** 15:16

**claiming** 16:11,21 43:1

**Clark** 52:19 59:6,7, 9

**client** 16:5 47:5,13, 19,23 48:3,10 58:12 59:16 60:4,9

**clients** 4:14 46:23

**clinic** 18:6 28:22,24 44:15 45:3,8

**clip** 55:17

**Closer** 29:1

**Club** 17:5 27:22

**collections** 46:7

**College** 14:5

**coloring** 17:11 28:7

**commenting** 38:22

**community** 12:8

**company** 13:2

**completely** 22:11 46:9

**conclusion** 47:12, 13,25 48:4

**confusing** 5:13 16:4

**connection** 29:7 42:7 47:22

**construction** 11:11

**contact** 19:13

**contained** 22:13

**continue** 62:7

**control** 29:14,15

**copy** 62:4

**correct** 4:14 8:23 10:22 13:6,16 21:18,24 24:20,21, 24,25 26:1 27:18 30:10 37:1 49:2,25 50:1 52:3,17

**cost** 18:20 21:5

**County** 11:20 12:9 42:1 61:16,19

**couple** 49:15 54:14 55:23

**court** 4:22 62:12,16

**courtroom** 6:21

**Craigslist** 20:18

**cramped** 10:9

**crime** 11:16

**crimes** 12:11

**current** 6:6 17:24

**D**

**Dale** 9:9 30:9

**damage** 44:4

**Damon** 4:11 61:24

**Darren** 52:19 59:6

**date** 6:8 10:11 30:7 52:25

**daughter** 50:7

**day** 34:1 44:9 56:7 58:13,18

**days** 45:4

**dead-end** 36:15

**deal** 5:22

**death** 25:19

**deceased** 26:1 34:17

**defended** 23:23

**define** 38:25

**demoed** 14:5

**demolition** 14:1,7

**demonstrate** 47:5

**department** 54:25 56:6 60:17 61:16

**deposition** 4:24 5:23 48:6,17 51:6

**deputy** 39:17 40:8, 25 41:2,6,11,12,15 54:15,16

**describe** 11:2 14:3 17:11 28:7 42:2 44:17 45:15

**devices** 22:18 45:12

**Devon** 37:24

**diesel** 13:13

**difference** 29:2,13

**difficult** 59:12

**diploma** 11:4

**directly** 15:9

**disclosure** 60:23

**disclosures** 60:23, 25

**discover** 47:2 48:7

**Discovery** 47:2

**discussing** 16:2 38:21

**disposition** 12:2 49:25

**distance** 38:12

**document** 61:2

**documentation** 28:1

**documents** 46:14, 16 61:1

**dog** 15:2,4 17:1,9, 16,18,24 18:11,13, 16 19:2 20:25 21:2 23:18,20,22,24 24:1,5,7,16,19,20 25:4,6,24 26:3,16, 20 27:21 28:5,13 31:3 34:17 36:2,5,8, 11 38:5 42:11 50:17,24 51:2,22 52:2,14,17,23 55:12,15,24,25 56:16,21,24 57:20, 22

**dog's** 16:24 19:20 26:5,12

**doghouse** 22:1

**dogs** 15:24 16:11, 15,22 22:15 23:15 25:14 26:9 29:19,22 42:11,23 50:20 51:14 54:1 55:4,13 57:1

**door** 58:1,2,4,6

**Draco** 36:7,9,11,13, 20 38:8 42:19,20,23

**drink** 5:24

**driveway** 56:24

**driving** 50:25

**dropped** 11:5

**duty** 41:21

**dwelling** 9:22

**E**

**Earl** 7:25 8:4,19 9:3 21:20

**earlier** 29:7 42:10 52:16

**educational** 11:2 49:22

**elbow** 44:1,21

**electric** 57:12

**electronic** 22:18

**employed** 12:21 13:19

**employee** 14:10

**employer** 14:12

**employment** 11:12

**enclosed** 22:11,23 29:4

**enclosure** 22:11, 12,17 43:6,7,21 56:18,20

**end** 36:15 37:16 57:19

**ended** 14:18

EXHIBIT B

**enforcement** 14:20,23 54:21

**engine** 13:13

**entailed** 14:4

**essentially** 15:23

**etran** 62:13,16

**Eudaley** 39:17 40:10 54:15,16,22 55:2

**exact** 10:11 45:11

**EXAMINATION** 4:5 49:10

**examined** 4:4

**exchanged** 38:11

**excused** 62:18

**Exhibit** 48:17,20 51:6

**F**

**face** 59:15

**faces** 59:13

**fact** 52:2

**facts** 46:25 47:2,4 48:7

**fair** 5:18 18:16 26:3 32:2 42:12

**Fairdealing** 17:21, 23

**familiar** 41:23 50:12 51:18 59:7,19

**father** 8:7 9:15 18:14,21,25 19:20 20:25 21:6,8

**father's** 9:18 21:23 60:3

**father-in-law** 8:22 9:7 10:20 30:10 36:24,25 55:4

**father-in-law's** 8:24 18:11 22:2 25:21 26:10 36:8, 21,22 50:16 56:13

**February** 15:21

**feel** 5:23 8:13

**feet** 31:3 50:24

**female** 54:12

**females** 54:12

**fence** 22:18 57:12

**fenced** 22:6

**fight** 24:13 38:8

**fighting** 36:7 42:19

**fights** 23:15 29:18, 22

**figure** 57:22

**file** 61:4

**fill** 49:15

**finalized** 50:9

**find** 43:20

**fine** 8:16 10:17 31:25 33:10 48:6 62:8,17

**finish** 34:20

**fire** 34:19

**flood** 8:7,20 10:5, 15 21:22

**follow** 49:17

**form** 16:1 46:24

**found** 11:15 20:18

**Fox** 17:21 18:4 28:17,25

**frame** 9:12 10:20 14:16 32:1,6

**free** 22:8,23

**friend** 19:1 32:8

**friend's** 19:7

**friends** 31:17,20,25 32:5,7,13,16

**front** 43:11,12,14, 24 44:1 55:25 56:25 58:15,21,23

**fur** 17:11 28:7

**fused** 44:21

**G**

**gas** 13:13

**gave** 18:21 61:4

**GED** 11:8

**general** 38:20 40:21

**generally** 14:3

**gentleman** 50:12 59:4,11

**girl** 54:6

**give** 46:17 54:7 56:3

**giving** 61:25

**government** 15:9

**grade** 11:6

**Grassham** 20:2

**great** 5:21

**greatly** 62:6

**Greg** 19:8

**ground** 43:22

**Group** 14:13,14

**growing** 31:22

**guess** 36:7

**guilty** 11:15

**gun** 35:1

**gunshots** 30:23,24 34:6,9

**guys** 14:7 37:10 57:22

**H**

**H-U-F-F-M-A-N** 7:14

**half** 14:15

**hand** 34:17

**handed** 41:11

**happened** 44:25 53:6,14,23

**happening** 38:20

**happy** 16:8

**head** 25:8 35:2 46:11

**healed** 45:18

**hear** 24:25 25:7 57:19 58:4

**heard** 24:11 25:5 30:23,24 34:6,7,9 36:9,10 43:1

**hearing** 34:9 39:7 49:25

**heartworms** 53:10

**helper** 17:16 28:13

**Hicks** 18:3,5,6

**hiding** 43:6,18

**high** 11:3,4,5

**highest** 11:6

**home** 7:24 8:5 10:7 12:24 34:5 45:8 55:5

**honestly** 61:3

**house** 9:24,25 10:19 25:2 30:13,16 32:9,11,18,23,25 33:2,21 34:2 36:21, 22 43:12,13 56:1, 10,13,25 57:23,25 58:15,21,24

**housebroken** 23:9

**Huffman** 7:10,12

**human** 30:4,5

**husband** 33:7

**I**

**idea** 36:12 55:1,2

**identification** 48:18 51:7

**identified** 52:2

**identify** 51:2 55:24 56:15

**Illinois** 7:23

**imagine** 4:17

**Immediately** 30:12,15

**incident** 8:2,8,25 9:8,12 15:20,24 16:12 21:19 23:12, 14 28:10,20 29:17, 21 30:1,3,7 33:15 34:1 35:24 39:23 41:21 42:5 44:9 45:24 47:23 50:22 51:12,13,19 52:16 53:1,4,21 54:16 55:6 56:8,11 58:13, 18

**incidents** 12:13,16 25:23 42:22 55:12

**industrial** 11:11 15:18

**influence** 6:12

**initial** 60:22 61:11

**injured** 16:11 43:25 52:22,25 53:3

**inside** 23:7 40:19 41:6,8 44:3

**instructing** 48:13

**intend** 61:1

**intended** 47:2

**interact** 42:5

**interacted** 39:24 40:12

**interacting** 43:10

**interactions** 50:19

**interfere** 6:14

**interrogatory** 48:21

**investigating** 34:22

**involve** 51:14

**involved** 23:15

EXHIBIT B

**involving** 15:24 51:11,12

**Irrelevant** 15:15

**issue** 8:2 29:17

**J**

**jacket** 60:7

**Jacob** 37:24

**jail** 12:5

**jeans** 59:4 60:7

**Jeff** 20:7 37:3 59:10

**Jennifer** 6:20

**Jim** 55:20

**job** 13:25 15:11

**jobs** 13:23 15:12

**jump** 30:25 49:14

**Justin** 40:10

**K**

**Kailee** 37:24

**Kayser** 49:6,11,12 51:16,18 52:8,13 55:19,23 56:5,9 60:12,16 61:10,15, 18,22 62:8,14

**Keene** 20:7

**keeping** 38:22

**Kennel** 17:5 27:21

**kids** 9:4 21:23 37:19 38:2

**kids'** 37:21

**killed** 16:22 53:19

**killing** 16:15

**kind** 12:16 13:12 17:1 20:25 21:2 24:5 26:16,20 35:7, 11 36:11 38:9,14 43:24 45:12

**Kirksville** 14:5

**knew** 21:15 38:21 54:17

**knowledge** 23:14 39:23

**Kylea** 37:24

**L**

**law** 4:22 14:20,23 54:21 61:18

**Lawn** 13:17

**lawsuit** 4:14 8:2 15:21 26:3 29:18 33:16 49:13

**laying** 31:3 43:21

**leash** 57:5

**leashes** 22:19

**left** 43:19 46:13

**leg** 43:25

**legal** 47:11,13,14, 25 48:4,5

**legs** 5:25 43:23 46:1

**liability** 47:17

**life** 13:22

**light** 56:10

**lights** 35:16

**litter** 53:15,17,20 54:1

**litters** 53:11,14

**live** 7:15,19,22 21:19 33:13 50:6

**lived** 8:22 9:13 21:22 23:18 36:14 59:10

**lives** 9:3 19:15 55:2

**living** 8:1 9:16 10:20,23 20:1 26:10 41:18 55:5 56:10

**local** 14:2 15:8 54:21

**located** 20:23

**location** 9:13 10:13

**long** 6:24 8:4,14 10:12 13:19 14:14 45:20

**longer** 19:1 54:24

**looked** 61:3

**lost** 15:16

**Lots** 11:11

**loud** 39:4

**loudly** 39:1

**Louis** 14:2

**lower** 27:18

**M**

**M-E-S-E-Y** 4:10

**M-E-S-T-E-R** 9:21

**made** 11:6

**Main** 20:9

**make** 23:1 44:21 47:13 48:4 53:24 54:3

**making** 5:5 15:16 34:17

**males** 54:12

**marked** 48:17,20 51:6

**married** 6:17,25

**Max** 16:25 21:17, 20,22 22:1,8 23:5,7, 9,11,14 24:11,16 26:1,9 29:4,7,11,15, 24 34:13 35:1,25 38:7 42:18,25 43:5, 11 44:25 45:1 52:17,22,25 53:15, 16,19 54:8 57:25 58:3 61:11

**Max's** 26:7 44:25 54:1

**means** 39:2

**mechanic** 12:22 13:12

**Mechanic/ detailing** 20:5

**medical** 6:11

**medication** 6:13

**meet** 31:16 33:2

**meeting** 31:14

**mentioned** 9:4

**Mesey** 4:2,8,9,10, 11 6:10,20 16:9 47:18,22 48:8,11, 14,19 49:1,12

**Mester** 9:19

**Michael** 7:5,9 9:17, 19

**Midwest** 14:13,14

**military** 14:25

**mine** 4:14 50:25

**minutes** 55:23

**misdemeanor** 11:17

**Missouri** 7:25 9:10 14:6 17:21 20:3

**Misstates** 42:13 52:4

**mix** 55:8,9

**mixed** 24:6 55:10

**moment** 38:15

**money** 27:4

**months** 25:18 26:19 53:6

**months'** 11:24 12:4

**morally** 47:19,21

**morning** 44:8,12

**mother** 18:14,22 20:10,17,19 21:2,7, 9 22:16 26:7

**motor** 13:15

**motorcycle** 50:23

**Mountain** 28:22,24 44:15

**mouth** 13:10 22:25

**move** 45:13

**mowers** 13:17

**municipality** 15:8

**N**

**names** 6:4 7:4 37:21,23

**nature** 42:2

**needed** 34:19

**neglect** 49:22

**negotiations** 27:14

**neighbor** 24:3 25:23 50:16 52:14, 20

**neighbor's** 25:24 52:17,22

**Nervous** 39:6

**nights** 44:24

**Nina** 26:6,7,9,16, 18,20 27:14 29:3, 14,18,21 30:3,4 43:1,2,4,18 44:12 45:3 53:3,6,11 57:25

**Nina's** 46:5 53:20

**nipping** 50:24

**nods** 25:8 35:2

**Nonresponsive** 8:10 24:14 32:17 36:17

**noon** 44:11

**noted** 51:16

**November** 6:9

**O**

**oath** 4:19

**objecting** 61:25

**objection** 8:10 15:15 16:1,16,18

EXHIBIT B

24:14 27:9 32:17,19
33:3 36:17 42:13
46:24 47:6,21,24
51:11,16 52:4

**observe** 35:23 36:2

**observed** 40:24

**observing** 34:25
38:4

**occupying** 35:8

**occur** 33:18 44:10

**occurred** 8:25 9:8
21:22 25:17

**officer** 14:21 16:14,
22 31:2,5,6,8,10
39:18,19,24 40:4,18
41:1,8,10,20 43:2,5
52:15 56:7

**officer's** 59:12

**officers** 39:9,13

**offspring** 21:17

**on-the-job** 11:13

**open** 43:13

**option** 27:4

**orders** 48:15

**ordinary** 5:1

**organization**
27:22 28:3

**outcome** 50:9

**Overbroad** 47:6

**overnight** 44:23

**oversee** 44:4

**owned** 8:5,19 24:1
53:12

**owner** 25:4,6

---

**P**

**p.m.** 49:8,9 62:18

**paid** 18:18 19:22
20:10 46:5,9,10,19

**painting** 15:18

**papers** 21:8,10
27:1,5,7,15,16

**parents** 18:17,20

**parked** 58:20

**part** 43:12 46:19

**partial** 46:9

**pass** 26:18 49:4

**passing** 40:2

**Past** 31:22

**patrol** 40:6,16

**pause** 56:2,9

**pay** 19:19 20:17
27:15

**paying** 46:20 59:2

**pending** 49:19
50:8

**people** 5:1,4 13:3,4
37:9,12,14,16
39:11,12

**people's** 59:13

**period** 8:6,15,21

**person** 59:14

**personal** 35:17,19

**Phillips** 4:6,11
8:13,16,19 15:19
16:5,7,21 24:16
27:13 32:21 33:5,10
36:19 42:17 47:3,4,
7,9,14,17,18,22
48:1,8,14,19 49:4
54:14 60:20,25
61:8,25 62:15

**Phillips'** 49:16

**phone** 57:18

**phrase** 29:3

**phrased** 16:17
48:12

**physically** 34:24

**pick** 20:14 33:22

**picked** 44:3

**picking** 33:19,24

**place** 8:1,8 18:23
22:2 33:12

**Plaintiff** 4:3

**play** 56:1

**pled** 11:15

**point** 5:22 10:25
24:22 34:3 37:12

**police** 14:20 35:5,
14,21 39:9,18,19,24
41:1 43:19 51:4,19
52:15 56:6 58:10,
16,17,23 60:9,16

**poorly** 5:13

**Poplar** 18:7

**Portia** 49:12 62:7

**portion** 52:9

**possibly** 44:22
61:2

**pounds** 17:14
28:11

**prescriptions** 45:8

**pretty** 5:11 10:9

**price** 27:7,8,15,16,
18

**prior** 23:14 25:18
29:17 30:12,15 34:9
39:23 42:22 52:25
53:4 54:16

**probation** 11:24
12:5,7,8

**proceedings** 49:8

**processed** 51:23

**produced** 4:3

**property** 57:13

**provided** 46:16
56:6

**pry** 6:10

**pull** 24:22

**pup** 54:11

**puppies** 18:15
53:14,23,25 54:7

**pups** 54:3

**purchase** 27:14

**purchased** 18:17

**purebred** 21:12
55:8

**put** 14:9 22:25

**putting** 6:23

---

**Q**

**question** 5:12,14,
17,19 6:24 8:11
15:17 16:4,6,8,10,
19 24:15 27:3,10,11
32:4,18,20 36:18
41:2,8 42:15 46:25
47:1,10,15 51:24
52:6 57:7 58:21

**questioned** 40:23
41:3,6

**questioning** 49:16

**questions** 4:16,17,
18 5:10 6:15 48:4,5,
10,12,13 51:12
54:15 62:9

**quick** 49:6

**quickly** 5:11

---

**R**

**R-E-C-T-O-R**
19:12

**re-** 10:7

**read** 51:8 52:8,9
62:11

**reading** 51:10

**reason** 18:8 41:20

**recall** 45:11 50:2

**receive** 21:9

**received** 61:20

**recliner** 34:7

**recognize** 58:8
59:11,14,24

**recollection** 52:20

**recommending**
47:9

**record** 5:5 6:3
20:15 51:11 52:9
60:14

**recover** 45:21

**recovered** 45:22

**Rector** 19:10,13,
15,17,19 21:11

**red** 59:19

**reduced** 50:4

**refer** 46:14

**reference** 13:3

**referenced** 29:7

**references** 26:3

**referred** 12:13

**refresh** 52:19

**registered** 17:3
27:21

**regular** 17:18
28:15

**relate** 61:2

**related** 13:14 50:20

**relationship** 42:2

**released** 45:6

**remember** 9:7
10:11,15 11:21
12:2,4,6,11 18:20
19:22 20:6,8,21,23
25:16 31:14 35:6,7
36:13,19 37:2,4
40:21 41:10 45:10
61:3 62:1,4

**remodel** 14:6

**remodeling** 10:8

**repeat** 16:10,20
42:16 52:7

**rephrase** 5:15
16:3,9 46:25

**report** 51:19 52:5

EXHIBIT B

Robin Mesey

**reporter** 52:10
62:12,16

**represent** 4:12
48:21 49:13 61:23

**represented** 21:11

**request** 61:18

**requested** 52:9

**requires** 60:23

**residence** 8:24
21:20,23 23:7
25:20,21 26:10
29:10 30:9 40:20

**responded** 56:7

**restrained** 57:10

**restroom** 5:24

**review** 48:22

**reviewed** 49:1

**reviewing** 48:23

**Richard** 41:23

**rid** 14:8 53:16,25

**riding** 50:23

**road** 31:4 61:11

**roam** 22:8,24

**roaming** 22:20
23:24 24:8,9

**Robbie** 7:7,9,18
9:17

**Robin** 4:2,8 51:8

**roof** 56:19,21

**Roper** 16:14,22
31:6,8,10 33:12,22,
25 34:3,13 35:5,7,
25 37:9,19 38:6
39:5 41:18,20
42:10,17 43:2,5,11
49:13 51:15 58:12
59:16

**Roper's** 33:21
36:25

**Ropers** 31:18 32:1,
5,25 33:5 35:22
38:2,18 41:13,16

**Ropers'** 32:9,23

**roughly** 10:15
45:20 46:12

**Rule** 60:25

**rules** 48:7

**run** 56:16,17

**running** 51:11

---

**S**

**save** 44:20

**scene** 30:13

**school** 11:3,4,5
31:23

**SCHOTTEL** 8:10,
14,18 15:15 16:1,16
24:14 27:9 32:17
33:3,6 36:17 42:13
46:24 47:6,8,11,16,
21,24 48:3,12 51:8
52:4 55:21 56:2
60:14,18,21 61:6,
14,17,21,23 62:3,
11,17

**scope** 48:7

**screaming** 39:1

**scuffle** 52:22

**scuffles** 55:13

**seat** 12:17

**seeking** 46:25

**self-employed**
12:25

**sell** 54:8,10

**send** 45:8

**sentence** 12:5

**service** 12:8 14:13,
14

**set** 27:7,8 49:24

**settled** 40:19

**shelter** 22:2,13
29:4

**sheriff** 41:23 42:1,8

**sheriff's** 39:17
54:24 61:16

**shoot** 36:5

**shooting** 16:14

**short** 8:6

**shot** 16:22 34:20
38:7 42:18 43:2
51:15 56:15

**shots** 17:24,25
34:7

**show** 17:9 28:5
39:14 48:19 55:17

**showed** 39:16 40:8

**showing** 39:10,13

**sick** 53:8,9

**side** 22:4 38:14,16
39:7 43:13,15,16

**sidearm** 34:16,23,
25 36:4

**similar** 27:22

**Sir** 62:9

**sit** 47:12

**situation** 38:12
40:23

**small** 31:13 39:25

**Smith** 50:13,15,17,
19 52:3 55:15

**sniffling** 23:21

**socialized** 31:18
54:18

**Sold** 54:9

**solid** 44:21

**son** 32:12,15 33:20,
22,24 57:6

**son's** 59:23

**sort** 13:7 22:1
45:13

**Sounds** 10:9

**speak** 5:1,6,8 40:18
41:15

**speaking** 37:8 59:3

**specialized** 17:15
28:12

**specific** 12:2

**speech** 5:1

**speeding** 12:17

**spell** 7:13 9:20
19:11 37:6

**splint** 45:16

**split** 25:13

**spoke** 19:17 40:20
41:12

**spoken** 38:6 39:25

**spot** 6:23

**spouse's** 6:19

**St** 14:2

**standing** 34:16,25
36:3 57:18

**start** 24:22 30:20,
22

**started** 14:18 24:19
39:9,13

**starting** 24:17

**state** 4:7 7:4 51:10

**stated** 6:3

**statement** 57:19

**stay** 22:22 23:3,5,7
29:3,6,10 44:23

**stayed** 8:7 22:13
44:24 45:17

**staying** 10:5

**step** 30:16,20,22,25

**stepchildren**
37:18

**Stephens** 41:23
42:8

**stepped** 38:14

**steps** 29:14,15

**stories** 10:1

**street** 7:25 8:4,19
9:3,9 20:9 21:20
23:18 30:9 31:2

34:4 35:10 36:15
37:16 50:23 59:10

**stretch** 5:25

**stuff** 11:11,13

**subject** 15:17
16:18 32:19 33:9
42:15 51:13 52:6

**subpoena** 61:17

**substance** 6:13

**sued** 4:13

**suggests** 48:9

**Sunshine** 61:18

**supportive** 45:12

**supposed** 21:9

**surprised** 5:3

**survived** 54:5

**SUV** 35:18 59:20,24

**switched** 18:8

**sworn** 4:3

---

**T**

**T-SHIRT** 59:5

**talk** 5:4,5 30:7 53:1

**talked** 42:25 52:16

**talking** 15:20 31:5
33:15 36:24 37:19
39:1

**teenager** 13:21

**teenagers** 31:22

**tells** 38:6

**ten** 8:5 54:2

**tendency** 5:1

**tense** 31:22

**Tenth** 11:7

**testified** 4:4

**testimony** 42:14

**theft** 11:17

**thing** 13:8 45:13,16

EXHIBIT B

**things** 34:12

**thinking** 29:3

**thought** 8:14 44:19 50:25

**thousand** 14:17

**ticket** 12:17 51:23

**tickets** 11:17

**time** 5:22 8:6,15,21 9:12 10:20,25 13:25 14:16 19:17 21:6 22:22 23:11 28:9 32:1,6,8 39:9 41:21 44:9 53:12 55:5,22 56:11 60:21 62:3,10

**times** 5:12 33:19

**today** 4:16,21 5:22 6:15,21 53:1

**token** 5:17

**told** 38:8 42:10

**top** 35:16 46:11

**town** 7:22 31:13 40:1

**traffic** 11:17 12:13, 16

**trailer** 22:21 29:6 43:7

**trainer** 15:2

**training** 11:10,11 14:23 17:15 28:12

**treat** 44:5,18

**treatment** 46:5

**Truman** 14:5

**truth** 4:22

**Tuesday** 49:24

**turn** 60:18 61:6,9 62:5

**turned** 7:6

**tussle** 24:11 25:5

**type** 9:22 11:13 45:16

**U**

**Uh-huh** 10:10 19:4 20:11 40:3 47:8 56:19 57:21

**understand** 4:13, 19,21 6:14,17 12:1 15:23 16:3,7 27:20 44:16 52:12

**understanding** 15:19 21:4 27:13 44:17 46:12

**understands** 16:5

**understood** 5:19

**unemployed** 11:1

**unfolding** 30:13

**unhappy** 15:24

**uniform** 35:5 40:4, 14 60:9

**uniformed** 40:18

**unpaid** 46:13

**unrestrained** 23:24 51:22

**upset** 38:10,11

**V**

**vague** 16:2,16 33:3 47:6

**Van** 4:12 7:25 8:21 9:10 15:6 20:2 39:18,19,24 40:18 56:6 58:10,16,17 59:1 60:16 61:13, 21,22,23

**vehicle** 33:23 35:7, 9,11,14,17,19 40:6, 16 58:8,12,14,17, 18,23 59:18,22,24 60:2

**vehicles** 13:15 35:21 58:19

**versus** 29:14 45:24

**vet** 44:6,7,12,14,16,

23 45:1 46:7,19

**veterinarian** 17:18 18:1 28:15

**veterinarian's** 28:23

**veterinary** 18:6

**vets** 18:8 28:19

**victim** 52:3

**video** 55:18 56:6 57:16 59:4 60:15, 22,23 61:7,11,12 62:1

**View** 28:22,24 44:15

**visit** 18:9,10

**vocational** 11:10

**W**

**wages** 15:16

**Wahlberg** 37:5 59:10

**waiting** 33:23 34:19

**walk** 36:2

**walked** 43:20 46:1

**walking** 23:19 43:23

**walkway** 56:25

**wanted** 27:4 44:20

**watch** 36:2 55:21

**wearing** 35:5,6 60:4

**website** 13:7

**weigh** 28:9

**weight** 17:13

**white** 17:12 28:8

**wife** 9:4,14 19:24 21:23 24:11,25 30:17 31:17,20,21 32:7 33:6,19,21 37:18 38:10,18 39:3 42:8 46:20 50:8

51:21 52:1 57:15,20

**wife's** 9:15,18 32:8, 12

**wise** 11:12

**witnessing** 43:4

**word** 5:12 13:10 38:25

**worded** 5:14 27:3 32:4

**words** 22:25 38:11

**work** 12:22 13:3,4, 12 14:14

**worked** 15:2,4,6,8 20:8

**working** 10:7,19 20:2 41:21

**worried** 35:24 38:5

**written** 48:21

**wrong** 46:23 47:5, 19 48:10

**Y**

**yard** 22:4 23:19 43:11,21

**year** 10:14 12:5 14:15,19

**years** 8:5,20 19:18, 21 20:1 53:18

**yelling** 38:23,24,25 39:2

**young** 13:21

EXHIBIT B