ALONZO BRADWELL  10/30/2020

### Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MISSOURI
 3               SOUTHEASTERN DIVISION
 4
 5
 6   ROBIN MESEY and JENNIFER MESEY,  )
 7         Plaintiff,              )
 8   vs.                             )
 9   CITY OF VAN BUREN, MISSOURI, et ) 1:19-CV-71 SNLJ
10   al,                             )
11         Defendant.               )
12
13
14
15           DEPOSITION OF ALONZO BRADWELL
16           TAKEN ON BEHALF OF THE PLAINTIFF
17                  OCTOBER 30, 2020
18
```

PLAINTIFF'S EXHIBIT 5

### Page 2

```
 1                      INDEX
 2   QUESTIONS BY:                       PAGE
 3   Mr. Schottel                         7
 4
 5                    EXHIBITS
 6   EXHIBIT                             PAGE
 7   1                                    39
 8   2                                    39
 9   3                                    47
10
11       (Exhibits retained by Mr. Schottel.)
```

### Page 3

```
 1              CERTIFIED QUESTIONS
 2   Page 34, Line 7:
 3      Q. So when he came to you, what did he tell you?
 4      A. _____.
 5   Page 34, Line 25:
 6      Q. Did Charles Roper tell you who he was with on
 7   that day?
 8      A. _____.
 9   Page 35, Line 6:
10      Q. Did Charles Roper tell you that the dog tried
11   to attack his wife?
12      A. _____.
13   Page 35, Line 12:
14      Q. Did Charles Roper tell you on the day of the
15   incident he fired a warning shot before shooting at
16   the dog?
17      A. _____.
18   Page 37, Line 9:
19      Q. Okay. After the incident in question, did
20   you punish Charles Roper in any way?
21      A. _____.
```

### Page 4

```
 1              CERTIFIED QUESTIONS
 2   Page 45, Line 2:
 3      Q. Oh. And I guess my question was outside of
 4   just obtaining those records, did you do any kind
 5   of -- or did your department do any kind of
 6   investigation into defendant Roper's actions on that
 7   day?
 8      A. _____.
 9   Page 49, Line 4:
10      Q. Okay. So this says that Roper was not
11   disciplined by this defendant -- meaning you -- or the
12   City of Van Buren, Missouri as a result of any
13   incident involving plaintiff's dogs on February 22nd,
14   2019. Is that true?
15      A. _____.
```

### Page 5

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MISSOURI
 3                SOUTHEASTERN DIVISION
 4
 5    ROBIN MESEY and JENNIFER MESEY,  )
 6          Plaintiff,          )
 7    vs.                       )
 8    CITY OF VAN BUREN, MISSOURI, et ) 1:19-CV-71 SNLJ
 9    al,                       )
10          Defendant.          )
11
12           DEPOSITION OF ALONZO BRADWELL, produced,
13    sworn and examined on OCTOBER 30, 2020, between the
14    hours of eight o'clock in the forenoon and six o'clock
15    in the afternoon of that day, at the Phelps County
16    Courthouse, 200 North Main Street, Skyroom, Rolla,
17    Missouri  65401, before Sarah J. Pokorski, a Certified
18    Court Reporter and Notary Public within and for the
19    State of Missouri, in a certain cause now pending in
20    the United States District Court, Eastern District of
21    Missouri, Southeastern Division, between ROBIN MESEY
22    and JENNIFER MESEY, Plaintiff vs. CITY OF VAN BUREN,
23    MISSOURI, et al, Defendant; on behalf of the
24    Plaintiff.
25
```

### Page 6

```
 1              A P P E A R A N C E S
 2
 3    For the Plaintiff:
      Schottel & Associates
 4    James W. Schottel, Jr.
      906 Olive Street, PH
 5    St. Louis, Missouri  63101
      314-421-0350
 6    jwsj@schotteljustice.com
 7
 8    For the Defendant:
      Keck Phillips
 9    Ty Z. Harden
      3140 East Division Street
10    Springfield, Missouri  65802
      417-890-8989
11    ty@kpwlawfirm.com
12
13    Fisher Patterson Sayler & Smith
      Joshua C. Grumke
14    1010 Market Street
      Suite 1650
15    St. Louis, Missouri  63101
      314-561-3675
16    jgrumke@fpsslaw.com
17
18    Court Reporter:
      Sarah J. Pokorski, CCR
19    Missouri CCR No. 745
      Alaris Litigation Services
20    711 North Eleventh Street
      St. Louis, Missouri  63101
21    314-644-2191
      1-800-280-DEPO
22
23
24
25
```

### Page 7

```
 1         IT IS HEREBY STIPULATED AND AGREED by and
 2    between counsel for the Plaintiff and counsel for the
 3    Defendant that this deposition may be taken in
 4    shorthand by Sarah J. Pokorski, CCR, a Certified Court
 5    Reporter and Notary Public, and afterwards transcribed
 6    into typewriting; and the signature of the witness is
 7    expressly reserved.
 8
 9                      * * * * *
10
11         ALONZO BRADWELL,
12    Of lawful age, produced, sworn and examined on behalf
13    of the plaintiff, deposes and says:
14
15      (Starting time of the deposition:  12:11 p.m.)
16
17         DIRECT EXAMINATION
18    QUESTIONS BY MR. SCHOTTEL:
19      Q.  Could you state and spell your full name,
20    please.
21      A.  Alonzo Bradwell.  A-L-O-N-Z-O.  Last name
22    Bradwell.  B-R-A-D-W-E-L-L.
23      Q.  All right.  And can you state and spell your
24    current business address.
25      A.  P.O. Box 40, Van Buren, Missouri  63965.
```

### Page 8

```
 1      Q.  Is there an actual street outside of a P.O.
 2    Box for the department?
 3      A.  Due to the flood, we're in a disaster trailer
 4    still.
 5      Q.  Oh, okay.
 6      A.  So we have 1301 Main Street that we use for
 7    like UPS packages, which is next to City Hall.
 8      Q.  Oh, okay.
 9      A.  But outside of that, we -- no.
10      Q.  All right.  Thanks for the clarification.
11    I'm sorry.  What was the zip code of Van Buren?
12      A.  63965.
13      Q.  Okay.  Chief Bradwell, my name is James
14    Schottel, Jr.  I represent Jennifer and Robin Mesey in
15    this case.  It's against the City of Van Buren,
16    yourself, and Charles Roper.  I'm sure you're well
17    aware of that by now.  The case has been going on for
18    some time.  I'll be asking you a series of questions.
19    Try to speak up.  I usually talk low; but during
20    these, the court reporter's going to be taking
21    everything down.  And because of that, please try to
22    refrain from answering a question by nodding your
23    head, and voice your answer, even if it's a yes or no.
24    And uh-huh and uh-uhs don't look good on the
25    transcript, so I might ask you to -- say is that a
```

Page 9

1  yes, or is that a no. But hopefully once you get the
2  hang of it, we'll get beyond that. If you do not
3  understand a question, simply ask me to repeat it or
4  rephrase it, and I'll be happy to do that for you.
5  Sometimes us lawyers, our brains go faster than our
6  mouths, and the question sounds good to us inside, but
7  it doesn't come out the right way. Have you had your
8  deposition taken before?
9      A.  Yes.
10     Q.  About how many times?
11     A.  Roughly five.
12     Q.  Okay. And would that have been in relation
13 to your work as a law enforcement officer?
14     A.  Yes.
15     Q.  And would those roughly five depositions --
16 were those relating to criminal cases?
17     A.  Yes.
18     Q.  And a question I have to ask of everyone --
19 no offense -- are you presently under the influence of
20 any substance, drug, whether prescription or
21 non-prescription, that would affect your ability to
22 understand my questions or give testimony today?
23     A.  No, sir.
24     Q.  Did you review any documents, or photographs,
25 or anything else in preparation of your deposition

Page 10

1  today?
2      A.  Just information with my attorney.
3      Q.  I'm not talking about any attorney/client
4  discussions or anything. I'm talking actual physical
5  documents, pictures, or anything like that. Did you
6  take a look at anything?
7      A.  I believe I looked at the incident report
8  from the Carter County Sheriff's Department last week
9  when we were trying to figure out this -- when to do
10 this deposition.
11     Q.  Oh, okay. And are you talking about the
12 thick entire investigation file? Or just the report?
13     A.  Just the incident report.
14     Q.  Incident report. And do you remember who
15 authored that incident report?
16     A.  I believe it was Chief Deputy Justin Eudaley.
17     Q.  Okay. And who is he with?
18     A.  Carter County Sheriff's Department.
19     Q.  Okay. And what's your date of birth?
20     A.  11/6/1989.
21     Q.  And what's the highest grade of education
22 you've completed?
23     A.  Some college.
24     Q.  Okay. And who is your present employer?
25     A.  City of Van Buren, City of Eminence, City of

Page 11

1  Summersville.
2      Q.  And what was the one after Van Buren? Could
3  you spell that for us and the court reporter.
4      A.  City of Summersville.
5  S-U-M-M-E-R-S-V-I-L-L-E.
6      Q.  And what was the other one?
7      A.  Eminence? Is that -- that the one you're
8  asking me?
9      Q.  Yeah. Could you spell that.
10     A.  E-M-I-E-N-I-C-E. No. Hold on. Sorry. I
11 work there very rarely. So --
12         MR. HARDEN: You've got -- Eminence.
13 You've got it; right, Sarah?
14         MR. SCHOTTEL: I don't have it.
15         MR. HARDEN: E-M-M --
16         THE WITNESS: No.
17         MR. HARDEN: -- I-N-E-N-C-E.
18         MR. GRUMKE: It's one M.
19         MR. HARDEN: It's just one?
20         THE WITNESS: Yes.
21         MR. HARDEN: Oh, there you go.
22         MR. SCHOTTEL: See, that's what I was
23 confused about.
24         MR. HARDEN: Really? Got me. I know
25 that's where the Ozark Trail starts, somewhere around

Page 12

1  there. I always think I'm going to jump on it, and I
2  haven't yet. Sorry. But --
3          MR. SCHOTTEL: That's all right.
4      Q.  (BY MR. SCHOTTEL.) What kind of work do you
5  do for City of Eminence?
6      A.  Reserve officer.
7      Q.  Okay. And what kind of work do you do for
8  the City of Summersville?
9      A.  Reserve officer.
10     Q.  Okay. And can you briefly describe what it
11 is a reserve officer does, or --
12     A.  So the City of Summersville, if there is
13 someone who is unavailable to work -- for example, a
14 full-time employee -- a reserve officer would be
15 called in to see if they can work or cover that shift.
16     Q.  All right. How long have you been a reserve
17 officer for City of Eminence?
18     A.  Two years.
19     Q.  Same question. How long have you been a
20 reserve officer for the City of Summersville?
21     A.  Since 2013, I believe.
22     Q.  Okay. When did you first become chief of
23 police for the City of Van Buren?
24     A.  January 1st, 2019.
25     Q.  Did you work for the City of Van Buren Police

Page 13

1  Department prior to becoming chief?
2     A.  I did.
3     Q.  And immediately prior to January 1, 2019,
4  what was your position with the police department?
5     A.  Full-time officer.
6     Q.  Full-time officer?
7     A.  Yes, sir.
8     Q.  How did you become chief?  Was there an
9  application process?  Were you nominated?  Did you
10 have -- what were the steps?
11    A.  I had applied for it.  There was an interim
12 chief at the time.  I went through an interview with
13 the council and the mayor, and I was subsequently
14 appointed to the position.
15    Q.  At the time you interviewed, how many members
16 were on the council?  If you remember.
17    A.  The same as there are now.  There are four
18 council members and the mayor.
19    Q.  Okay.  When did you -- in what year did you
20 first begin working for the Van Buren Police
21 Department?
22    A.  In 2018, just -- just prior.
23    Q.  And did you start out as a full-time officer?
24    A.  No, sir.
25    Q.  No?  Okay.  What did you start out with the

Page 14

1  Van Buren Police Department?
2     A.  It was a part-time position as I transferred
3  from another agency over, and which quickly led into a
4  full-time position.
5     Q.  Okay.  So were you -- were you like a reserve
6  officer, or just a part-time officer?
7     A.  I was a part-time officer.
8     Q.  Okay.  And do you remember what month in 2018
9  that was?
10    A.  I don't.
11    Q.  What police department did you transfer from?
12    A.  I was the chief of police for the City of
13 Winona.
14    Q.  And why did you leave that position?
15    A.  We -- my family and I wanted to move to
16 Carter County.
17    Q.  Okay.  How long were you the chief of police
18 for Winona?
19    A.  Since 2014.
20    Q.  Is that -- you said that's Winona County?
21    A.  Winona city.
22    Q.  Winona city?  I'm sorry.
23    A.  In Shannon County.
24    Q.  Okay.  Did you hold other positions of
25 employment with the Winona City Police Department?

Page 15

1     A.  I held different ranks.
2     Q.  Right.  That's what I meant.
3     A.  Okay.
4     Q.  Sorry.
5     A.  The -- starting out, I was a reserve officer,
6  then a full-time officer, then the corporal, then the
7  chief of police.
8     Q.  And I'm not going to put you through the pain
9  of trying to remember which period you served when.
10 How about what year did you start working for the
11 Winona City Police Department?
12    A.  2012, I believe.
13    Q.  Okay.  And did you work for any other police
14 departments prior to Winona in 2012?
15    A.  I -- I can't remember if it was '12 or 2013
16 that I was a reserve at Summersville.  So there could
17 be employment record for Summersville --
18    Q.  Okay.
19    A.  -- as a reserve officer.  But other than
20 that, no.
21    Q.  All right.  And where did you attend the
22 police academy?
23    A.  Missouri State University, West Plains.  The
24 sheriff's academy.
25    Q.  Okay.  And in what year did you attend that?

Page 16

1     A.  From 2011 to 2012.
2     Q.  Okay.  And how long was that program?
3     A.  I believe it was 11 months.
4     Q.  Okay.  And I'm assuming you got your
5  certificate from there.
6     A.  Yes, sir.
7     Q.  And from 2011 to current, have you ever
8  worked any secondary positions?
9     A.  I don't understand the question.
10    Q.  Secondary positions means like bars,
11 restaurants, things like that where they may need
12 additional law enforcement officers outside of the
13 regular work.
14    A.  I -- I've never worked as an officer in
15 something other than a law enforcement agency.  No.
16    Q.  Okay.  It's more of a common thing in
17 St. Louis.  There's secondary and different, you know,
18 areas of -- wherever extra police might -- might be
19 needed in the social domain.  Like I said, bars,
20 restaurants.  So that's why I asked the question.
21    A.  Okay.
22    Q.  Wasn't trying to confuse you.
23    A.  We don't have that in our area, so I didn't
24 understand the question.
25    Q.  Okay.  No problem.  Well, that would make

4 (Pages 13 to 16)

Page 17

1  sense why you didn't understand.  Since you became
2  chief of police with the City of Van Buren, is one of
3  your duties to hire new police officers?
4      A.  Yes, sir.
5      Q.  And can you just briefly describe your
6  process for hiring new police officers.
7          MR. HARDEN:  And let me just go ahead and
8  make this statement now, just so we're clear, and --
9          MR. SCHOTTEL:  Well, I meant --
10         MR. HARDEN:  No.  You're good.
11         MR. SCHOTTEL:  -- involving with the
12 city --
13         MR. HARDEN:  No.  You're fine.  I just want
14 to put this on the record, if you don't mind.
15         MR. SCHOTTEL:  Sure.
16         MR. HARDEN:  For my sake, no one else's.
17 Today, Chief Bradwell was noticed in his official
18 capacity as the chief of police for deposition.  He
19 was not offered today or designated as a corporate
20 representative for the City or the police department,
21 and he's not testifying in that capacity today, and
22 plaintiff's counsel and I had that understanding.  I
23 just wanted to make sure that was on the record.
24 Thank you, Mr. Schottel.
25         MR. SCHOTTEL:  Yeah.  And that's why I

Page 18

1  wanted to clarify that wasn't -- I wasn't asking about
2  the city.
3          MR. HARDEN:  And you're not.
4      Q.  (BY MR. SCHOTTEL.)  Just your individual
5  process.
6      A.  Outside of police department?  Is that --
7      Q.  No.  Just as you're in your function as
8  sheriff, individually.
9      A.  I'm the chief of police.
10     Q.  Or I'm sorry.  I said sheriff.  My apologies.
11 As the chief, what is your hiring process?
12     A.  So I have, generally speaking, at that time,
13 being as I was just taking over, I -- my process then
14 was to look over application, check their POST license
15 to make sure that they're up to date on all their
16 training required by the State, and call references,
17 and then do an interview.  Then I would present it to
18 our council and mayor as either a recommendation, or I
19 would recommend an officer to go to work for me or not
20 to go to work for me.
21     Q.  Okay.  And Officer Charles Roper, was he on
22 the force at the time you became chief of police?
23     A.  No.
24     Q.  Okay.
25     A.  He had been prior to -- to me.

Page 19

1      Q.  Okay.  So Charles Roper was hired when you
2  were chief of police?
3      A.  Yes, sir.
4      Q.  Okay.
5      A.  As a training reserve.
6      Q.  Okay.  Training reserve officer?  Is that
7  what it was?
8      A.  Yes, sir.
9      Q.  Can you describe what that is.
10     A.  With initial training, we -- may I rephrase?
11     Q.  Sure.
12     A.  I would hire an officer who has met the
13 qualifications through the interview process for
14 on-the-job training.  If they make it through that, at
15 that point, they would be listed as a reserve officer
16 ready to be called in.  At that time, Mr. Roper was
17 still in training.
18     Q.  And when you say at the time -- at the time
19 of the incident subject to the case when he shot the
20 Meseys' dogs, he was a training reserve officer?
21         MR. HARDEN:  Just object to form.
22         THE WITNESS:  He -- he held that position.
23 Yes.  He was not training when that incident happened.
24     Q.  (BY MR. SCHOTTEL.)  Okay.  I guess that was a
25 bad question.  But that was the position that he held

Page 20

1  at the time of the incident in this case?
2      A.  Yes, sir.
3      Q.  All right.  Do you remember when Mr. Roper
4  began holding that position?
5      A.  I believe his oath of office was the end of
6  January, beginning of February, in that time frame.  I
7  can't remember the exact date.
8      Q.  Yeah.  I'm not --
9      A.  Okay.
10     Q.  -- trying to tie you down to an exact date.
11 Just --
12     A.  Yeah.
13     Q.  -- month -- yeah.  That was -- and the
14 process that you mentioned before about reviewing
15 applications and then presenting it to a council when
16 you go to hire an officer, did any of that happen or
17 occur before Charles Roper became a training reserve
18 officer?
19     A.  They were notified, and they had no
20 objections.
21     Q.  Okay.  How long is the training reserve
22 period?
23     A.  Then, it would have been at the
24 recommendation of full-time officers that he trained
25 with.  At that point, when they stated to me that they

**Page 21**

1  felt that he was ready to go back and be a reserve --
2  or to be a reserve, then I would do a ride-along
3  training with them --
4      Q.  Uh-huh.
5      A.  -- and quiz them on the streets, quiz them on
6  how-to on certain incidents.  And then they would be
7  put on the reserve list if I felt that they were ready
8  to do that.
9      Q.  Okay.  So you didn't have a specific time
10 frame.  What you're testifying to is that it's -- it's
11 on an individual, person-by-person basis.
12     A.  At the time, I was brand new to the
13 department as their chief, and there's a lot of
14 process that I was still working on to make official.
15     Q.  Okay.  And you said at that time.  So did you
16 change that aspect?
17     A.  I had completed what I was working on.  Yes.
18     Q.  Okay.  So by your testimony, is it fair to
19 say once you became chief of police, you kind of
20 reviewed everything, and had your own ideas on what
21 you wanted to assess, or how you wanted things to run
22 in the department?
23     A.  I think it's important for me to review
24 current policies and current procedures, budgets,
25 everything, before making a complete decision on any

**Page 22**

1  ideas that I do have.  I had plenty of ideas, but I
2  wanted to make sure it would match with the department
3  at the time.
4      Q.  Okay.  And if you had policies with respect
5  to police practices, did you have to present them to
6  the council or the mayor for approval?
7      A.  Yes.
8      Q.  Okay.  I'm sorry.  Bear with me just a
9  second.
10         MR. HARDEN:  You're fine.
11     Q.  (BY MR. SCHOTTEL.)  And you're familiar with
12 the -- the claims that the Meseys are making in this
13 case; are you not?
14     A.  Yes.
15     Q.  Okay.  The incident subject to this case
16 involved the shooting of the Meseys' dogs by Officer
17 Charles Roper.  Is that fair to say?
18     A.  Can you re-ask that question, please.
19     Q.  Okay.  The claims involved in this case are
20 the shooting of the Meseys' dogs by Officer Charles
21 Roper.  Is that a fair statement?
22         MR. HARDEN:  Just object to form.  Go
23 ahead.
24         THE WITNESS:  I would -- I would say that
25 the incident involved Charles Roper.  Officer implies

**Page 23**

1  to me that he was acting while on duty; and it was not
2  Officer Roper that was involved in this, in my
3  opinion.
4      Q.  (BY MR. SCHOTTEL.)  But Charles Roper?
5      A.  Yes.
6      Q.  And I'm sorry.  Even -- I didn't clarify.  By
7  your earlier testimony, he was not an officer anyway
8  with the department yet.  He was a training --
9      A.  He was a training reserve officer.
10     Q.  Training reserve officer.  When Mr. Roper
11 became a training reserve officer, was he given any
12 equipment to use by you or the department?
13     A.  I -- I do not believe so.  When -- when I
14 hear equipment, when it comes to a new hire, I would
15 say badge, commission card, vest, gun, things like
16 that.  I don't recall ever -- I know he didn't have a
17 badge, a commission card, or a department firearm.  In
18 regards to any other equipment, I -- I don't recall
19 that.  I don't know.
20     Q.  Okay.  What does -- what does an officer do
21 as a training reserve officer?
22     A.  They train with a full-time officer.
23     Q.  Okay.  Out on the streets?
24     A.  Yes.
25     Q.  Are -- when they're training out on the

**Page 24**

1  streets with a full-time officer, are they supposed to
2  be carrying a weapon at that time?
3      A.  Yes.  They're -- through the State of
4  Missouri, they're a law enforcement officer still.
5      Q.  Right.
6      A.  With us, they're training.  So thus, they can
7  still carry a firearm, as long as they have been
8  previously qualified, or still up to date with the
9  firearm requirements for the State for POST licensing.
10     Q.  And to the best of your recollection, at that
11 time when he was a training reserve officer, was
12 Charles Roper qualified to carry a weapon?
13     A.  He was.  He was qualified by the Ripley
14 County Sheriff's Office, where he also held a position
15 at that time.
16     Q.  Okay.  Now, as a training reserve officer,
17 did you or the department provide Charles Roper with a
18 gun to carry when he was out in the streets with a
19 full-time officer?
20     A.  No.
21     Q.  Were -- was a training reserve officer
22 required to purchase their own gun?  Or were they
23 given an option?
24     A.  As a training reserve, they're given -- I
25 mean, we don't have a firearm to give them.

Page 25

1  Q. Okay.
2  A. We have three Glock pistols at our
3  department, and those are used by our full-time
4  officers.
5  Q. Okay.
6  A. All other firearms for a training officer --
7  or trainee officer -- reserve officer -- we would have
8  allowed them to carry a firearm that they were
9  qualified with, but we did not provide one.
10  Q. In your opinion, and -- scratch that. In
11  your opinion, if a training reserve officer is on the
12  streets with a full-time officer, would it be -- would
13  it be the safest and best idea that the training
14  reserve officer do have a weapon to carry while on the
15  streets?
16      MR. HARDEN: Object to form.
17      THE WITNESS: In -- in most cases. Yes.
18  Q. (BY MR. SCHOTTEL.) When Charles Roper was a
19  training reserve officer, and when he was on the
20  streets with a full-time officer, do you know whether
21  or not he was carrying a firearm?
22  A. He was.
23  Q. Okay. And how do you know he was?
24  A. Because I approved it.
25  Q. Okay. And how did that approval process go?

Page 26

1  A. During the hiring process of the -- and
2  scheduling of the training reserve to go out with an
3  officer, I have to approve any equipment that they do
4  have with them. I approved his 1911 pistol that he
5  had been using for the Ripley County Sheriff's Office
6  and qualified with at that time.
7  Q. Okay. What about when it comes to handcuffs?
8  What's the position with respect to you and training
9  officers carrying handcuffs? Do you provide those, or
10  do they provide -- they get their own?
11  A. Only equipment that we have the capability of
12  providing would be a bullet-proof vest, a badge, and a
13  commission card, and uniforms, generally. Again, we
14  went through a flood, and lost most of our things, so
15  we were rebuilding at that time.
16  Q. Okay. Do you know if Charles Roper had
17  handcuffs as a training reserve officer?
18  A. He did.
19  Q. Okay. And would he have to get those
20  approved through you?
21  A. All his equipment that he carried was
22  approved.
23  Q. Okay. And outside of the handcuffs and the
24  pistol, did he get anything else approved through you?
25  A. It's -- the way you're asking me is difficult

Page 27

1  for me to understand. When I see a duty belt, it's
2  difficult to take so many things off. So his duty
3  belt and firearm as a whole was approved.
4  Q. Okay.
5  A. Okay.
6  Q. So you don't know specifically -- it could
7  have had mace, I guess, in it.
8  A. He did have mace. Yes.
9  Q. He did have mace?
10  A. I believe so. I'd have to -- again, I --
11  I -- that was a long time ago. I'd have to --
12  Q. Right.
13  A. -- I guess go back and try to see if I can
14  remember. I don't know.
15  Q. Yeah. But you would have kept a record of
16  that?
17  A. No.
18  Q. No? Okay. Based upon your sitting here
19  today, is there anything else that you can remember
20  that Charles Roper was carrying as a training reserve
21  officer?
22  A. I cannot recall.
23  Q. Okay. What about uniform? Do you remember
24  or not whether you had a uniform for him at that time?
25  A. I don't think we had a uniform. I cannot

Page 28

1  remember. But as a trainee, usually I would have the
2  trainees dress in a plain polo with khaki pants,
3  without any logos or anything like that on them.
4  Q. Okay.
5  A. But I don't remember exactly that situation.
6  Q. All right. Fair enough. At the time you
7  became chief, did -- did you require any new hires to
8  go through any kind of firearm training or any
9  exercises?
10  A. Our department does firearms training once a
11  year in the summer.
12  Q. Okay.
13  A. So on new hires, as long as they were
14  compliant with POST requirements for firearm hours,
15  then they would wait for our firearms qualification.
16  Q. Okay.
17  A. For Mr. Roper, he had completed his firearms
18  training out of Ripley County.
19  Q. All right. So if an officer -- or -- he
20  wasn't an officer. But a person like Charles Roper
21  who had previous law enforcement experience, you would
22  take that into consideration because he would have I
23  guess done certain things that you may have required
24  him to, but he had already done the previous --
25  A. I verified that he did complete those hours.

Page 29

1  Yes.
2  Q. Okay. But I wasn't trying to trick you or
3  just nail -- narrow it down to Roper. I was just
4  saying you, that's what you do generally when you look
5  at the new hires, or someone new you're bringing in.
6  A. Yes. I -- I verify to make sure they're
7  compliant with their POST licensing in the state, at
8  which point I go through their equipment, make sure
9  that I approve those. And if they are still in
10 compliance outside of our agency's firearms
11 qualification, then they will be made to wait for that
12 qualification.
13 Q. Okay. You referenced a duty belt. And I'm
14 not asking specifically to Charles Roper. But I've
15 seen duty belts. I'm not a police officer. So if you
16 could enlighten me, what kinds of equipment can a duty
17 belt carry?
18 A. Generally speaking, firearms, handcuffs, less
19 lethal devices, cell phone holders.
20 Q. Yeah.
21 A. You know, every duty belt's slightly
22 different, depending on the person.
23 Q. Now, way back in the day -- I'm dating myself
24 here. But they used to call it a night stick. But
25 there's different names for it now. Do you know what

Page 30

1  I'm talking about, with a handle that --
2  A. It's still a night stick.
3  Q. It's still a night stick? Okay.
4  A. There's different types of -- I think what
5  you're referring to would be an ASP, where it's
6  expandable, rather than fixed.
7  Q. Okay. So there's two types of them? One you
8  can expand --
9  A. I'm sure that there's plenty more --
10 Q. Probably more?
11 A. -- than two. But those are the --
12 Q. The ones you're aware of, or --
13 A. Yeah.
14 Q. Yeah. I envision the one with a handle.
15 A. Uh-huh.
16 Q. And it's one piece.
17 A. Right.
18 Q. So that's called a night stick?
19 A. Yeah. That's still what I call it.
20 Q. And my follow-up question was are your
21 officers allowed to carry a night stick if it's
22 approved?
23 A. A night stick that -- the way you described
24 the night stick?
25 Q. Either -- either one.

Page 31

1  A. Okay. They are allowed to carry expandable
2  batons. That's what's taught in the academy.
3  Q. Okay.
4  A. Usually.
5  Q. Is there any kind of training course or
6  anything that your department provides with respect to
7  mace?
8  A. No.
9  Q. Okay.
10 A. We personally do not do that. No.
11 Q. All right.
12 A. Can I clarify that, a little bit?
13 Q. Sure.
14 A. When I said we personally, I meant our
15 department does not have instructors that teach that.
16 Q. Okay. How did you first hear about the
17 incident with Charles Roper and the shooting of the
18 Meseys' dogs?
19 A. From Officer Dyer.
20 Q. And could you spell that.
21 A. D-Y-E-R.
22 Q. And is he with the Carter County Sheriff's
23 Department?
24 A. He's with my department.
25 Q. Oh, he's with your department. Okay. And

Page 32

1  how did he notify you about the incident?
2  A. By calling me on my cell phone.
3  Q. Okay. Did he call you on the same day it
4  occurred?
5  A. While he was on scene. He had just arrived.
6  Q. Okay. And did Charles Roper come to see you
7  immediately after this incident?
8      MR. HARDEN: Object to form.
9  Q. (BY MR. SCHOTTEL.) Scratch the immediately.
10     MR. HARDEN: Good.
11     THE WITNESS: Mr. Roper did come to see me.
12 Yes.
13 Q. (BY MR. SCHOTTEL.) And are you aware of what
14 happened with his weapon after the incident, after he
15 shot the dogs?
16 A. Everything from the point that I spoke with
17 the sheriff of Carter County, which was the phone call
18 after I spoke with Officer Dyer, I -- I relinquished
19 the -- we relinquished the scene over to the sheriff's
20 department. So I -- their procedures, I couldn't tell
21 you.
22 Q. Okay. Was the pistol -- or the gun that
23 Charles Roper shot the Meseys' dog with, was that the
24 same gun he was carrying on the streets as a training
25 reserve officer?

Page 33

1   A.  No.
2   Q.  Can you describe the differences of the guns.
3   A.  The information I read in the incident report
4   of the sheriff's department is that he used a
5   Springfield 45-caliber.  I approved a 1911 for him to
6   carry on duty.  He had a separate gun that I had
7   nothing -- I have no idea about, that he did not use
8   while under my care.
9   Q.  The one you approved, can you state that one
10  again.
11  A.  It was a 1911.  I -- I don't remember the
12  brand.
13  Q.  Oh, okay.  And a 1911 is just a handgun?
14  A.  Yes.  I believe it had a blue handle on the
15  1911, if I remember correctly.
16  Q.  All right.  With your training reserve
17  officers, do you give them any instructions of whether
18  or not to carry their gun when they're not working?
19  A.  At the time, there was a policy for reserve
20  officers -- and all officers, part-time, full-time --
21  to -- that they could wear a concealed firearm or a
22  firearm, as long as they had a badge and a commission
23  card.  With Mr. Roper, he was still in training, and
24  did not have a badge and a commission card.  And
25  because he was in training, we hadn't even made it

Page 34

1   that far --
2   Q.  Okay.
3   A.  -- to even have that discussion.
4   Q.  And you said after the incident, he did come
5   and talk to you after he shot the Meseys' dogs?
6   A.  Not immediately, but yes.
7   Q.  So when he came to you, what did he tell you?
8       MR. HARDEN:  All right.  So here's where
9   we're going to object, on the basis that any
10  information that Chief Bradwell obtained after he
11  received the call from Officer Dyer is privileged and
12  protected information as insurer/insured and
13  attorney/client privileged information, and the
14  material created or that he reviewed in the process is
15  also privileged and/or work-product protected,
16  including intangible work product.  Also,
17  communications between Mr. Roper and the police chief
18  are privileged and protected under the Garrity rule.
19  Therefore, Chief Bradwell, I will instruct you not to
20  answer this question or anything related to those
21  types of communications or material after you received
22  that call from Mr. Dyer.
23      MR. SCHOTTEL:  Can I have that question
24  certified for the court, please.
25  Q.  (BY MR. SCHOTTEL.)  Did Charles Roper tell

Page 35

1   you who he was with on that day?
2       MR. HARDEN:  Same objections.  Don't
3   answer.
4       MR. SCHOTTEL:  All right.  Have that
5   question certified for the court.
6   Q.  (BY MR. SCHOTTEL.)  Did Charles Roper tell
7   you that the dog tried to attack his wife?
8       MR. HARDEN:  Same objection.  Instruct you
9   not to answer.
10      MR. SCHOTTEL:  Have that question certified
11  for the court.
12  Q.  (BY MR. SCHOTTEL.)  Did Charles Roper tell
13  you on the day of the incident he fired a warning shot
14  before shooting at the dog?
15      MR. HARDEN:  Same objection.  Instruct you
16  not to answer.
17      MR. SCHOTTEL:  Have that question certified
18  for the court.
19      MR. HARDEN:  Can we go off the record for a
20  second.
21      (OFF THE RECORD.)
22      MR. HARDEN:  We're back on when he gets
23  done.
24  Q.  (BY MR. SCHOTTEL.)  Do you know whether or
25  not Charles Roper was married or not?

Page 36

1   A.  Yes.  He was married, to my knowledge.
2   Q.  Do you know his wife's name?
3   A.  I'm just drawing a blank.
4   Q.  Have you -- have you ever --
5   A.  Donna.
6       MR. HARDEN:  You got it.
7   Q.  (BY MR. SCHOTTEL.)  There you go.  Have you
8   ever met Charles Roper's wife?
9   A.  I believe at last year's Christmas party.
10  Q.  Okay.
11  A.  And maybe in passing, but --
12  Q.  All right.  Do you know where Charles Roper's
13  wife's father lived?
14  A.  Yes.
15  Q.  And where did he live?
16  A.  He lived at the end of Dale Street.
17  Q.  Okay.  Do you know who his wife's father
18  lived with?
19  A.  No, I don't.
20  Q.  Okay.  At the time of the incident, did you
21  know where the Meseys lived?
22  A.  I was told by Officer Dyer where this
23  incident occurred, and whose home they were at.  So at
24  that time, because of that, yes.
25  Q.  Okay.  And what street was that, if you

### Page 37

1  recall?
2  A. Dale Street.
3  Q. After the incident, did you put Charles Roper
4  on any administrative leave?
5  A. He was not able to finish his training. And
6  he was not able to be used as a call-in officer
7  pending the investigation from the sheriff's
8  department.
9  Q. Okay. After the incident in question, did
10  you punish Charles Roper in any way?
11  MR. HARDEN: Object to form. This is the
12  same objection in terms of privileges and protections.
13  But also, I would add that there's confidentiality and
14  privacy rules for employment files. I don't think
15  there's a protective order in place at this point.
16  And those types of issues directly fall under the
17  Garrity rule as well.
18  MR. SCHOTTEL: Well, we can agree that this
19  questioning could be -- this portion would be sealed
20  under the transcript, which would -- we don't need a
21  protective order for that. We can agree that this
22  question would be kept under seal in that way. If
23  it's filed with the court, it's filed under seal.
24  MR. HARDEN: I'll tell you what I'll do.
25  I'm going to instruct him not to answer, because I

### Page 38

1  don't want to waive any privileges or protections.
2  Okay. You can certify that one to the court. And if
3  there's a way that I can provide you the information
4  that you seek in that question in a non-privileged or
5  protected manner, I'll provide it to you.
6  MR. SCHOTTEL: All right.
7  MR. HARDEN: All right. Otherwise, we can
8  either get back to him, or we can get it from someone
9  else if necessary.
10  MR. SCHOTTEL: That's not the question. I
11  don't need to get -- if I want to ask the witness
12  questions, then I need this witness to answer
13  questions. And if you're instructing him not to
14  answer, then I have to have it certified by the court.
15  MR. HARDEN: Okay.
16  MR. SCHOTTEL: And we can bring it to the
17  court's attention.
18  MR. HARDEN: Okay.
19  MR. SCHOTTEL: So have that question
20  certified for the court.
21  MR. HARDEN: Thank you. I guess I should
22  incorporate by reference the same objections to the
23  same written discovery as well.
24  MR. SCHOTTEL: All right. We can go off
25  the record for just a minute.

### Page 39

1  (OFF THE RECORD.)
2  (PLAINTIFF'S EXHIBIT 1 AND 2 MARKED FOR THE RECORD.)
3  Q. (BY MR. SCHOTTEL.) I've just handed you
4  Plaintiff's Exhibit 1. And it's a -- a few different
5  documents combined to one for the ease of -- of this
6  deposition. Also, they're related. And your response
7  to a Sunshine letter. Could you identify Exhibit 1,
8  the top page, and what it contains.
9  MR. HARDEN: And I'll just object to form,
10  foundation and hearsay. Go ahead.
11  THE WITNESS: This is a records completion
12  form in response to your second page of information --
13  your request.
14  Q. (BY MR. SCHOTTEL.) And what else is after my
15  second page?
16  MR. HARDEN: I'll also object on the basis
17  this is discovery on discovery. Go ahead.
18  THE WITNESS: It's an officer narrative
19  report by Officer Dyer.
20  Q. (BY MR. SCHOTTEL.) And after -- after the
21  narrative report?
22  MR. HARDEN: And then I'm going to object
23  on the last -- object to any examination, testimony,
24  use or display of any Missouri laws or city codes or
25  ordinances on the basis that the court will instruct

### Page 40

1  the jury on the law, and that witnesses should not
2  testify about legal conclusions. Go ahead.
3  Q. (BY MR. SCHOTTEL.) Okay. This is -- those
4  are documents you provided to me. Correct?
5  A. I -- I believe so. I don't know if that was
6  its entirety. I'd have -- I don't know. I'd have to
7  look back at my records to show what I sent you. But
8  from what I can tell here from the document
9  description on this records completion form, it
10  appears to be so.
11  Q. Okay. And that's your signature on the first
12  page. Correct?
13  A. Yes.
14  Q. And so did -- you did receive the April 2nd,
15  2019 Sunshine law request from my office?
16  MR. HARDEN: Object to form. Again,
17  discovery on discovery and hearsay. Go ahead.
18  THE WITNESS: Yes.
19  Q. (BY MR. SCHOTTEL.) And in response, this
20  packet is what you returned to my office. Is that
21  correct?
22  A. Yeah. I believe I also made a phone call to
23  your office because I was confused.
24  Q. Right.
25  A. Because we didn't work the case. And so I

### Page 41

1  wanted to make sure I sent what you needed.  Yes.
2      Q.  Okay.
3          MR. HARDEN:  Same objections.
4      Q.  (BY MR. SCHOTTEL.)  Right.  And outside that
5  phone call, these are just the physical documents that
6  you have mailed.  Is that to the best of your
7  recollection?
8      A.  Yes.
9      Q.  And the one-page reporting officer's
10 narrative that you identified the list of items, the
11 offense slash incident report narrative, that was by
12 Officer Dyer.  Is that correct?
13     A.  Yes.
14     Q.  And is that the same Officer Dyer that called
15 you that you had mentioned earlier?
16     A.  Yes.
17     Q.  And you had also sent five pages of animal
18 regulations from the Van Buren city code.
19         MR. HARDEN:  Same objections.
20         THE WITNESS:  Yes.
21     Q.  (BY MR. SCHOTTEL.)  Why did you send the
22 animal regulations?
23         MR. HARDEN:  Same objections.
24         THE WITNESS:  Your request was lastly,
25 please provide any ordinances or local laws relating

### Page 42

1  to dogs in the City of Van Buren.
2      Q.  (BY MR. SCHOTTEL.)  Okay.  And at the time of
3  the incident of Charles Roper shooting the Meseys'
4  dogs, do you have any knowledge of whether the Meseys'
5  dogs were leashed or not?
6      A.  Prior to the incident, you said?  Is that
7  what --
8      Q.  Prior to the incident of Charles Roper
9  shooting the Meseys' dogs --
10         MR. HARDEN:  And I'll just --
11     Q.  (BY MR. SCHOTTEL.) -- do you have any
12 knowledge of whether or not the Meseys' dogs had
13 leashes on them?
14         MR. HARDEN:  So I'm going to object just to
15 the extent it might call for privileged or protected
16 information, and instruct you to answer to the extent
17 you know based on personal knowledge.
18         THE WITNESS:  I -- I don't recall.
19         MR. SCHOTTEL:  All right.  If you'd hand --
20         MR. GRUMKE:  What is that?
21         MR. SCHOTTEL:  Counsel --
22         THE WITNESS:  Want me to hand it to him?
23         MR. HARDEN:  Answers to interrogatories.
24         MR. GRUMKE:  Okay.
25         MR. HARDEN:  At the end of the windy

### Page 43

1  objections, you'll see a sentence or two that'll
2  actually provide an answer sometimes.  So if you see a
3  big block of objections, and you're looking at this
4  for review, you might look to the end of that
5  paragraph for an answer.  Help shorten your review,
6  probably.  You remember these?  Taking a look at
7  these?  All right.  So you ready to go?
8          MR. SCHOTTEL:  Oh, yeah.  He's looking
9  through them.  Just go through every page, and just
10 check the last page.  It's been a while.
11         MR. HARDEN:  Well, if you want to ask him
12 about something in particular, go ahead.
13     Q.  (BY MR. SCHOTTEL.)  And Plaintiff's Exhibit 2
14 I just handed you, those are your answers to
15 interrogatories in this case?
16     A.  It appears so.
17     Q.  And I know it's been quite a while ago since
18 you answered them.  I just wanted you to look at the
19 last page.  Is that your signature?
20     A.  Yes, it is.
21     Q.  Okay.  And does November 21st, 2019 sound
22 about right?  Almost a year ago --
23     A.  Yeah.
24     Q.  -- that you signed them.
25     A.  Sounds right.

### Page 44

1      Q.  You had mentioned that the Carter -- or
2  Carter County did the investigation with respect to
3  Charles Roper and the shooting of the Meseys' dogs.
4  Is that correct?
5      A.  Yes.
6      Q.  Did your department do any investigation into
7  Charles Roper's actions in shooting the Meseys' dogs?
8          MR. HARDEN:  So I'll object to the extent
9  that it calls for privileged or protected information,
10 including attorney/client, insurer/insured privilege,
11 work product, including intangible work product, or
12 calls for information materially protected by the
13 Garrity rule that we discussed earlier.  To the extent
14 that it's possible to answer the question without
15 divulging anything that might be privileged or
16 protected, you may answer, otherwise I'd instruct you
17 not to answer.  So --
18         THE WITNESS:  I did follow up when the
19 sheriff's department -- with the sheriff's -- by
20 reading the sheriff's department reports.
21     Q.  (BY MR. SCHOTTEL.)  And who did you follow up
22 with?
23     A.  The Carter County Sheriff's Department.
24     Q.  Anybody in the -- or do you know the name?
25     A.  I did a records request just like you did to

Page 45

1   me, and they sent that over to me.
2      Q. Oh. And I guess my question was outside of
3   just obtaining those records, did you do any kind
4   of -- or did your department do any kind of
5   investigation into defendant Roper's actions on that
6   day.
7      MR. HARDEN: Again, same objections as
8   before. Just immediately before. You may answer to
9   the extent you will not divulge privileged and
10  protected information. And I believe that by the
11  scope of his question, that would include before -- or
12  would include what Officer Dyer did. Right?
13     THE WITNESS: Okay. So outside of what
14  Officer Dyer has told me in that phone call, and
15  reading his report, and getting a records request from
16  the sheriff's department, I did follow up with those.
17  After that, take the advice of my attorney and not
18  answer any more of that substance of that question, I
19  guess.
20     MR. HARDEN: Yeah. Well done. Thank you.
21     MR. SCHOTTEL: All right. Have that
22  question certified for the court.
23     Q. (BY MR. SCHOTTEL.) In the city of Van Buren,
24  are there occasions where large dogs are running loose
25  in the city?

Page 46

1      A. We have received some calls of attacks.
2   Yeah.
3      Q. And what is the policy and/or procedure that
4   the department takes when it receives those calls?
5      MR. HARDEN: Just object to the extent that
6   the scope's vague.
7      THE WITNESS: Generally, if a -- a dog gets
8   out of a fence or off a leash, and they're running
9   around in the neighborhood, the on-duty officer would
10  attempt to make contact with the owner, and most
11  likely write a citation if it's -- sometimes they'll
12  get warnings. It depends on the situation. It's --
13  that's the end of that, I guess.
14     Q. (BY MR. SCHOTTEL.) Okay. What if the owner
15  is not near, or if it's a dog that's unidentified?
16     A. We're not a -- we're not animal control, so
17  we only enforce city ordinance by issuing criminal
18  summons, things like that.
19     Q. All right. Did you have an animal control
20  unit you could call to assist you?
21     A. Not at that time.
22     Q. Okay. Do you have one now?
23     A. No.
24     Q. When Charles Roper was -- have to look at the
25  term -- a training reserve officer? Is that correct?

Page 47

1      A. Yes.
2      Q. All right. How would his time be logged with
3   the department?
4      A. A time clock.
5      Q. Time clock? Okay.
6      A. With a time card.
7      Q. And would that go for every officer, no
8   matter whether you're a reserve, full-time, or
9   training?
10     A. In most cases, yeah.
11     MR. SCHOTTEL: Okay. One last exhibit.
12     (EXHIBIT 3 MARKED FOR THE RECORD.)
13     MR. SCHOTTEL: Thank you.
14     Q. (BY MR. SCHOTTEL.) And these are plaintiff's
15  second set of interrogatories to you. And flipping
16  through those, does that refresh your memory that you
17  had received those and answered those?
18     A. Yes.
19     Q. And on the last page, is that your signature
20  under verification?
21     A. Yes.
22     Q. All right. And on the third page, it's --
23  this one's not numbered. Some of the objections your
24  counsel stated here today are stated in the first half
25  of the answer. But then it says additionally, subject

Page 48

1   to and without waiving any objection --
2      MR. HARDEN: Object to the extent that your
3   question's going to be a conduit for hearsay and
4   privileged and protected information. We maintain our
5   privileges and protection. Move to strike any
6   testimony of counsel about this.
7      MR. SCHOTTEL: I'm just reading off his
8   answer.
9      MR. HARDEN: Which is hearsay.
10     MR. SCHOTTEL: How is it hearsay? It's his
11  answer.
12     MR. HARDEN: On that document, it's
13  hearsay. And we're maintaining our privileges and
14  protections, so -- go ahead.
15     Q. (BY MR. SCHOTTEL.) Okay. Beginning with the
16  word additionally, half down, could you read that
17  sentence.
18     MR. HARDEN: I'm going to instruct you not
19  to do that. I believe it would divulge the privileged
20  and protected information we've been trying to keep
21  privileged and protected throughout this deposition.
22     MR. SCHOTTEL: Well, it's been waived in
23  this answer to interrogatory.
24     MR. HARDEN: I think you think it's been
25  waived. I think it says subject to and without

**Page 49**

1   waiving, and then there's some responses there.  So
2   I'm going to instruct the deponent not to read
3   anything from there or respond from it at this time.
4       Q.  (BY MR. SCHOTTEL.)  Okay.  So this says that
5   Roper was not disciplined by this defendant -- meaning
6   you -- or the City of Van Buren, Missouri as a result
7   of any incident involving plaintiff's dogs on February
8   22nd, 2019.  Is that true?
9           MR. HARDEN:  Do not respond on the basis of
10  attorney/client privilege, insurer/insured privilege,
11  work product, and the Garrity rule.
12          MR. SCHOTTEL:  Have that question certified
13  for the court.
14          MR. HARDEN:  And that's what I meant by
15  some other means.  If you could be provided certain
16  information, we'll provide it.  You know what I mean?
17          MR. SCHOTTEL:  I don't know anything what
18  you mean --
19          MR. HARDEN:  Okay.
20          MR. SCHOTTEL:  -- or said today, so -- I
21  don't.
22      Q.  (BY MR. SCHOTTEL.)  Was Charles Roper a
23  reserve probationary officer?
24      A.  Yes.
25      Q.  And can you describe what a reserve

**Page 50**

1   probationary officer is.
2       A.  They're on probation until they finish their
3   training.  Or the other word would be reserve training
4   officer, or training reserve officer, however you want
5   to put the word training in by reserve.
6       Q.  And as you testified before, that's on a
7   case-by-case basis?
8       A.  I'm sorry?
9       Q.  On how long that lasts.
10      A.  At that point, it was.  I had just taken
11  over.
12      Q.  Sure.
13      A.  So yes.
14      Q.  If a Van Buren Police Department officer has
15  the appropriate credentials to carry a firearm, are
16  they allowed to carry a firearm when they are not
17  working with your department?
18      A.  So at this time, the officer -- anything they
19  do off duty that does not have to do with any law
20  enforcement equipment, we do not have any oversight on
21  something like that.  If it's related to the law
22  enforcement equipment that's provided or trained with
23  for their job with us, then it has to be approved by
24  myself, and they do need to make sure they have their
25  credentials, if -- I guess it would be situational,

**Page 51**

1   just generally speaking.
2       Q.  Right.
3       A.  It would have to be approved.
4       Q.  Have you ever talked to Donna Roper about the
5   incident of Charles Roper shooting the Meseys' dogs?
6       A.  No.
7       Q.  Have you ever spoke to the Meseys about
8   Charles Roper shooting their dogs?
9       A.  No.
10          MR. SCHOTTEL:  Okay.  I don't think I have
11  any further questions.  Thank you for your time.
12          THE WITNESS:  Do you want me to set these
13  back over there, or --
14          MR. HARDEN:  I can -- may I have these
15  copies?
16          MR. SCHOTTEL:  Yeah, you can.
17          MR. HARDEN:  And then --
18          MR. SCHOTTEL:  The originals that you have
19  go to the -- or can you initial them, and then I'll
20  probably keep them.
21          THE REPORTER:  Before I do that, if no one
22  else has any questions, can someone cover signature.
23          MR. HARDEN:  Oh, yeah.  So you have the
24  opportunity to take a look at this, review it, and
25  make sure that it's all basically transcribed

**Page 52**

1   correctly.  I think I'll recommend you just take a
2   look at it, and then we'll sign, basically.  Does that
3   sound good to you?
4           THE WITNESS:  Yeah.
5           THE REPORTER:  So I will -- are you
6   ordering a copy?
7           MR. HARDEN:  Yes.  You get it to us, we'll
8   get it to him.
9           THE REPORTER:  Okay.
10          MR. GRUMKE:  I'll take an eTran as well.
11
12      (Ending time of the deposition:  1:53 p.m.)

13 (Pages 49 to 52)

## Page 53

1  CERTIFICATE OF REPORTER
2  STATE OF MISSOURI   )
3              ) ss.
4  COUNTY OF PHELPS    )
5
6      I, Sarah J. Pokorski, Certified Court
7  Reporter within and for the State of Missouri, do
8  hereby certify that the witness whose testimony
9  appears in the foregoing deposition was duly sworn by
10 me; that the testimony of said witness was taken by me
11 to the best of my ability and thereafter reduced to
12 typewriting under my direction; that I am neither
13 counsel for, related to, nor employed by any of the
14 parties to the action in which this deposition was
15 taken, and further that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties thereto, nor financially or otherwise
18 interested in the outcome of the action.
19      Sarah Pokorski
20      Sarah Pokorski, CCR 745

## Page 54

1  Alaris Litigation Services
   711 North Eleventh Street
2  St. Louis, Missouri  63101
   Phone (314)644-2191 * Fax (314)644-1334
3
4  November 10, 2020
5
   Keck Phillips
6  Ty Z. Harden
   3140 East Division Street
7  Springfield, Missouri  65802
8
   In Re:  Mesey vs. City of Van Buren, Missouri
9
10 Dear Mr. Harden:
11 Please find enclosed your copy of the deposition of
   ALONZO BRADWELL taken on OCTOBER 30, 2020, in the
12 above-referenced case.  Also enclosed is the original
   signature page and errata sheets.
13
   Please have the witness read your copy of the
14 transcript, indicate any changes and/or corrections
   desired on the errata sheets, and sign the signature
15 page before a notary public.
16 Please return the errata sheets and notarized
   signature page to my office for filing prior to trial
17 date.
18 Thank you for your attention to this matter.
19
20
   Sincerely,
21
   Sarah J. Pokorski, CCR
22 Enclosures
23
   cc:  James W. Schottel, Jr., Joshua C. Grumke
24
25

## Page 55

1  STATE OF _____  )
                 ) ss.
2  COUNTY OF _____ )
3
4  I, ALONZO BRADWELL, do hereby certify:
5      That I have read the foregoing deposition;
       That I have made such changes in form and/or
6  substance to the within deposition as might be
   necessary to render the same true and correct;
7      That having made such changes thereon, I hereby
   subscribe my name to the deposition;
8      I declare under penalty of perjury that the
   foregoing is true and correct.
9
10
   _____
11
       ALONZO BRADWELL
12
13    Executed this _____ day of _____, ____, at
14 _____.
15
16 Notary Public:
17 My Commission Expires:
18
19 Signature page to:  James W. Schottel, Jr.
   ALONZO BRADWELL, OCTOBER 30, 2020
20 Mesey vs. City of Van Buren, Missouri

## Page 56

1  WITNESS ERRATA SHEET
   Witness Name:  ALONZO BRADWELL
2  Case Name:  Mesey vs. City of Van Buren, Missouri
   Date Taken:  OCTOBER 30, 2020
3
   Page #_____ Line #_____
4  Should Read: _____
   Reason for Change: _____
5
6  Page #_____ Line #_____
   Should Read: _____
7  Reason for Change: _____
8
   Page #_____ Line #_____
9  Should Read: _____
   Reason for Change: _____
10
11 Page #_____ Line #_____
   Should Read: _____
12 Reason for Change: _____
13
   Page #_____ Line #_____
14 Should Read: _____
   Reason for Change: _____
15
16 Page #_____ Line #_____
   Should Read: _____
17 Reason for Change: _____
18
   Page #_____ Line #_____
19 Should Read: _____
   Reason for Change: _____
20
21 Page #_____ Line #_____
   Should Read: _____
22 Reason for Change: _____
23
24 Witness Signature: _____
25